**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TAMARA SHANAHAN,** | |
| **PLAINTIFF,** | **Civil Action No. 2:21-cv-00595-TJS** |
| **v.** | |
| **ETHAN ALLEN RETAIL, INC.,** | |
| **KATE SAVINO,** | |
| **and** | |
| **ROBERT KALINA** | |
| **DEFENDANTS.** | |

## AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Tamara Shanahan, by and through her undersigned attorneys, Bell & Bell LLP, hereby files the following Amended Complaint and Jury Demand ("Complaint").

## PRELIMINARY STATEMENT

1.     This is an action for an award of damages, liquidated damages, punitive damages, attorneys' fees and other relief on behalf of Plaintiff Tamara Shanahan, a former employee of Ethan Allen Retail, Inc. ("Ethan Allen"). Ms. Shanahan was discriminated against and harassed on the basis of her age and disability and/or perceived disability, was retaliated against for her complaints of discrimination and harassment, and was retaliated against for seeking accommodations of her disability including her use of leave pursuant to the Family and Medical Leave Act, culminating in her wrongful termination on January 2, 2020.

2.      This action is filed pursuant to the Age Discrimination in Employment Act, 29 U.S.C. §

621, et seq. ("ADEA"), the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

12101, et seq., the Family and Medical Leave Act, 29 U.S.C. § 2611, et seq. ("FMLA")

and the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA").

## JURISDICTIONAL STATEMENT

3.      This Court has original jurisdiction of all civil actions arising under the Constitution,

laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331 and 1391.

4.      The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4), which

grants the District Court original jurisdiction in any civil action authorized by law to be

commenced by any person to recover damages to secure equitable or other relief under

any act of Congress providing for the protection of civil rights.

5.      This Court has supplemental jurisdiction over any Pennsylvania state law claims pursuant

to 28 U.S.C. § 1367.

6.      All conditions precedent to the institution of this suit have been fulfilled. On March 30,

2020, Plaintiff timely filed a Charge of Discrimination with the United States Equal

Employment Opportunity Commission ("EEOC"), which was dual-filed as a Complaint

with the Pennsylvania Human Relations Commission ("PHRC"). On November 13, 2020,

the EEOC issued a Notice of Right to Sue to Plaintiff.  This action was filed within ninety

days of Plaintiff's receipt of said Notice.  With respect to the PHRA claims herein, it has

been more than one year since Plaintiff dual-filed her Charge of Discrimination as a

Complaint with the PHRC.

## VENUE

7.   This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. §
     1391(b).

8.   This action properly lies in the Eastern District of Pennsylvania because the claims and
     significant activities associated with those claims arose in this judicial district, and
     Plaintiff was employed by and terminated by Defendant Ethan Allen in this judicial
     district.

## PARTIES

9.   Plaintiff Tamara Shanahan is a sixty-two-year-old adult female citizen and resident of
     Wilmington, Delaware and the United States of America.

10.  Ms. Shanahan is a qualified individual with a disability within the meaning of the ADA.

11.  Ms. Shanahan has had her disability for a period far in excess of six months.

12.  Ms. Shanahan's disability affects a major bodily function and substantially limits one or
     more major life activities.

13.  Defendant Ethan Allen is a manufacturer and distributer of furniture and home
     furnishings with several locations throughout the United States, including the one located
     at 100 Ridge Road, Suite 5, Chadds Ford, Pennsylvania 19317, where Plaintiff had been
     employed.

14.  At all relevant times, Defendant Ethan Allen is and has been an employer employing
     more than 500 employees.

15.  At all relevant times, employees of Defendant Ethan Allen acted as agents and servants
     for Defendant Ethan Allen.

16.     At all relevant times, employees of Defendant Ethan Allen were acting within the scope
        of their authority and in the course of employment under the direct control of Defendant
        Ethan Allen.

17.     At all times material hereto, Defendant Ethan Allen acted by and through its authorized
        agents, servants, workmen and/or employees acting within the course and scope of their
        employment with Defendant Ethan Allen and in furtherance of Defendant Ethan Allen's
        business.

18.     Defendant Kate Savino is a former Managing Director for Ethan Allen who aided and
        abetted discrimination, harassment and retaliation as alleged herein.  Upon information
        and belief, Ms. Savino is a citizen and resident of Philadelphia, Pennsylvania.

19.     Defendant Robert Kalina is employed by Ethan Allen as Manager Compensation &
        Benefits.  Mr. Kalina aided and abetted discrimination, harassment and retaliation as
        alleged herein.  Upon information and belief, Mr. Kalina is a citizen and resident of
        Milford, Pennsylvania.

20.     At all relevant times hereto, Plaintiff Tamara Shanahan was an "employee" of Defendant
        Ethan Allen within the meanings of the laws at issue in this suit and is accordingly
        entitled to the protection of said laws.

21.     At all relevant times hereto, Defendants each were an "employer" and/or "person" under
        the laws at issue in this matter and is accordingly subject to the provisions of said laws.

22.     During her employment, Ethan Allen regarded Ms. Shanahan as disabled.

23.     This cause of action arose out of transactions or occurrences that took place in whole or
        in part in Chadds Ford, Pennsylvania.

24. Defendant Ethan Allen does significant business within the Commonwealth of Pennsylvania.

25. This Honorable Court has jurisdiction over Defendants.

## FACTS

26. Beginning in 2005, Ms. Shanahan was employed as a Design Consultant for a franchise of Ethan Allen.

27. While employed by Ethan Allen, Ms. Shanahan performed her duties in an excellent and hardworking manner.

28. Despite her loyalty and consistent performance, Ms. Shanahan was harassed and discriminated against on the basis of her age and disability and/or perceived disability, and was retaliated against for her complaints about discrimination and harassment, and for seeking accommodations of her disability, including leave pursuant to the FMLA.

29. While employed by Ethan Allen, Ms. Shanahan required surgery that required her to take medical leave.

30. After her surgery, and continuously after her initial request for leave, Ethan Allen was openly hostile and aggressive toward Ms. Shanahan, forced her to return to work prior to being fully recovered in order to keep her job, failed to engage in a good-faith, interactive process with respect to accommodating Ms. Shanahan's disability, and set unrealistic expectations for Ms. Shanahan designed to set her up for failure upon her premature return from medical leave.

31. Ms. Shanahan began her employment with a franchise of Ethan Allen in or about 2005 at its location in Oklahoma City, Oklahoma.

32.  In approximately 2008, this location was purchased by Ethan Allen corporate and Ms. Shanahan continued to work there.

33.  While there, Ms. Shanahan received substantial praise and was consistently recognized as a top performer for her success and contributions to Ethan Allen.

34.  Ms. Shanahan was the top seller for Ethan Allen in Oklahoma for a number of years.

35.  Ms. Shanahan received the "Diamond Spirit Award" - awarded to the top seller in Oklahoma - in 2011, 2012 and 2013.

36.  Ms. Shanahan transferred to Ethan Allen's Chadds Ford Design Center, located in Chadds Ford, Pennsylvania, in 2014.

37.  Shortly after her transfer to Chadds Ford, Ms. Shanahan fell down the stairs and injured her foot.

38.  Nevertheless, Ms. Shanahan continued to diligently work, without interruption.

39.  Over the years, however, Ms. Shanahan's foot became exceedingly painful to the point where she found it too difficult to walk.

40.  In or about June 2019, it was determined by Ms. Shanahan's physician that her foot had been damaged from the fall and had healed incorrectly, requiring extensive surgery.

41.  On July 5, 2019, Ms. Shanahan underwent a seven-hour surgical operation requiring three (3) plates and twelve (12) screws to be placed in her foot.

42.  Ms. Shanahan had originally hoped to return to work on September 26, 2019.

43.  However, by letter dated September 18, 2019, Ms. Shanahan's operating physician directed that Ms. Shanahan was to remain out of work through November 11, 2019, with another recommendation to be made at that time.

44.   Based on the foregoing, Ms. Shanahan requested a short extension of leave of absence for her disability from September 24, 2019 through November 11, 2019.

45.   Ethan Allen then engaged in a pattern of sending threatening messages and setting arbitrary deadlines directed toward trying to force Ms. Shanahan out and intimidate her.

46.   While still on leave, on or about October 4, 2019, Ms. Shanahan was advised by Sheryl Ramey, Senior Benefits Specialist in Ethan Allen's Human Resource Department, that Ethan Allen would not hold her job for her, and that, unless she came back before they found a replacement, she would lose her job with Ethan Allen.

47.   By letter dated October 7, 2019, Bob Kalina, Manager Compensation and Benefits for Ethan Allen, stated that Ms. Shanahan's job protection under the FMLA ended on September 27, 2019, and that Ethan Allen would no longer hold her position open for her.

48.   Mr. Kalina further stated that, when Ms. Shanahan was cleared to return to work, she was welcome to apply for available positions posted at that time for which she was qualified.

49.   This was further reiterated on October 11, 2019, in an email from Ms. Ramey.

50.   In her email, Ms. Ramey stated that Ms. Shanahan's position could not be held open until November 11, 2019, but that once Ms. Shanahan was permitted to return to work, Ms. Ramey would reach out to the Ethan Allen to see if Ms. Shanahan's position or another position for which Ms. Shanahan was qualified was open.

51.   Ms. Shanahan was shocked by these emails, as she had been an excellent and dedicated worker for Ethan Allen for several years and was simply following the dictates of her physician so that her foot would properly heal.

52. Due to Ethan Allen's threat to replace her, and against her physician's recommendation, Ms. Shanahan pleaded to her physician that she be permitted to return to work earlier than he had advised.

53. By letter dated October 21, 2019, Ms. Shanahan's physician permitted Ms. Shanahan to return to work as of November 1, 2019, with certain accommodations, such as wearing a medical walking boot for a portion of the day, using a scooter as needed, and icing her foot periodically.

54. Ethan Allen strongly resisted Ms. Shanahan's return, claiming that her FMLA had ended and they were entitled to replace her.

55. Ms. Shanahan spent significant time and effort emailing Ethan Allen seeking to return to her position, and on several occasions requested reasonable accommodations to allow her to return to work as soon as possible.

56. She received no response to her several requests.

57. In fact, on October 14, 2019, Ms. Shanahan emailed Ms. Ramey to note her concern that her request for accommodations that would permit her to return to work was not being considered by Ethan Allen.

58. Notably, despite her repeated efforts to verify her return to work in November, Ethan Allen made Ms. Shanahan's attempts to return to work as difficult as possible, unreasonably changing the requirements and/or process for her to return, including with respect to Ethan Allen's requests for documentation from Ms. Shanahan's doctors.

59. Finally, after numerous emails and Ms. Shanahan's submission of a new doctor's note, Ethan Allen agreed to permit Ms. Shanahan to return to work on November 1, 2019 with a limited version of her requested accommodations.

60.    Although Ethan Allen permitted Ms. Shanahan to return to work, it discriminated against and harassed Ms. Shanahan, and retaliated against Ms. Shanahan for her request for accommodations and having taken FMLA leave, and, thereafter, for her complaints of discrimination and harassment.

61.    On her first day back on November 1, 2019, Ms. Shanahan was presented with a Return to Work Program Agreement (the "Agreement") setting forth Ms. Shanahan's mandated hours of employment, from 9:30 a.m. to 6 p.m., five days per week.

62.    Ms. Shanahan returned to work on a Friday.

63.    Despite Ms. Shanahan's previous schedule being Wednesday through Sunday, Ethan Allen changed her schedule to ensure that she would have to work five days straight, Friday though Tuesday, immediately upon her return from a four-month medical leave.

64.    The Agreement noted Ms. Shanahan's requested accommodations of the medical walking boot, use of a medical scooter, and icing of her foot periodically.

65.    Per the agreement, however, Ethan Allen determined, on its own, that such accommodations could last for only for one month, without any discussion or consultation with Ms. Shanahan's physician.

66.    Thus, Ethan Allen unilaterally mandated that such accommodations were only in place until December 1, 2019.

67.    The Agreement also stated that "Wages will be paid according to the Return to Work Policy," without attaching the alleged policy or providing further details regarding wages or the policy.

68.    The Agreement also contained a lengthy list of duties purportedly required of Ms. Shanahan as a Design Consultant, purposefully ignoring that Ms. Shanahan was a long

time, high performing Design Consultant who was well aware of her duties and responsibilities in that role.

69.     This list included, but was not limited to, driving, navigating stairs, navigating driveways and hills, navigating a two-story, 18,000 square foot design center, conducting full room surveys with bending and stretching and pushing and pulling furniture, and packing, lifting, and carrying various items.

70.     This list of duties, which emphasized physical labor, was clearly meant to intimidate Ms. Shanahan with respect to coming back to work with her disability, particularly where she had gone against her physician's recommendations to return to work earlier than advised.

71.     Ms. Shanahan objected to the one-sided and unilateral terms and conditions in the Agreement, but was told she must sign it on the spot.

72.     Due to the tone of the meeting, and because she felt that she had no other choice, Ms. Shanahan signed the document.

73.     Thereafter, Ms. Shanahan asked her Manager, David Golinski, several times to meet to discuss her concerns.

74.     Mr. Golinkski failed and/or refused to do so.

75.     Instead, two days later, on November 3, 2019, Ms. Shanahan was called into a meeting with Mr. Golinski, and via telephone, Kate Savino, Managing Director.

76.     At this meeting, Ms. Shanahan was given a letter with further "conditions" of her employment.

77.     Specifically, the November 3 letter stated that, while she was away, a customer failed to pay for part of its order and a drapery order was sold with errors, and that she now maintained a deficit of $3,988.33.

78. Thus, the next three months would be "non recoverable" for Ms. Shanahan.

79. The letter further stated that, to reduce the deficit that occurred, Ms. Shanahan would have to write a minimum of $58,121 for three months, achieve all her benchmarks, and conduct three home calls per week.

80. The letter ended by stating that, if Ms. Shanahan could not achieve the goals set forth in the letter, she would be placed on a written warning.

81. This letter was highly inaccurate and inappropriate.

82. There was no demonstration of any alleged "deficit" calculation in the amount of $3,988.33.

83. Moreover, the two alleged "errors" were not the fault of Ms. Shanahan.

84. With respect to the order for which the customer did not pay a part of the order, the client at issue had an agreement to pay, and Ethan Allen easily could have contacted her regarding the order for payment or instituted collection efforts – a practice followed in other Ethan Allen locations.

85. Regarding the alleged order error, Ms. Shanahan worked up to the day of her surgery to ensure that this order was settled and that the client had agreed to pay the required amount.

86. To the extent there was a mistake or issue that occurred while Ms. Shanahan was on leave, such mistake was not the fault of Ms. Shanahan and in no way should she have been required to make up payment for it.

87. Moreover, the "benchmarks" demanded of Ms. Shanahan were outrageously inflated and unattainable.

88.   Ethan Allen essentially mandated that Ms. Shanahan produce revenue more than 40% above quota, equating to an approximate average of selling $58,121 a month over the next three (3) months.

89.   This was an extremely difficult task in any normal situation, but particularly so upon an individual who had just returned from a lengthy medical leave, during a very slow time for business, as business had been very slow and November and December are historically slow months.

90.   Notably, Ms. Shanahan discovered that the Ethan Allen had recently relieved other employees of their quota requirement.

91.   With respect to Ms. Shanahan, however, Ethan Allen expected her to far exceed her quota immediately upon returning from medical leave.

92.   As with the Agreement, Ms. Shanahan disputed much of the letter and disagreed with the unfair and unattainable conditions and expectations set forth therein.

93.   Again, however, as with the Agreement, Ms. Shanahan was told that she must sign the document.

94.   Ms. Shanahan signed the document because she felt she had no other choice.

95.   In addition to the numerous unrealistic demands placed upon her immediately upon her return from leave, Ethan Allen engaged in other hostile and discriminatory practices designed to push Ms. Shanahan out.

96.   For example, Ms. Shanahan was not given any administrative support or any assistance or help regarding best practices or even an answer when Ms. Shanahan asked how other designers got business.

97.    Although Ethan Allen stated numerous times that it would help Ms. Shanahan achieve her goals, it did quite the opposite.

98.    Moreover, upon her return, Ms. Shanahan was informed that her computer, which stored all of her information, files, and client information, had to be taken away and sent elsewhere, but that another computer would be sent to her immediately.

99.    This was highly suspicious, as Ethan Allen regularly purchased new computers, and it was unclear why Ethan Allen needed Ms. Shanahan's used computer, particularly when she had all her data on that computer.

100.   Ethan Allen thereafter did not provide her a computer for at least a week, impeding Ms. Shanahan's ability to access emails, floor plans and other information necessary for her to do her work.

101.   When Ms. Shanahan finally did get a computer, it was broken, and Ethan Allen refused to help Ms. Shanahan set up her computer as it had been prior to her leave.

102.   Ethan Allen also gave away many of Ms. Shanahan's clients to other design consultants. Ethan Allen did not follow this practice with respect to other designers.

103.   Notably, Ethan Allen had not informed Ms. Shanahan's clients that she was out on medical leave, but rather, Ethan Allen told Ms. Shanahan's clients to pick another designer despite the clients' desire to wait for her return.

104.   These hostile and discriminatory acts made it even more difficult for Ms. Shanahan to attain the purposefully difficult goals that Ethan Allen had set for her.

105.   By email, Ms. Shanahan wrote to Mr. Golinski outlining her concerns of discrimination, harassment and retaliation.

106.   Specifically, Ms. Shanahan stated that she was disappointed about how she was being treated by Ethan Allen since her return, noting that she felt that she was being treated differently because of her leave and her request for accommodations.

107.   Among other things, Ms. Shanahan stated that she disagreed with many parts of the Agreement, including the duration of leave and her new work schedule.

108.   However, she felt compelled to sign the Agreement.

109.   She also stated that she disagreed with the November 3 letter, but had no choice but to sign that as well.

110.   Ms. Shanahan explained why she should not be required to pay back for the canceled and wrong orders, as, in the one instance, Ethan Allen  - not her – was unable to get the client to pay for her order, and in the other instance, Ms. Shanahan had confirmed that the client was willing to pay an extra $3,000 for new fabric, and another employee had entered all the paperwork for the client.

111.   Ms. Shanahan further noted that, even if she were responsible for making up those sales, requiring her to sell an extra 40% over her draw amount on her first month back from a debilitating medical leave was not fair to her, particularly during traditionally slow months of business.

112.   She concluded by expressing her belief that she was being set up for failure.

113.   Due to the foregoing, Ms. Shanahan set up a meeting for November 7, 2019 with David Golinski and Kate Savino to discuss the discrimination, harassment and retaliation she was enduring.

114.   Ms. Shanahan requested that her husband be present at the meeting to assist her, but this request was denied, even though Ms. Shanahan was aware of at least one other co-worker who was permitted to have their partner at a meeting to discuss medical issues.

115.   The meeting took place on November 7, 2019.

116.   At the meeting, although Ms. Shanahan sought an explanation regarding each issue, Ethan Allen failed and/or refused to address any issue meaningfully.

117.   For example, when Ms. Shanahan questioned the $3,988.83 deficit calculation, she received no response.

118.   When Ms. Shanahan questioned why Ethan Allen would only hold her job for so long, she received no response.

119.   Ms. Shanahan also questioned the unilateral limitation of her accommodations to one month.

120.   Ms. Savino stated that they would "evaluate" at the end of the month.

121.   When Ms. Shanahan noted that she did not have a follow up appointment with her physician until January to discuss the need for continuing accommodations, she received no response.

122.   Ms. Shanahan also received answers with empty promises to help.

123.   For example, when Ms. Shanahan stated that she should not be responsible for failed customer obligations during her time on leave, Ms. Savino simply stated that: "we will work with you" and that it was "company policy."

124.   When Ms. Shanahan asked how they would work with her, she received no response.

125.   Ms. Shanahan noted that Ethan Allen had promised to help her achieve her goals, but she had not received any help, administrative or other support, or even a response to her requests for assistance.

126.   Again, they simply reiterated that "we will work with you," but failed to indicate how they would do so and refused to discuss the issue further.

127.   Regarding the extremely short time she was expected to do more than 40% quota, Ms. Shanahan noted that the odds were stacked against her, as it was the slowest month of the year for business, she was given a broken computer and Ethan Allen gave away many of her clients, which was not the practice at Ethan Allen, including at the Chadds Ford office.

128.   In response to Ms. Shanahan noting her concerns, Mr. Golinski and Ms. Savino stated that this was how they did it here, and joked that she just needed to "sell $100,000 this month."

129.   Regarding the broken computer, Ethan Allen stated that Ms. Shanahan was entitled to ask other people to let her borrow their computers.

130.   By its refusal to retract any of its discriminatory acts, the meeting demonstrated that Ethan Allen was merely seeking to placate Ms. Shanahan with its robotic recitation of "we will help you," while actually taking aggressive steps to push Ms. Shanahan out.

131.   Notably, throughout the meeting, Ms. Savino and Mr. Golinski attempted to shift blame to Ms. Shanahan, belittling and bullying her, making such comments as: "you're making this too hard on yourself," "it's not that stressful," and "if you have this kind of attitude it won't help you."

132.    Ethan Allen also attempted to intimidate Ms. Shanahan into going back out on leave so that they could then fill her position.

133.    Ms. Shanahan mentioned numerous times during the meeting with Ms. Savino and Mr. Golinski that the conditions and practices she was being subjected to would not have occurred in Oklahoma City, where she previously worked for Ethan Allen.

134.    Ms. Shanahan was told that "that's now how we do things here" and "you're not in Kansas anymore" – a belittling reference to Ms. Shanahan's previous work in the Oklahoma location.

135.    Ms. Savino further stated that, if it was too hard for Ms. Shanahan, then she should go back on leave.

136.    Ms. Shanahan returned to see her physician due to significant pain she was experiencing as a result of her early return, and out of fear she might suffer permanent damage.

137.    By letter dated November 19, 2019, Ms. Shanahan's physician opined that she should still be on medical leave and should not return to work until January 8, 2020, at which time her condition would be re-evaluated.

138.    Accordingly, on November 21, 2019, Ms. Shanahan emailed Ms. Savino, stating, in light of the events that occurred during her return and her physician's advice, she would be returning to medical leave, effective immediately, until January 8, 2020.

139.    On November 26, 2019, despite Ms. Savino's previous indication to Ms. Shanahan that she should "go back on leave", Ethan Allen sent Ms. Shanahan a responsive letter to her request for further medical leave, stating that it would not hold her position open.

140.    As before, Ms. Shanahan protested, and continuously affirmed that she would be cleared for full work duty on January 8, 2020.

141.  On January 2, 2020, six (6) days before her scheduled return to work, Ms. Shanahan received an email attaching a letter to her that had been returned as undelivered.

142.  The email noted that because her position had been filled, Ms. Shanahan could continue on her benefit elections until her short-term disability concluded, and that her benefits would continue through January 18, 2020.

143.  This was Ms. Shanahan's first notification that her position had been filled and that her job was no longer available.

144.  On January 7, 2020, Ms. Shanahan was examined by her physician and cleared to return to work on January 8, 2020, as she had indicated she would do in her November 21st email to Ms. Savino.  Ms. Shanahan immediately emailed Mr. Kalina from her physician's office, informing him that she was cleared to return to work by her physician, and attached a letter from her doctor to this effect.  Less than thirty minutes later, Mr. Kalina responded that Ms. Shanahan could not return to work because she had not been cleared, despite Ms. Shanahan including the letter in her previous email.

145.  Also by email on January 7, 2020, Ms. Shanahan strenuously objected to having been replaced, and urged Ethan Allen to reconsider and permit her to return to her previous position.

146.  Among other things, Ms. Shanahan noted that, in being informed that she had been replaced, it was a portion of another sentence and casually mentioned in an email regarding the failed delivery of a letter.

147.  Notably, after fifteen (15) years of dedicated and loyal service to Ethan Allen, Ms. Shanahan was replaced during her medical leave from an extensive surgery, less than one

week prior to her return, and notified that she had been replaced as an afterthought in an email regarding another issue.

148.   Although Ms. Shanahan continued to dispute Ethan Allen's wrongful actions, particularly in requiring her to re-apply for a position she held for fifteen (15) years, Ms. Shanahan requested information on how to apply for her job.

149.   In response, by email on January 8, 2020, Mr. Kalina thanked her for acknowledging that she was told that Ethan Allen was not holding a position open for her.

150.   He then provided a link to view job postings.

151.   By email from Ms. Ramey dated January 21, 2020, Ms. Shanahan was notified that her employment with Ethan Allen had been terminated as of January 8, 2020.

152.   Ms. Shanahan later learned that the individual hired to fill her position was a former poor performer at Ethan Allen who had difficulty meeting her sales quotas.

153.   This former employee did not quit, but instead stopped appearing for work.

154.   When Ethan Allen made contact with her, she informed them that she was not returning.

155.   Ethan Allen sought so strongly to replace Ms. Shanahan that they were willing to hire an individual to fill Ms. Shanahan's position who was less qualified, less dedicated, and less responsible, but younger, than Ms. Shanahan and not disabled.

156.   Moreover, Ms. Shanahan's position was filled by this former employee during one of the slowest months of the year, at a time when the current design consultants were already unable to hit their quotas.  Additionally, the replacement did not even start working at the Design Center until the week before Ms. Shanahan would have returned, further demonstrating that Ethan Allen did not replace Ms. Shanahan due to business needs.

157.  Thus, the hiring of an additional design consultant, particularly in light of Ms. Shanahan's upcoming planned return, was entirely unnecessary and unjustified and appears to have been designed to allow Ethan Allen to claim that it had "filled" Ms. Shanahan's position.

158.  Ethan Allen has also repeatedly demonstrated its discriminatory animus towards older employees and those who take medical leave.

159.  For example, in the Ethan Allen brochures, all of the designers represented are diverse in ethnicity, but are young and appear to be under the age of forty.

160.  Moreover, in September 2019, an email was sent to the youngest employees only to represent the Ethan Allen booth at the Philadelphia Home Show in January 2020.

161.  Thus, management wanted only its youngest employees to represent Ethan Allen, which would result in giving only those designers the opportunity for new contacts and business.

162.  Notwithstanding its preference for the younger employees, in late December 2019, the rest of the designers received a cut and paste version of the email seeking someone to man the booth, as the younger employees refused to do so.

163.  In addition, Ms. Shanahan is aware of a previous employee, who was a high producer that had been with Ethan Allen for a long time, who was out for a period of time due to illness, and who was terminated shortly after her return.

164.  The facts alleged herein demonstrate the discriminatory animus held by Ethan Allen against Ms. Shanahan, whom it perceived as old and disabled.

165. Ethan Allen's alleged "inability to hold her position open for her" (which was simply another way of saying termination) was pretext for discrimination, harassment and retaliation.

166. The reasons given for Ms. Shanahan's termination were pretext, as Ms. Shanahan had been an exceptional employee during her long tenure and Ms. Shanahan had only sought to follow her doctor's orders to ensure that her foot would properly heal.

167. The above facts indicate that, immediately after Ms. Shanahan developed her disability and requested accommodations for her disability, Ethan Allen aggressively sought to deny Ms. Shanahan her job, and then imposed outrageously unattainable mandates upon her in order to keep her job.

168. Moreover, once Ms. Shanahan complained about the severe and pervasive discrimination and harassment that she had been subjected to, Ethan Allen retaliated against Ms. Shanahan by ensuring that she would not be able to meet her unattainable mandates and then terminating her in favor of a younger, less responsible, less experienced and non-disabled former employee.

169. The timing of Ms. Shanahan's termination, coupled with the treatment Ethan Allen subjected her to during and upon return from her medical leave, the lack of any legitimate justification for her termination (particularly when she was replaced with a younger, less responsible, and non-disabled employee during the slowest time when other employees were not even making their quotas) at around the same time Ms. Shanahan indicated she was able to return, and absurd newly mandated "conditions" of Ms. Shanahan's employment (including false claims that she owed the deficit and demands that she produce 40% over quota during the slowest time of the year), indicates that the real

reason for Ms. Shanahan's termination was discrimination and retaliation on the part of Defendant.

170.   Ms. Shanahan's termination was pretextual.

171.   Ms. Shanahan's termination was wrongful.

172.   Despite her loyalty, dedication and consistently excellent performance, and given her treatment during her employment with Ethan Allen (including, but not limited to, her wrongful termination), Ms. Shanahan maintains that Ethan Allen harassed, discriminated and retaliated against her on the basis of her age and disability or perceived disability, and retaliated against her for requesting accommodations, including her use of leave under the FMLA.

173.   Defendant Ethan Allen discriminated against Ms. Shanahan because of her age and disability or perceived disability, and retaliated against Ms. Shanahan for complaining of the discrimination and for seeking accommodations, including through her use of leave through the FMLA, in violation of the ADEA, the ADA, the PHRA and the FMLA.

174.   Defendants Kate Savino and Robert Kalina aided and abetted Ethan Allen's discrimination, harassment and retaliation as alleged herein, in violation of the PHRA.

175.   Ms. Shanahan has suffered and continues to suffer mental anguish and severe emotional distress as a proximate result of the actions and inactions of Defendants.

176.   Defendants and their agents acted with the intent of causing or with reckless disregard for the probability that their actions would cause Ms. Shanahan severe emotional distress.

177.   Ms. Shanahan has suffered financial losses, which include, among other things, lost wages, and an obligation for attorneys' fees and costs of bringing suit, as a proximate result of the actions and inactions of Defendants.

22

<u>**COUNT I**</u>
**Age Discrimination in Employment Act, 29 U.S.C. § 621, <u>et seq</u>.**
**(Plaintiff v. Ethan Allen)**

178.   Plaintiff Tamara Shanahan repeats and incorporates by reference the allegations of all

previous paragraphs as if fully set forth at length herein.

179.   Based on the foregoing, Defendant engaged in unlawful employment practices in

violation of the ADEA.

180.   Plaintiff is and was at the time of his termination, over forty years of age, and an

individual within the class protected by the ADEA.

181.   In discriminating against and harassing Ms. Shanahan because of her age, and in

retaliating against Ms. Shanahan for her complaints of discrimination and harassment,

Defendant violated the ADEA.

182.   Defendant's violations were intentional and willful.

183.   Defendant's willful violations of the ADEA warrant an award of liquidated damages.

184.   As the direct result of the aforesaid unlawful employment practices engaged in by

Defendant, Plaintiff Tamara Shanahan has sustained a loss of earnings, loss of severance,

retirement and other benefits, loss of incentive and bonus payments, severe emotional and

psychological distress, loss of self-esteem, loss of reputation and opportunity for career

advancement, loss of future earning power, as well as back pay, front pay and interest due

thereon, and has incurred attorneys' fees and costs.

185.   Defendant's willful violations of the ADEA warrant an award of liquidated damages.

## <u>COUNT II</u>
### The Americans with Disabilities Act, 42 U.S.C. § 12101, <u>et seq.</u>
### (Plaintiff v. Ethan Allen)

186. Plaintiff Tamara Shanahan repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

187. Based on the foregoing, Defendant engaged in unlawful employment practices in violation of the Americans with Disabilities Act.

188. In discriminating against and harassing Ms. Shanahan on the basis of her disability and/or because Defendant regarded Ms. Shanahan as disabled, in retaliating against Ms. Shanahan for her complaints about discrimination and harassment, in retaliating against Ms. Shanahan for seeking reasonable accommodations, and in failing and refusing to engage in a good faith, interactive process with respect to accommodating Ms. Shanahan, Defendant violated the ADA.

189. Said violations were intentional and willful.

190. Said violations warrant the imposition of punitive damages.

191. As the direct and proximate result of Defendant's violation of the Americans with Disabilities Act, Plaintiff Tamara Shanahan has sustained loss of earnings, loss of severance, retirement and other benefits, loss of incentive and bonus payments, severe emotional and psychological distress, loss of self-esteem, loss of reputation and opportunity for career advancement, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred attorneys' fees and costs.

## COUNT III
### The Family and Medical Leave Act, 29 U.S.C. § 2611, et seq.
### (Plaintiff v. Ethan Allen)

192.  Plaintiff Tamara Shanahan repeats and incorporates by reference the allegations of all

preceding paragraphs as if fully set forth at length herein.

193.  Defendant's conduct, in retaliating against Ms. Shanahan for requesting and taking

medical leave pursuant to the Family and Medical Leave Act, violated the FMLA.

194.  Defendant's violations of the FMLA were intentional and willful, as Defendant knew or

should have known the requirements of the FMLA.

195.  Defendant's violations of the FMLA warrant the imposition of liquidated damages.

196.  As a direct and proximate result of Defendant's violations of the FMLA, Ms. Shanahan

has sustained loss of earnings, loss of severance, retirement and other benefits, loss of

incentive and bonus payments, severe emotional and psychological distress, loss of self-

esteem, loss of reputation and opportunity for career advancement, loss of future earning

power, as well as back pay, front pay, and interest due thereon, and has incurred

attorneys' fees and costs.

## COUNT IV
### Pennsylvania Human Relations Act, 43 P.S. § 951, et seq.
### (Plaintiff v. All Defendants)

197.  Plaintiff Tamara Shanahan repeats and incorporates by reference the allegations of all

preceding paragraphs as if fully set forth at length herein.

198.  Based on the foregoing, Defendants engaged in unlawful employment practices in

violation of the Pennsylvania Human Relations Act.

199.  In discriminating against and harassing Ms. Shanahan on the basis of her age and

disability and/or because Defendant Ethan Allen regarded Ms. Shanahan as disabled, in

retaliating against Ms. Shanahan for her complaints about discrimination and harassment, in retaliating against Ms. Shanahan for seeking reasonable accommodations, and in failing and refusing to engage in a good faith, interactive process with respect to accommodating Ms. Shanahan, Defendant Ethan Allen violated the Defendant violated the PHRA.

200.  Defendants Kate Savino and Robert Kalina aided and abetted Ethan Allen's discrimination, harassment and retaliation as alleged herein and in so doing, violated the PHRA.

201.  As the direct and proximate result of Defendants' violations of the Pennsylvania Human Relations Act, Plaintiff Tamara Shanahan has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred an obligation for attorneys' fees and costs.

## PRAYER FOR RELIEF

202.  Plaintiff Tamara Shanahan repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

**WHEREFORE**, Plaintiff Tamara Shanahan respectfully requests that this Court enter judgment in her favor and against Defendants and Order:

a.  Appropriate equitable relief;

b.  Defendants to compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which she would have been entitled had she not been subjected to unlawful discrimination, harassment and retaliation;

c.  Defendants to compensate Plaintiff with the wages and other benefits and emoluments of employment lost because of their unlawful conduct;

d.  Defendant Ethan Allen to pay Plaintiff punitive damages;

e.  Defendant Ethan Allen to pay Plaintiff liquidated damages;

f.  Defendants to pay Plaintiff compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

g.  Defendants to pay Plaintiff's costs of bringing this action and her attorneys' fees;

h.   Plaintiff be granted any and all other remedies available pursuant to the ADEA, the ADA, the PHRA and the FMLA; and

i.  Such other and further relief as is deemed just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff hereby demands trial by jury as to all issues so triable.

*/s/ Christopher A. Macey, Jr.*
Christopher A. Macey, Jr., Esquire
Bell & Bell LLP
One Penn Center
1617 JFK Blvd. – Suite 1254
Philadelphia, PA  19103

*Attorneys for Plaintiff Tamara Shanahan*

Dated:  May 18, 2021