**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TAMARA SHANAHAN,** | |
| **PLAINTIFF,** | **Civil Action No. 2:21-cv-00595-TJS** |
| **v.** | |
| **ETHAN ALLEN RETAIL, INC. KATE SAVINO and ROBERT KALINA,** | |
| **DEFENDANTS.** | |

---

**PLAINTIFF TAMARA SHANAHAN'S BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

---

Respectfully submitted,

BELL & BELL LLP

By:    */s/ Christopher A. Macey, Jr.*
Christopher A. Macey, Jr., Esquire
Bell & Bell LLP
1617 JFK Blvd. – Suite 1254
Philadelphia, PA 19103
(215) 569-2500

*Attorneys for Plaintiff Tamara Shanahan*

DATED:  December 10, 2021

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ……………………………….............………......……………  iv

I.  INTRODUCTION  ……………....……………………………….………………………1

II.  STATEMENT OF FACTS……………….……………………………………....…… 1

III.  LEGAL ARGUMENT ……………………………………………....……….......……2

  A. Legal Standard ………………………………………………………….…………..2

  B. Ms. Shanahan Has Established a Prima Facie Case of Disability Discrimination
    Under Both the ADA and the PHRA…………………………………………....………2

    1. Ms. Shanahan Has a Disability Under the ADA and was Regarded as
      Having a Disability Under the ADA…………………………………………...…….…3

    2. Ms. Shanahan Was Discriminated Against Because of her Disability……..……8

    3. Defendants Failed to Accommodate Ms. Shanahan and Failed to
      Engage in the Interactive Process……………………………………………...…….11

      a. Ms. Shanahan Has Established a Prima Facie Case of Failure to
        Accommodate……………………………………………………………….……13

      b. Defendants Failed to Engage in an Interactive Dialogue with
        Ms. Shanahan…………………………………………………………….……15

      c. Ms. Shanahan Did Not Request an Indefinite Job Protected Leave
        as an Accommodation………………………………………….…………….17

      d. There was No Undue Hardship for the Design Center………………...……18

  C. Ms. Shanahan Has Established a Prima Facie Case of Age Discrimination……..….19

  D. Ms. Shanahan Has Established a Prima Facie Case of Retaliation Under
    the ADA……………………………………………………………….……...….21

    1. Ms. Shanahan Engaged in Protected Activity…………………………...…….22

    2. Ms. Shanahan Has Demonstrated a Causal Link Between the Protected
      Activities and the Adverse Employment Decision………………….…...…….24

  E. Ms. Shanahan Has Established FMLA Retaliation………………………….…..27

F.  Ethan Allen Has Not Demonstrated a Legitimate, Non-Retaliatory,
or Non-Discriminatory Reason for Terminating Ms. Shanahan
and Replacing her ………………………………………………………..….30

G.  Ms. Shanahan Has Demonstrated Pretext………………………………………...….31

    a.  The evidence does not support Defendant's reasons for terminating
Ms. Shanahan…………………………………………………………..….31

    b.  The evidence demonstrates that Ms. Shanahan's disability was more likely
than not the reason for her termination…………………………….…….…...34

    c.  The temporal proximity and pattern of antagonism demonstrate pretext …..…..38

H.  Ms. Shanahan Has Demonstrated Harassment and Hostile Work Environment…...42

I.  Ms. Shanahan Has Established a Prima Facie Case of Disability
and Age Discrimination and Retaliation Under the PHRA…………………………46

J.  Ms. Savino and Mr. Kalina are Individually Liable……………………………...….47

K.  K.  Ms. Shanahan Has Established a Right to Punitive Damages, Front Pay,
Back Pay and a Jury Trial……………………………………………………..….49

    1.  Ms. Shanahan is Permitted to Recover Punitive Damages………………………49

    2.  Ms. Shanahan's Request for Jury Trial Should Not be Stricken…………...….…51

    3.  Ms. Shanahan is Entitled to Back Pay and Front Pay……………………...…….51

L.  This Court May Exercise Personal Jurisdiction over Mr. Kalina…………..……...54

    1.  Standard for Personal Jurisdiction…………………………………………………54

    2.  This Court Has Personal Jurisdiction Over Defendant Robert Kalina…………..56

        a.  This Court has General Jurisdiction over Mr. Kalina………………….…..56

        b.  This Court has Specific Jurisdiction over the Defendants………………..…..57

    3.  The Assertion of Personal Jurisdiction in this Case Comports with
Fair Play and Substantial Justice…………………………………………………64

IV.  CONCLUSION …………………………………………………..….…...…….65

## **TABLE OF AUTHORITIES**

### **Cases**

*Abramson v. William Paterson College of N.J.*, 260 F.3d 265 (3d Cir. 2001)…..…..24, 25, 38, 39

*Acosta v. Heart II Heart, LLC*, No. 2:17-CV-1242, 2019 WL 5197329
    (W.D. Pa. Oct. 15, 2019)……………………………………………………...……….....2

*Allen v. Verizon Pennsylvania, Inc.*, 418 F. Supp. 2d 617 (M.D. Pa. 2005)…..,…………………11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)……………….....……………………....2

*Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261 (3d Cir. 2010)………………………………3

*Beistle Co. v. Party U.S.A., Inc.*, 914 F.Supp. 92 (M.D. Pa. 1996)………………………..……..56

*Berkowitz v. Oppenheimer Precision Prod., Inc.*, No. CIV.A. 13-4917,
    2014 WL 5461515 (E.D. Pa. Oct. 28, 2014)…………………………………………………6

*Bevan v. Cty. of Lackawanna*, No. 3:17-CV-0919, 2017 WL 6336595
    (M.D. Pa. Dec. 12, 2017)………………………………………………...………….46

*Biggs v. Thomas Jefferson Univ. Hosp.*, No. CIV.A. 13-03037, 2014 WL 3709749
    (E.D. Pa. July 28, 2014) ………………………………………….…………...16, 22, 23

*Brearey v. Brennan*, No. 17-CV-2108, 2019 WL 111037 (E.D. Pa. Jan. 4, 2019)………...……...7

*Bonson v. Hanover Foods Corp.*, 451 F. Supp. 3d 345 (M.D. Pa. 2020)………………………..24

*Booker v. Taylor Milk Co., Inc.*, 64 F.3d 860 (3d Cir.1995)……………………………...……..52

*Bush v. Donahoe*, 964 F. Supp. 2d 401 (W.D. Pa. 2013)……………...…………………….7

*Bullock v. Balis & Co.*, No. 99-748, 2000 WL 1858719 (E.D. Pa. Dec. 19, 2000)…………...…10

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)….passim

*Burton v. Teleflex Inc.*, 707 F.3d 417 (3d Cir. 2013). ………………………...………………35

*Butler v. BTC Foods, Inc.,* No. CIV.A. 12-0492, 2014 WL 336649 (E.D. Pa. Jan. 30, 2014)…...5

*Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 148, 279 L.Ed.2d 804 (1984)…………………..…….62

*Castleberry v. STI Grp.*, 863 F.3d 259 (3d Cir. 2017)…………………….....……………………42

*Caufield v. Ctr. Area Sch. Dist.*, 133 F. App'x 4 (3d Cir. 2005)…………………..………...52, 54

*Celotex Corp. v. Cattrett*, 477 U.S. 317 (1986)………………………………………..……….2

*Colwell v. Rite Aid Corp.*, 602 F.3d 495 (3d Cir. 2010)……………………………………46

*Demshick v. Delaware Valley Convalescent Homes, Inc.*, No. CIV.A. 05-2251,
2007 WL 1244440 (E.D. Pa. Apr. 26, 2007)…………..………………………………3

*Dici v. Pennsylvania*, 91 F.3d 542 (3d Cir. 1996)…………………………………..……..47

*Dollar Sav. Bank v. First Sec. Bank*, 746 F.2d 208 (3d Cir. 1984)……………….…….…..57

*Donner v. Tams–Witmark Music Library, Inc.*, 480 F. Supp. 1229 (E.D. Pa. 1979)…..….…56

*Drummer v. Trustees of University of Pennsylvania*, 286 F. Supp. 3d 674 (E.D. Pa. 2017)…....…8

*Emmell v. Phoenixville Hosp. Co., LLC.*, No. CV 16-3787, 2018 WL 3727765
(E.D. Pa. Aug. 6, 2018)…………………………………………..…………13

*El v. Se Pa. Transp. Auth.*, 479 F.3d 232 (3d Cir. 2007)……………………..…………2

*Eshleman v. Patrick Indus., Inc.*, 961 F.3d 242 (3d Cir. 2020)…………….…………………..3

*Ferrigno v. Franklin Grp., Inc.*, No. CIVA 08-1140, 2010 WL 1136293
(W.D. Pa. Mar. 1, 2010), *report and recommendation adopted*,
No. CIVA08-1140, 2010 WL 1133431 (W.D. Pa. Mar. 23, 2010)………….……….46

*Freeman v. Chertoff*, 604 F. Supp. 2d 726 (D.N.J. 2009)…………………………………..42

*Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994)……………………………….…………30

*Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565 (3d Cir. 2002)……………………...……50

*Garner v. Sch. Dist. of Philadelphia*, 63 F. Supp. 3d 483 (E.D. Pa. 2014)……………….…...18

*Gaul v. Lucent Techs.*, 134 F.3d 576 (3d Cir. 1998)………………..……………………3,12

*Gentex Corp. v. Abbott*, 978 F. Supp. 2d 391 (M.D. Pa. 2013)…………………..………64

*Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506 (3d Cir., 2004)………………………46

*Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)………..……..57

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868,
80 L.Ed.2d 404 (1984)……………………………………………………...56

*Hickman v. TL Transportation, LLC*, 317 F. Supp. 3d 890 (E.D. Pa. 2018)……………..…...59

*Horton v. Amerway, Inc.*, No. CIV.A. 3:11-00112, 2013 WL 3802459
    (W.D. Pa. July 19, 2013)……………………………………………………...……31

*Howell v. Raymours Furniture Co.*, 26 F. Supp. 3d 366 (M.D. Pa. 2014)………………….....46

*Incorvati v. Best Buy Co.*, No. CIV 10-1939 RBK/KMW, 2010 WL 4807062
    (D.N.J. Nov. 16, 2010). ……………………………………….……………...……39

*Int'l Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)……………55, 64

*Johnson v. Bally's Atl. City*, 147 F. App'x 284 (3d Cir. 2005)…………………….……………42

*Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173 (3d Cir. 1997)……………………………25

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)……...55

*Kelly v. Drexel University*, 94 F.3d 102 (3d Cir.1996)……………………………………….46

*Keuch v. Teva Pharms. USA, Inc.*, No. CV 19-5488, 2020 WL 6870602
    (E.D. Pa. Nov. 23, 2020)…………………………………………………………...…63

*Kiniropoulos v. Northampton Cty. Child Welfare Serv.*, 917 F.Supp.2d 377
    (E.D. Pa. 2013)………………………………………………………………...……10

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535–36, 119 S.Ct. 2118,
    144 L.Ed.2d 494 (1999)……………………………………………………………50

*Krouse v. Am. Sterilizer Co.*, 126 F.3d 494 (3d Cir.1997)……………………………………22

*Leboon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)………………22

*Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294 (3d Cir. 2012)……………….……27

*Lowe v. Philadelphia Newspapers, Inc.*, 594 F. Supp. 123 (E.D. Pa. 1984)………….…..……51

*Mackenzie v. Caplan Industries, Inc.*, No. CV 19-371, 2019 WL 3284886
    (E.D. Pa. July 19, 2019)……………………………………………………………28

*Marinelli v. City of Erie, Pa.*, 216 F.3d 354 (3d Cir. 2000)…………………………………………3

*Mascioli v. Arby's Rest. Grp., Inc.*, 610 F. Supp. 2d 419 (W.D. Pa. 2009)………………...……46

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817,

36 L.Ed.2d 668 (1973)……………………………………………………...13, 19, 27

*McFadden v. Biomedical Sys. Corp.*, No. 13-4487, 2014 WL 80717 (E.D. Pa. Jan. 9, 2014)….10

*McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)……..…55

*Mellon Bank (East) PSFS, Nat'l Assoc. v. Farino*, 960 F.2d 1217 (3d Cir.1992)……….55, 57, 60

*Merical v. Valor Healthcare, Inc.*, No. CIV.A. 12-1681, 2013 WL 5408986
    (W.D. Pa. Sept. 25, 2013)………………………………………..…….…..….63

*Milliken v. Meyer*, 311 U.S. 457, 61 S.Ct. 339, 85 L.Ed. 278 (1941)……………………..……55

*Moore v. Cty. of Camden*, No. CIV. 10-3044 RMB/JS, 2013 WL 1903300
    (D.N.J. May 7, 2013)…………………………………………………..……..42

*Nicholas v. Saul Stone & Co. LLC*, 224 F.3d 179 (3d Cir. 2000)……………………….…..63

*O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312 (3d Cir. 2007)…………..……………56

*Parrotta v. PECO Energy Co.*, 363 F. Supp. 3d 577 (E.D. Pa. 2019)……………………....7

*Peter v. Lincoln Tech. Inst., Inc.*, 255 F. Supp. 2d 417 (E.D. Pa. 2002)……………..………18

*Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361 (3d Cir. 2002)……………………...…………55

*Reyer v. Saint Francis Country House*, 243 F. Supp. 3d 573 (E.D. Pa. 2017)……..………..3, 24

*Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128 (3d Cir.1997)………………………….……19

*Schmidt v. Montgomery Kone, Inc.*, 69 F. Supp. 2d 706 (E.D. Pa. 1999)………………….…19

*Scopelliti v. Traditional Home Health & Hospice*, No. 3:18-CV-00040,
    2019 WL 8955168 (M.D. Pa. Dec. 4, 2019), *report and recommendation*
    *adopted as modified*, No. 3:18-CV-40, 2020 WL 2850905
    (M.D. Pa. June 2, 2020)……………………………..…………..…………27

*Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977)……….…58

*Shaner v. Synthes (USA)*, 204 F.3d 494 (3d Cir. 2000)………………………………...…..30

*Schneider v. Works*, 223 F. Supp. 3d 308 (E.D. Pa. 2016)………………...……………30,31

*Sine v. Rockhill Mennonite Home*, 275 F. Supp. 3d 538 (E.D. Pa. 2017)……………..….3,6,10,13

*Stewart v. Bally Total Fitness*, No. 99-3555, 2000 WL 1006936 (E.D. Pa. July 20, 2000)…….10

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)......19

*Sube v. City of Allentown*, 974 F. Supp. 2d 754 (E.D. Pa. 2013)....................…...46

*The Milby v. Greater Philadelphia Health Action*, 339 Fed.Appx. 190 (3d Cir. 2009)………...47

*Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61 (3d Cir. 1984)…………...……54, 55

*Todd v. New England Motor Freight*, No. CIV.A. 03-1684, 2003 WL 23199932
(E.D. Pa. Dec. 18, 2003)……………………………………………..…………...…..47, 49

*Tubari, Ltd., Inc. v. NLRB*, 959 F.2d 451 (3d Cir. 1992)…………………………………….52

*VanStory-Frazier v. CHHS Hosp. Co., LLC*, 827 F. Supp. 2d 461 (E.D. Pa. 2011)………..27, 28

*Veal v. Am. Hearing Aid Assocs., Inc.*, No. CV 17-1738, 2018 WL 3632159
(E.D. Pa. July 30, 2018)……………………………………………..…………..24

*Vizant Techs., LLC v. Whitchurch*, 97 F. Supp. 3d 618 (E.D. Pa. 2015)………………………..62

*Wainberg v. Dietz & Watson, Inc.*, No. CV 17-2457, 2017 WL 5885840
(E.D. Pa. Nov. 28, 2017)……………………………….……………………………….4

*Wilkie v. Luzerne County*, 207 F.Supp.3d 433 (M.D. Pa. 2016)……………………...…………30

*Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751 (3d Cir. 2004)……………......5, 12

*Wilson v. Indus. Com. Cleaning Grp., Inc.*, No. CV 19-2198, 2021 WL 3190555
(E.D. Pa. July 28, 2021)……………………………………………….…………..8

*Woodson v. Scott Paper Co.*, 109 F.3d 913 (3d Cir. 1997)……………….……………….…*passim*

*World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559,
62 L.Ed.2d 490 (1980)……………..……………………………...….55, 58, 64

*Zalinskie v. Rosner L. Offs., P.C.*, No. CIV.A. 12-289, 2014 WL 956022
(D.N.J. Mar. 12, 2014)………………………………………………………..24, 39

## Statutes

29 C.F.R. § 825.220(c)………………………………………………..…………….27

29 CFR 1630.2(h)(1)…………………………………………………..…………..4

29 C.F.R. § 1630.2(j)(1)(i), (iii)…………………………………………………..5

42 U.S.C. § 12112(a)………………………………………………………………………46

42 U.S.C. § 12102(1)………………………………………...…………………..3, 13

42 U.S.C. § 12102(2)………………………………………………………...………3

42 U.S.C. § 12112(b)(5)(A)……………………………………...………...11, 13

42 U.S.C. § 12111(9)(B)…………………………………………………………12

42 U.S.C. § 1981a(b)(1) (2000)………………………………………….....50

42 U.S.C. § 2000e–5(g)…………………………………...……………..52

42 Pa.C.S.A. § 5322(a)(2)……………………………………………….……54

42 Pa.C.S.A. § 5322(b)…………………………………………………….………54

43 PA. CONS.STAT. § 955(e) (West 2003)………………………………47

43 P.S. § 955(a)…………………………………………………….………46

## Court Rules

Fed. R. Civ. P. 4(e)………………………………...………………………54

Fed. R. Civ. P. 56(c) ……………………………………..………………………2

Plaintiff Tamara Shanahan, by and through her undersigned attorneys, Bell & Bell LLP, hereby serves the following Brief in Opposition to Defendants' Motion for Summary Judgment. For the reasons set forth below, Defendants Ethan Allen Retail, Inc. ("Ethan Allen"), Kate Savino, and Robert Kalina's (collectively, "Defendants") motion should be denied.

## I.     INTRODUCTION

Ms. Shanahan has brought claims pursuant to the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA") and the Pennsylvania Human Relations Act ("PHRA"). Defendants argue that Ethan Allen suffered "undue hardship" by Ms. Shanahan's medical leave and could not hold her position open for her while she was out on leave. The facts, however, demonstrate otherwise. Defendants' arguments only further demonstrate that, while Ms. Shanahan was on and returned from her necessary medical leave, Ethan Allen engaged in a series of acts designed to push Ms. Shanahan out and replace her with a younger, less qualified and not disabled individual, thus establishing Ms. Shanahan's claim that she was discriminated against on the basis of her age and disability or perceived disability, was retaliated against for her use of medical leave and for complaining about discrimination, and was fired as a result of discrimination and retaliation.  For these reasons, and as discussed in more detail below, Defendants' motion should be denied.

## II.     STATEMENT OF FACTS

Ms. Shanahan refers the Court to her Response in Opposition to Defendants' Statement of Facts, attached as Appendix 1, and her Statement of Materials Facts (hereinafter "SOF"), attached as Appendix 2, which are incorporated by reference.

1

### III.   LEGAL ARGUMENT

Defendants claim that Ms. Shanahan has not demonstrated a *prima facie* case of disability or age discrimination, of retaliation or FMLA retaliation, that Ms. Shanahan has failed to show the articulated reasons for her termination were pretext, that she is not entitled to punitive damages or front or back pay, that the individual defendants should be dismissed from this litigation, and that this Court does not have jurisdiction over Mr. Kalina. Defendants are mistaken, on all counts, and as such, their motion for summary judgment should be denied.

### A.  Legal Standard

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided in order to resolve the substantive claim or defense to which the motion is directed. In other words, there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id*. at 255. It refrains from making credibility determinations or weighing evidence. *Id*. "Real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof," will defeat a motion for summary judgment. *Acosta v. Heart II Heart, LLC*, No. 2:17-CV-1242, 2019 WL 5197329, at *3 (W.D. Pa. Oct. 15, 2019) (citing *El v. Se Pa. Transp. Auth*., 479 F.3d 232, 238 (3d Cir. 2007)).

### B.  Ms. Shanahan Has Established a Prima Facie Case of Disability Discrimination Under Both the ADA and the PHRA

The ADA "prohibits covered entities from discriminating against qualified employees

2

based on their disabilities." *Eshleman v. Patrick Indus., Inc*., 961 F.3d 242, 245 (3d Cir. 2020). "To establish a prima facie case of disability discrimination under the ADA, a plaintiff must demonstrate: (1) that she is a disabled person within the meaning of the ADA; (2) that she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that she has suffered an otherwise adverse employment decision as a result of discrimination." *Reyer v. Saint Francis Country House*, 243 F. Supp. 3d 573 (E.D. Pa. 2017) (citing *Gaul v. Lucent Techs*., 134 F.3d 576, 580 (3d Cir. 1998)). "At the *prima facie* stage, the goal ... is to eliminate ... the most common nondiscriminatory reasons for the defendant's actions; by doing so, the prima facie case creates an inference that the defendant's actions were discriminatory." *Id*. (citing *Anderson v. Wachovia Mortg. Corp*., 621 F.3d 261, 271 (3d Cir. 2010) (internal quotations omitted). Based on the evidence of record, Ms. Shanahan has established a *prima facie* case of disability discrimination.

## 1. Ms. Shanahan Has a Disability Under the ADA and was Regarded as Having a Disability Under the ADA.

Plaintiff was disabled under the ADA. "A person has a disability is she meets any of these three standards: (A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *Demshick v. Delaware Valley Convalescent Homes, Inc*., Civ. No. 05-2251, 2007 WL 1244440, at *5 (E.D. Pa. Apr. 26, 2007).

To demonstrate an ADA disability, a plaintiff need only meet one of the following definitions: "(1) a physical or mental impairment that substantially limits one or more major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." *Sine v. Rockhill Mennonite Home*, 275 F. Supp. 3d 538, 544–45 (E.D. Pa. 2017) (citing 42 U.S.C. § 12102(1); *Marinelli v. City of Erie, Pa*., 216 F.3d 354, 359 (3d Cir.

2000)). Ms. Shanahan has demonstrated that she had a physical impairment that substantially limited a major life activity and that Defendants regarded her as having such an impairment.

Ms. Shanahan's condition was a physical impairment that substantially limited her major life activities. Physical impairment is defined as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculo skeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." 29 CFR 1630.2(h)(1).

Ms. Shanahan's disability more than meets this criteria. Ms. Shanahan had fallen down a flight of stairs in 2014. Thereafter, she began treating for severe pain in her feet and needed ibuprofen to go to work every day. SOF ¶ 16. The pain was so severe that it caused Plaintiff to have difficulty walking, and it got to the point where she could barely walk. Shanahan Dep. SOF ¶¶ 17, 18. Although Ms. Shanahan repeatedly went to see physicians regarding this severe pain, she kept being told that it was arthritis and that she had to take arthritis medicine or ibuprofen. Shanahan Dep. SOF ¶¶ 16, 19. Ultimately, Ms. Shanahan went to a different physician, who informed her that it was not arthritis and that her foot was growing crooked and required plates and pins in order for her to work and keep her foot straight. Shanahan Dep. SOF ¶¶ 20, 21.

The case of *Wainberg v. Dietz & Watson, Inc.*, No. CV 17-2457, 2017 WL 5885840 (E.D. Pa. Nov. 28, 2017), is instructive. In *Wainberg*, the plaintiff sustained an injury while repairing a cart. That day, the plaintiff informed defendant he had severe abdominal pain and was having trouble bending and standing. *Id*. at *1. The defendant company's physician examined plaintiff and determined he had a hernia. *Id*. Defendant argued that because a hernia was temporary, could be corrected by surgery, and did not substantially limit a major life

activity, a hernia was not a disability under the ADA. The Court disagreed. First, the Court noted

that, according to current law, a temporary impairment may constitute a disability, and thus, the

temporary nature of a hernia was not a bar to plaintiff being disabled under the ADA. *Id*. at *2.

Although noting that an impairment with a duration of 6 months or less may not qualify under

the ADA's "regarded as" prong, the *Wainberg* plaintiff, as Ms. Shanahan here, demonstrated that

the impairment was not transitory and minor. *See id*. (citing *Butler v. BTC Foods, Inc*., 2014 WL

336649, at *3, 2014 U.S. Dist. LEXIS 11286 at *8 (Court ruled that hernia whose complications

lasted seven months constituted a disability under the ADA).

The Court further noted that "whether an impairment 'substantially limits' a major life

activity under the 'actual disability' or 'record of' prong is "not meant to be a demanding

standard." *Id*. at *3 (citing 29 C.F.R. § 1630.2(j)(1)(i), (iii)). "An impairment 'need not prevent

... or significantly or severely restrict" a major life activity as long as the impaired individual is

substantially limited 'as compared to most people in the general population.'" *Id*. (citing 29

C.F.R. § 1630.2(j)(1)(ii)). The ADA "provides a non-exhaustive list of major life activities,

including, but not limited to 'caring for oneself, performing manual tasks, seeing, hearing,

eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading,

concentrating, thinking, communicating, and working.'" *Id*. "Ultimately, 'whether an individual

is substantially limited in a major life activity is a question of fact.'" *Id*. (citing *Williams v. Phila.

Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004)).

In *Wainberg*, since plaintiff pled that his hernia substantially impaired his ability to stand,

walk and lift, all major life activities, plaintiff had met his burden of demonstrating a disability.

*See id*. at *4; *see also Butler v. BTC Foods, Inc*., *supra* (plaintiff established genuine issue of

material fact sufficient to defeat summary judgment where plaintiff provided evidence, primarily

of his own testimony, that he suffered pain due to hernia and stated intent of the ADAAA was to construe disability broadly); *Berkowitz v. Oppenheimer Precision Prods*, 2014 WL 5461515 (doctors' reports and plaintiff's testimony were sufficient to establish "a material question as to whether the major life activities of lifting, sitting, and standing were substantially limited).

Similarly, in *Sine v. Rockhill Mennonite Home*, 275 F. Supp. 3d 538 (E.D. Pa. 2017), the defendant argued that plaintiff's preventative hysterectomy was not a physical impairment and was not regarded as such. The Court disagreed, as, given the seriousness of the operation, defendant perceived her as being disabled, particularly when considering the potential state of plaintiff's impairment in the absence of the surgery. Here, Ms. Shanahan was at the point where she was virtually unable to walk, and her physicians informed her that she would not be able to walk if she did not have surgery. Defendants were well aware of Ms. Shanahan's condition and the need for her surgery. Thus, as in *Sine*, Defendants regarded Ms. Shanahan as being disabled.

Defendants argue that because Ms. Shanahan was "ready to go" in January 2020, around the time she was fired, she must not have been disabled. *See* Defendants' Brief, at pp. 9-10. This argument misses the mark. Plaintiff had experienced pain for several years and had undergone surgery to correct her condition and be able to walk again. Simply because Ms. Shanahan had healed shortly after her termination (which followed years of pain, surgery and several months of recovery) does not negate the fact that she was disabled while employed by Ethan Allen.

Defendants further argue that Ms. Shanahan condition could not be a disability, or perceived to be a disability, because it was "objectively transitory and minor." *See* Defendants' Brief, at p. 12. Again, the evidence refutes this argument. Ms. Shanahan was injured in 2014 and the pain became increasingly more severe. Ms. Shanahan lived with this pain until she could barely walk, for several years. Finally, after five years of this constant and severe pain for which

Ms. Shanahan had to take pain medication every day to be able to work, she was finally able to find a physician to perform surgery and correct the condition, for which Ms. Shanahan had to undergo several months of recovery – she had the surgery in July 2019 and was not fully recovered until January 2020, at the earliest. In fact, Ms. Shanahan required an extension of her medical leave, and then a second medical leave after her first, since her foot was taking a significantly longer time to heal than expected. This is not transitory or minor. Nor are the facts of this case similar to those cited by Defendants. *See Bush v. Donahoe*, 964 F. Supp. 2d 401 (W.D. Pa. 2013) (ankle/foot sprain was not disability where employee performed all regular duties without restriction, was able to drive car, did not require any treatment other than wearing an open toed boot, and did not require use of any medication); *Brearey v. Brennan*, No. 17-CV-2108, 2019 WL 111037, at *6 (E.D. Pa. Jan. 4, 2019) (no disability discrimination where employee required crutches for several weeks for broken ankle but had been hired as a two-month temporary holiday worker for physical labor duties); *Parrotta v. PECO Energy Co*., 363 F. Supp. 3d 577, 592–93 (E.D. Pa. 2019) (no discrimination where employee had surgery to correct pain, was returned to full duty without restrictions, was fired eight months after surgery but presented no medical documentation of any issues or pain in those eight months).

Ms. Shanahan has demonstrated that her impairment was neither transitory nor minor, as it lasted for several years. She has further demonstrated that it substantially impacted a major life activity, walking, which is one of the listed activities under the statute. Defendants knew of Ms. Shanahan's impairment, the severity of her condition and that she required surgery in order to fix the condition. As such, Ms. Shanahan has demonstrated that she is a qualified individual with a disability and was regarded as being disabled, under the ADA.

### 2.  Ms. Shanahan Was Discriminated Against Because of her Disability

"The third element of a *prima facie* case is whether Plaintiff suffered an adverse

employment action as a result of discrimination based on her disability." *Wilson v. Indus. Com.*

*Cleaning Grp., Inc.*, No. CV 19-2198, 2021 WL 3190555, at *9 (E.D. Pa. July 28, 2021). With

regard to this factor, Ms. Shanahan has demonstrated that she suffered an adverse action as a

result of discrimination. This element requires that "Plaintiff plead an adverse employment

action, which is defined as an action that alters the employee's compensation, terms, conditions,

or privileges of employment, deprives him or her of employment opportunities, or adversely

affects his or her status as an employee." *See id*. (citation and internal quotations omitted). Ms.

Shanahan was terminated, which is unquestionably an adverse employment action. This element

requires a "causal nexus between [the] disability and the adverse employment action." *See id*.

(citing *Drummer v. Trustees of University of Pennsylvania*, 286 F. Supp. 3d 674, 683 (E.D. Pa.

2017)).

Ms. Shanahan had hoped to return to work by September 27, 2019. However, her

operating physician directed that she remain out of work through November 11, 2019, with

another recommendation to be made at that time. SOF ¶ 34. Accordingly, Ms. Shanahan

requested an accommodation of an additional six weeks of leave for her foot to recover. SOF ¶

32. Plaintiff only pursued this additional leave upon the determination and direction of her

doctor, as she had been excited to return to work in September 2019. Immediately after Ms.

Shanahan requested the extension, however, Ethan Allen engaged in a hostile and discriminatory

campaign to oust Ms. Shanahan. Specifically, Ethan Allen's acts after Ms. Shanahan requested

the additional leave and accommodation overtly demonstrate that Ethan Allen had created and

implemented a plan to fire Plaintiff in favor of a younger and non-disabled individual.

Among other things, despite only having requested a limited amount of time off, per her physician's orders, Defendants repeatedly threatened Ms. Shanahan that they "could not hold her job" (and, unbeknownst to her, were actively seeking her replacement). SOF ¶¶ 29, 30, 48, 219. Moreover, while searching for Ms. Shanahan's replacement, Defendants took hostile and discriminatory acts to sabotage Ms. Shanahan and make it impossible for Ms. Shanahan to perform her duties.  Among other things, immediately upon her return to work, Defendants created a hostile work environment and imposed impossible demands upon Ms. Shanahan, including: demanding that Ms. Shanahan work five straight days, despite her prior schedule of three days in a row; setting unattainable benchmarks to meet and a wrongfully imposed deficit to reduce; refusing to give Ms. Shanahan any support or assistance regarding best practices or even an answer on how other designers got business; removing Ms. Shanahan's computer, which held all her information, files, clients, etc. from her fifteen years at Ethan Allen; and re-distributing all of Ms. Shanahan's clients to other design consultants. SOF ¶¶ 96, 105, 107.

Defendants further demonstrated their discriminatory animus against Ms. Shanahan by claiming to accommodate the restrictions set forth in the physician's note, but stating that they still expected her to perform several other duties that clearly could not be performed by someone recovering from foot surgery wearing a boot, such as driving, navigating stairs, navigating driveways and hills, conducting surveys by moving furniture, and packing, lifting and carrying items; and, with respect to the design center, navigating a two story, 18,000 square foot center, and lifting items as needed; and pushing, pulling and bending as required. SOF ¶ 57. This lengthy list of duties required of Ms. Shanahan emphasized physical labor, which was clearly meant to intimidate Plaintiff with respect to coming back to work with her disability. SOF ¶ 75.

Notwithstanding the foregoing, the temporal proximity alone is sufficient to support the

inference that Defendants regarded Ms. Shanahan as disabled and terminated her as a result.

Notably, Ms. Shanahan requested leave in June 2019 for a medical leave to take place July 5,

2019 through September 27, 2019. The evidence demonstrates that, immediately thereafter, by

letter dated September 30, 2019, Ms. Savino recommended that Ms. Shanahan be replaced. SOF

¶ 184. Defendants had not yet found her replacement as of November 1, 2019, so Ms. Shanahan

was permitted to return on that date, but when Ms. Shanahan sought a short leave to allow her

foot to heal properly (as she had not initially out of fear of losing her job), Defendants acted

swiftly to replace her and found a replacement to begin less than two weeks prior to Ms.

Shanahan's scheduled return date. SOF ¶ 158. This immediate adverse employment action is

sufficient to infer causation. *See Sine v. Rockhill Mennonite Home*, 275 F. Supp. 3d 538 (E.D.

Pa. 2017) ("mere two-month lag between Plaintiff's request and her termination is sufficient at

this juncture to infer that she was terminated as a result of her request for FMLA leave") (citing

*McFadden v. Biomedical Sys. Corp.*, No. 13-4487, 2014 WL 80717, at *1, 4 (E.D. Pa. Jan. 9,

2014) (defendants terminated the plaintiff a short period after plaintiff requested medical leave);

*Kiniropoulos v. Northampton Cty. Child Welfare Serv.*, 917 F.Supp.2d 377, 387 (E.D. Pa. 2013)

(holding that "the temporal proximity between the plaintiff's disclosure [that he required FMLA

leave after sustaining a significant leg injury] and his termination [four months later] is sufficient

to support an inference that the defendant regarded the plaintiff as disabled"); *Bullock v. Balis &*

*Co.*, No. 99-748, 2000 WL 1858719, at *5 (E.D. Pa. Dec. 19, 2000) (finding plaintiff's firing two

weeks after disclosure of disability sufficient to raise an inference of discrimination); *Stewart v.*

*Bally Total Fitness*, No. 99-3555, 2000 WL 1006936, at *5 (E.D. Pa. July 20, 2000) (holding that

the temporal proximity of the plaintiff's demotion, suspension and dismissal to onset of

symptoms of bipolar disorder was sufficient to raise an inference of disability discrimination)).

There also exists other evidence demonstrating that the Defendants engaged in a pattern or practice of discrimination against those with disabilities. Initially, Ms. Savino made her distaste for people with disabilities and taking medical leave or time off known to Ms. Shanahan in or about 2017, when Ms. Shanahan requested time off to see her mother in the hospital, and the assistant manager asked Ms. Shanahan to wait and finish the month out, even though they did not know if her mother was going to live much longer. SOF ¶ 8. Ms. Shanahan had also heard about other employees undergoing similar conditions when she transferred to the Chadds Ford location, including an employee who came back to work after having shingles and was subjected to harassment, discrimination and retaliation, including termination. SOF ¶ 122. In fact, Ms. Shanahan was specifically warned by another employee: "don't get sick or have surgery." SOF ¶ 122. Unfortunately for Ms. Shanahan, she had a disability, was compelled to have surgery, and suffered the same fate as past employees, culminating in her termination. This is sufficient for a jury to reasonably infer that Defendants made the decision to terminate Ms. Shanahan because of her disabilities, and Ms. Shanahan has established a *prima facie* case of disability discrimination.

### 3. Defendants Failed to Accommodate Ms. Shanahan and Failed to Engage in the Interactive Process

Ms. Shanahan has demonstrated that Defendants refused to accommodate her disability and failed to engage in the interactive process. "Under the ADA, an employer engages in unlawful discrimination by 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.'" *Allen v. Verizon Pennsylvania, Inc.*, 418 F. Supp. 2d 617, 623 (M.D. Pa. 2005) (citing 42 U.S.C. § 12112(b)(5)(A)). An accommodation may include "'job restructuring, part-time or modified

11

work schedules, reassignment to a vacant position, acquisition or modification of equipment or

devices, appropriate adjustment or modifications of examinations, training materials or policies,

the provision of qualified readers or interpreters, and other similar accommodations for

individuals with disabilities.'" *Id*. (citing 42 U.S.C. § 12111(9)(B)). "It is plain enough what

'accommodation' means. The employer must be willing to consider making changes in its

ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to

work." *Id*. (citation omitted). "[W]hether a proposed accommodation is reasonable is a question

of fact." *Id*. (citing *Williams v. Philadelphia Housing Auth*., 380 F.3d 751, 771 (3d Cir. 2004)).

"The parties are required to engage in an interactive process to find a reasonable

accommodation." *Id*. "This means they must make a good-faith effort to seek accommodations."

*Id*. "In this process, the employer must make every effort to determine the appropriate

accommodation." *Id*. (citation and internal quotation omitted). The Third Circuit has stated "it is

the employer's duty to help the disabled employee devise accommodations." *Id*. (citing *Williams*,

380 F.3d at 772). "Further, it is the employer's responsibility to gather needed information:

'Once the employer knows of the disability and the employee's desire for accommodations, it

makes sense to place the burden on the employer to request additional information that the

employer believes it needs.'" *Id*. (citing *Taylor*, 184 F.3d at 315). "When a requested

accommodation is not succeeding or is not possible, an employer has a duty to explore further

arrangements to reasonably accommodate the employee's disability." *Id.*

"If an employee has made a facial showing that a requested accommodation is possible,

'the defendant then bears the burden of proving, as an affirmative defense, that the

accommodation[ ] requested by the Plaintiff [is] unreasonable or would cause an undue hardship

on the employer.'" *Id*. (citing *Gaul v. Lucent Technologies, Inc*., 134 F.3d 576, 580–81 (3d

Cir.1998); 42 U.S.C. § 12112(b)(5)(A)). "[F]ailure to accommodate claims 'do not require that an employer's action be motivated by a discriminatory animus directed at the disability and, therefore, the *McDonnell-Douglas* test does not apply.'" *Emmell v. Phoenixville Hosp. Co., LLC.*, No. CV 16-3787, 2018 WL 3727765, at *5 (E.D. Pa. Aug. 6, 2018).

### a.  Ms. Shanahan Has Established a Prima Facie Case of Failure to Accommodate

Defendants make two arguments in their Brief: one, that Ms. Shanahan was not entitled to any accommodation because she was not disabled and was not perceived to be disabled; and two, that Ms. Shanahan requested and was provided with "several" accommodations regarding her return to work. *See* Defendants' Brief, at pp. 13-15. Neither of these arguments have merit.

First, as discussed in detail above, Ms. Shanahan was disabled under the ADA. Although only obligated to demonstrate one of the three definitions set forth by the ADA to establish disability, Ms. Shanahan has successfully demonstrated two: that she suffered a physical impairment that substantially limited a major life activity (here, walking); and that Defendants perceived her to be disabled. *See Sine v. Rockhill Mennonite Home*, 275 F. Supp. 3d 538, 544–45 (E.D. Pa. 2017) (citing 42 U.S.C. § 12102(1).

Defendants also did not make reasonable accommodations to the known physical limitations of Ms. Shanahan, a disabled individual, and have failed to show that any of those accommodations would have imposed any undue hardship or burden. Ms. Shanahan first requested the accommodation of an extended medical leave until November 11, 2019 or an earlier return on a part time or modified basis. SOF ¶ 32. Although Ms. Shanahan had been excited to return to work in September 2019, her foot had not been healing as quickly as hoped or anticipated, and her doctor recommended that she be out until at least November 11, 2019 to recover, with another recommendation to be made at that time. SOF ¶34. In fact, in his October

14, 2019, Mr. Kalina expressly acknowledged that Ms. Shanahan had requested an accommodation of a limited extension of leave until November 11 and/or a part-time or modified basis to return to work, but stated that they "have a business to run" and "cannot accommodate your leave until November 11, 2019." SOF ¶ 49.

Indeed, Ms. Shanahan received a call from Defendants at home while laying in bed with her foot elevated and iced, and was informed that if she did not come back before November 11 she would lose her job. SOF ¶¶ 35, 36, 37. Ms. Ramey did not offer any suggested accommodations during that discussion. SOF ¶ 39. In fact, when Ms. Shanahan informed Ms. Ramey that she was unable to drive, Ms. Ramey suggested that Ms. Shanahan's husband drive her back and forth to work. SOF ¶ 40. This is quite the opposite of an accommodation.

Due to Defendants' abject failure to accommodate her, by email dated October 9, 2019, Ms. Shanahan informed Ms. Ramey that she would speak to her physician regarding an accommodation of her disability and limited extension of her leave, including an earlier return to work date. SOF ¶ 42. When she had not yet heard from her doctor, on October 11, 2019, Ms. Shanahan wrote to request the accommodation that would allow her to return to work on November 11 and potentially other accommodations. SOF ¶ 45. Instead of accommodating this request, Ms. Ramey responded that Plaintiff's position would not be held until November 11, but that once she was released to return, they could see if her position or another position for which she was qualified was available. SOF ¶ 46. Ms. Shanahan noted in an email dated October 14, 2019 that her request for accommodation to return to work was not being considered. SOF ¶ 47.

Moreover, when Ms. Shanahan defied her doctor's orders and requested that her physician allow her to return to work earlier than his initial directive, Defendants purported to "agree" to the restrictions imposed by her doctor, but made it entirely clear that they would not

14

accommodate her. Although knowing that Plaintiff had just endured a several hour surgery on her foot, and that she had returned to work earlier than directed, and noting that Ms. Shanahan required to be in a boot and required periodic icing of her foot, Defendants demanded that Ms. Shanahan perform several impossible tasks of someone in that position, including driving, navigating stairs, navigating driveways and hills, conducting surveys by moving furniture, and packing, lifting and carrying items, navigating a two story, 18,000 square foot center, lifting items, and pushing, pulling and bending. SOF ¶ 57. This was particularly troublesome when Defendants demanded that Ms. Shanahan drive when Ms. Shanahan specifically informed Ms. Ramey that she could not drive, and Ms. Ramey offered no solution or accommodation other than to suggest that Ms. Shanahan's husband drive her to work every day. SOF ¶¶ 39, 40.

Based on the foregoing, Ms. Shanahan has sufficiently demonstrated that she requested accommodations and that Defendants failed to accommodate her.

### b. Defendants Failed to Engage in an Interactive Dialogue with Ms. Shanahan

Defendants failed to make a good faith effort to assist Ms. Shanahan in seeking and obtaining accommodations. As noted above, Ms. Shanahan requested that she be permitted to extend her leave until November 11, 2019, per the instructions of her doctor. SOF ¶ 32. Instead of discussing viable options, or engaging in any reasonable dialogue, Defendants abruptly and repeatedly informed her that they would not hold her position until that date. SOF ¶¶ 37, 41, 46.

Moreover, as also noted above, when Ms. Shanahan informed Ms. Ramey that she was unable to drive, Ms. Ramey offered no accommodations or solutions, other than to suggest that Ms. Shanahan's husband drive her to and from work everyday. SOF ¶¶ 39, 40. Moreover, upon her return, Defendants demanded that Ms. Shanahan perform several home calls requiring that she drive constantly throughout the day. SOF ¶ 57.

Defendants further demonstrated their entire lack of interest in any interactive dialogue when Ms. Shanahan voiced her concerns about harassment and discrimination upon her return from medical leave. At the meeting to discuss her concerns, Ms. Shanahan was bullied and belittled, being told such comments as: "you're making this too hard on yourself," "it's not that stressful," and "if you have this kind of attitude it won't help you." SOF ¶ 145.

In *Biggs v. Thomas Jefferson Univ. Hosp.*, No. CIV.A. 13-03037, 2014 WL 3709749, at *4 (E.D. Pa. July 28, 2014), the Court noted that: "it is not the Court's task to resolve issues of credibility at the summary judgment stage of litigation" and thus the Court could not decide which party to believe on the issue of the plaintiff's request for accommodation. Because the plaintiff's claim for failure to accommodate involved a dispute over whether he requested the accommodation, it "constitutes an issue of material fact," and summary judgment in favor of the defendant was "not appropriate." *Id.*

Defendants falsely claim that Ms. Shanahan did not properly engage in the interactive process because she did not adequately keep Defendants informed of her progress and recovery during her second leave of absence. This is simply not true. Notwithstanding the fact that the sole reason that Ms. Shanahan required a second leave of absence was because she returned to work too early, against her physician's orders, due to threats from Defendants that she would lose her job, Ms. Shanahan did inform Defendants of her progress and expected return. Specifically, Ms. Shanahan emailed Ms. Savino on November 21 and Mr. Kalina on December 9, 2019, respectively, regarding her expected return to work date on January 8, 2020. SOF ¶¶ 154, 155. In January 2020, Ms. Shanahan went to the doctor and was informed that she was cleared to return to work, and could move around the design center without a boot or scooter. SOF ¶ 160. On

16

January 7, 2020, she immediately confirmed to Defendants she was ready and able to return to work as of that date and planned to return on the following day, January 8, 2020. SOF ¶ 165.

Defendants apparently take issue with the fact that Ms. Shanahan did not return to work over the holidays. This is nonsensical. As Ms. Savino testified, and the documents demonstrate, December is historically one of Ethan Allen's least busy months. SOF ¶ 98, 183. Ms. Shanahan likely would not have been able to see her physician during the holidays, but had an appointment almost immediately thereafter. Moreover, Plaintiff kept Defendants informed of her expected return date, which was confirmed by her physician at her appointment in early January 2020.

The evidence demonstrates that Ms. Shanahan sought to return to work, with reasonable accommodations. Instead of engaging in any interactive process, or agreeing to Ms. Shanahan's requested accommodations, Defendants simply terminated Ms. Shanahan. Defendants' motion for summary judgment on Ms. Shanahan's claim for failure to accommodate should be denied.

### c. Ms. Shanahan Did Not Request an Indefinite Job Protected Leave as an Accommodation

Defendants argue that Ms. Shanahan also cannot establish a failure to accommodate claim because her requested accommodation for an "indefinite leave" was not reasonable. Contrary to Defendants' claim, there is absolutely no indication that Ms. Shanahan ever gave any inconsistent return dates or sought or requested any type of "indefinite leave."

As noted above, Ms. Shanahan had a very specific and limited request. For her first leave, she requested an accommodation of an extension of leave to November 11, 2019. SOF ¶ 32. This was outright denied, as she was told her position would not be held open until that date. SOF ¶ 49. Accordingly, Ms. Shanahan went against her physician's orders and returned to work on November 1, 2019. SOF ¶¶ 51, 55. Thereafter, because her foot had not been healing properly (in large part due to the rejected request to return on November 11), Ms. Shanahan requested a very

limited leave, from November 21, 2019 through January 8, 2020. SOF ¶¶ 152-154. As noted

above, Ms. Shanahan had emailed both Ms. Savino (on November 21) and Mr. Kalina (on

December 9) regarding her expected return to work date on January 8, 2020. SOF ¶¶ 154, 155.

On January 7, 2020, Ms. Shanahan confirmed her return to work the following day, January 8,

2020, and was informed that she could not return. SOF ¶¶ 165, 166.

Nor, as Defendants claim, is there any evidence whatsoever that the other designers

worked longer hours due to Ms. Shanahan's short absence. Ms. Savino specifically testified that

not one designer told her that they were working over 45 hours per week and she could not

identify one that had done so. SOF ¶¶ 191, 193. Defendants' cited cases are entirely inapposite to

the facts here. *See Garner v. Sch. Dist. of Philadelphia*, 63 F. Supp. 3d 483, 492 (E.D. Pa. 2014)

(employee only requested indefinite medical leave, consistently maintained that he was

completely disabled from performing job, never believed that he could return to work at a date in

the future and never informed employer that he could return at any future date); *Peter v. Lincoln

Tech. Inst., Inc*., 255 F. Supp. 2d 417, 437 (E.D. Pa. 2002) (employer not required to provide

indefinite leave as accommodation where employee never informed employer that she had a

disability or required an accommodation, just that she was going out on leave without any

indication of when she would return or any information demonstrating her need for leave).

#### d.  <u>There was No Undue Hardship for the Design Center</u>

Defendants further claim that Ms. Shanahan was not entitled to any accommodations

because it was an undue hardship to hold her position open. As discussed in more detail *infra*,

Defendants have not presented evidence demonstrating undue hardship, or more importantly,

than any decrease in sales was due to Ms. Shanahan's short medical leave. Ms. Savino's

testimony was a mass of inconsistencies and self-serving statements without any factual support

or analysis. Moreover, even if Ms. Shanahan's absence was a hardship (which it was not), it makes no logical sense for Defendants to replace Plaintiff two weeks prior to her return with a new designer, which Defendants admit generally take between three and six months to start being profitable, when Plaintiff was to return in two weeks and would immediately be profitable.

For all of these reasons, Ms. Shanahan has established her claim of disability discrimination, and Defendant's motion on this claim should be denied.

## C.   Ms. Shanahan Has Established a Prima Facie Case of Age Discrimination

"Under the ADEA, a plaintiff who relies upon indirect or circumstantial evidence enjoys the benefit of the Burdine–McDonnell Douglas burden shifting mode of analysis applied in Title VII cases." *Schmidt v. Montgomery Kone, Inc*., 69 F. Supp. 2d 706, 710 (E.D. Pa. 1999). "First, the plaintiff must establish a prima facie case of age discrimination by proving that (1) he was over forty years of age at the relevant time; (2) he was qualified for the position in question; (3) he suffered an adverse employment action; (4) he was replaced by a sufficiently younger person to permit an inference of age discrimination." *Id*.  (citing *Ryder v. Westinghouse Elec. Corp*., 128 F.3d 128, 136 (3d Cir.1997)).

"Once the plaintiff establishes a prima facie case, the defendant must state a legitimate, non-discriminatory reason for the adverse employment action." *Id*. at 711. "If the defendant does so, the plaintiff must then meet his burden of persuasion by proving that the defendant's proffered reasons are not the 'true reasons' for its decision, but instead are merely a pretext for age discrimination." *Id*. "A corollary to this final step… is that rejection of the employer's offered reasons alone permits … an inference that intentional discrimination was the real reason for the adverse employment action. *Id*. (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993)).

19

Ms. Shanahan has demonstrated a prima facie case. Ms. Shanahan is over forty years of age and was sixty one (61) years old at the time of her termination from Ethan Allen. SOF ¶ 1. Ms. Savino knew Ms. Shanahan's age, since she brought it up amongst her and a few other older designers that they were all around the same age. SOF ¶ 231.

Ms. Shanahan was clearly qualified for the position, as not only was she employed in that position for many years, but she earned several awards in recognition of her excellent work. SOF ¶¶ 2, 7, 8. Plaintiff suffered an adverse employment action, as she was terminated.

Finally, Ms. Shanahan was replaced by a sufficiently younger person to permit an inference of age discrimination. Ms. Savino hired another designer to take Ms. Shanahan's job, who was significantly younger than Ms. Shanahan. SOF ¶ 228. This individual, Robin Leigh, was an individual who was indisputably much less qualified, much less dedicated, and much less responsible, but younger, than Ms. Shanahan; notably, while Ms. Shanahan had begun her employment with Ethan Allen in 2000, Ms. Leigh began in 2012, and took off several years to have a family until returning to Ethan Allen in 2020. SOF ¶¶ 229, 230.

Ms. Savino hired Ms. Leigh to replace Ms. Shanahan at the end of December 2019, with a start date of December 27, 2019. The hiring of this younger and less experienced and qualified individual was entirely unnecessary, as the store was not busy and Ms. Shanahan was to return less than two weeks later. SOF ¶ 158.

In addition to the foregoing, Defendants displayed their discriminatory animus towards Ms. Shanahan based on her age, and their preference for younger employees, in several other ways. In the Ethan Allen brochures, all of the designers represented are diverse in ethnicity, but are young, all under the age of forty. SOF ¶ 255. In September 2019, an email was sent to the youngest employees only to represent the Ethan Allen booth at the Philadelphia Home Show in

January 2020 because management wanted only its youngest employees to represent Defendant, which would result in giving only those designers the opportunity for new contacts and business. SOF ¶ 256. Ms. Shanahan also learned that, when Covid hit, Ms. Savino laid off all the older employees but kept the two younger ones who did not have as much seniority as the other designers. SOF ¶ 232. She did not do anything by seniority, and for Ms. Savino, she always favored the younger designers. SOF ¶ 232.[1]

In another instance of the discriminatory animus held by Ms. Savino against the older employees, another older designer, Mark, who was in his 50s, felt that he was being discriminated against because he had a lot of seniority and was laid off due to Covid, even though his sales were good. SOF ¶ 233. Notably, Ms. Savino did not lay off a young designer who had just gotten out of college but whose numbers were not as good as Mark's numbers. SOF ¶ 233. Mark is still employed by Ethan Allen, but ultimately transferred to a store in Connecticut so he did not have to work under Ms. Savino. SOF ¶ 233.

Based on the foregoing, Ms. Shanahan has demonstrated a prima facie case of discrimination based on her age, and Defendants' motion on this count should be denied.

### D.  Ms. Shanahan Has Established a Prima Facie Case of Retaliation Under the ADA

"To establish a prima facie case of retaliation under the ADA, a plaintiff must show that: (1) he engaged in a protected employee activity; (2) his employer took some adverse action either after or contemporaneous with that protected activity; and (3) a causal connection existed

---

[1] Tellingly, although Defendants claim that Ms. Shanahan cannot demonstrate damages because she would have been laid off due to Covid later in 2020 anyway, it does appear that, due to her age, Defendants likely would have laid off Ms. Shanahan at that time. SOF ¶ 232.

between the employee's protected activity and the employer's adverse action." *Biggs*, 2014 WL 3709749, at *4 (citing *Krouse v. Am. Sterilizer Co*., 126 F.3d 494, 500 (3d Cir.1997)).

"A causal connection can be demonstrated by providing direct or circumstantial evidence of (1) unusually suggestive temporal proximity; (2) a pattern of antagonism following the protected activity; or (3) a showing that the reason for his alleged adverse action is pretextual." *Id*. (citing *Leboon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir.2007)). "If the employee establishes a prima facie case for retaliation, the burden then shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action." *Id*. (citing *Woodson v. Scott Paper Co*., 109 F.3d 913, 920 (3d Cir. 1997)). In its Brief, Defendants argue that Ms. Shanahan has failed to demonstrate the first and third elements of a claim for retaliation. Contrary to such claims, as discussed below, Ms. Shanahan has established all elements of a *prima facie* case for retaliation under the ADA.

### 1.  **Ms. Shanahan Engaged in Protected Activity**

Defendants argue, incorrectly, that Ms. Shanahan did not engage in protected activity.[2]

First, Ms. Shanahan requested reasonable accommodations for her disability. Specifically, Ms. Shanahan requested an accommodation to allow her to return to work on November 11, 2019, or earlier on a part time or modified basis, as well as other potential accommodations. SOF ¶ 32. When this was denied, Ms. Shanahan requested accommodations through a note from her physician, Dr. Kwaadu, consisting of the use of a boot, the use of a medical scooter, and permission and opportunity to ice her foot periodically. SOF ¶ 56.

---

[2] Defendants' argument that Ms. Shanahan could not recall complaining at deposition is irrelevant; the facts and evidence speak for themselves and unambiguously demonstrate that she did.

These requests for accommodations are protected activity. *See Biggs v. Thomas Jefferson Univ. Hosp.*, No. CIV.A. 13-03037, 2014 WL 3709749, at *4 (E.D. Pa. July 28, 2014). ("Under the ADA, a request for a reasonable accommodation constitutes protected activity.").

Ms. Shanahan also engaged in protected activity when she complained to her supervisor, Mr. Golinski, regarding discrimination and harassment. By email dated November 7, 2019, Ms. Shanahan complained about the discriminatory, harassing and disparate treatment she had been experiencing since her return from medical leave. SOF ¶ 123. This email absolutely constitutes a complaint of harassment and discrimination and any argument to the contrary is disingenuous.

In this email, Ms. Shanahan specifically stated that she felt that she was being treated differently because of her leave and the request she made for accommodation. SOF ¶ 123. Ms. Shanahan stated that she signed the Return to Work Agreement because she felt she had to, but she had significant concerns about the agreement, among other things, that: (i) the agreement only allowed her restrictions to be in place from November 1, 2019 through December 1, 2019; (ii) the agreement required her to change her days, such that she would now be required to work five straight days rather than three days with two days off; and (iii) a deficit was calculated in the amount of $3,998.83 regarding two clients, which had to be made up in three months, without informing Ms. Shanahan what the issues were, how the amount was calculated, or why Ms. Shanahan was at fault. SOF ¶ 127. Plaintiff further noted that requiring her to sell an extra 40% over her draw amount of $41,667 in her first month back from medical leave was not fair and extremely difficult, particularly when those months are traditionally slow. SOF ¶ 128. Ms. Shanahan indicated that she felt that she was being set up for failure, and requested assistance and a discussion of such issues. SOF ¶ 128. These statements clearly indicated Ms. Shanahan's belief that she was being subjected to harassing, discriminatory and retaliatory treatment as a

result of having taken FMLA and medical leave for her disability, with numerous supporting facts and examples of the unlawful treatment. This, too, is protected activity engaged in by Ms. Shanahan. *See Bonson v. Hanover Foods Corp.*, 451 F. Supp. 3d 345, 357 (M.D. Pa. 2020) ("it is clear that 'protected activity' under Title VII 'extends beyond formal complaints ... and can include informal protests of discriminatory employment practices, [such as] making complaints to management....'"). Conversely, the case cited by Defendants is inapplicable. *See Veal v. Am. Hearing Aid Assocs., Inc.*, No. CV 17-1738, 2018 WL 3632159, at *4–5 (E.D. Pa. July 30, 2018) (employee did not demonstrate prima facie case because although he complained about discourteous and unprofessional behavior, he did not mention or attribute it to his race).

Ms. Shanahan has satisfied the first prong of a prima facie case of retaliation.

## 2. Ms. Shanahan Has Demonstrated a Causal Link Between the Protected Activities and the Adverse Employment Decision

"Temporal proximity establishes causation on its own when the adverse action occurs so close to the protected conduct that the timing is 'unusually suggestive.'" *Zalinskie v. Rosner L. Offs., P.C.*, No. CIV.A. 12-289, 2014 WL 956022, at *7 (D.N.J. Mar. 12, 2014) (denying summary judgment where "the relatively short time between Plaintiff's initial written and multiple oral complaints and her termination is "unusually suggestive," and sufficient standing alone to create an inference of causality and defeat summary judgment."). "Courts generally focus on two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism." *Reyer v. Saint Francis Country House*, 243 F. Supp. 3d 573, 587 (E.D. Pa. 2017) (citing *Abramson v. William Paterson College of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001)). Notably, "a court may infer causation where an employer engages in a continuous pattern of antagonism between the time an employee engaged in protected activity and the adverse employment action." *Id.* (citing *Abramson*, 260 F.3d at 288). "Temporal

proximity and evidence of antagonism are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Id*. (citing *Kachmar v. SunGard Data Sys., Inc*., 109 F.3d 173, 177 (3d Cir. 1997) (retaliatory action occurred "[s]everal months after [the plaintiff's] last protected activity" along with other evidence of antagonism is sufficient to allege a causal connection). This is precisely what has occurred here.

Ms. Shanahan engaged in two types of protected activity: she made reasonable requests for accommodation and complained about discrimination, harassment and retaliation. Shortly after engaging in this protected activity, Ms. Shanahan was fired.  Specifically, Ms. Shanahan requested the accommodations through her physician's note dated October 21, 2019; and complained about the harassing, discriminatory and retaliatory treatment on November 7, 2019. She was terminated almost immediately thereafter, as Mr. Kalina sent Ms. Shanahan the letter dated November 26, 2019 that her position was being filled and she would have to apply for a new position once she returned from leave. SOF ¶ 157. This is sufficient to demonstrate temporal proximity and is unusually suggestive of retaliation. "[T]emporal proximity ... is sufficient to establish the causal link…." *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001) (citing *Woodson v. Scott Paper Co*., 109 F.3d 913, 920–21 (3d Cir. 1997)).

In addition to the temporal proximity demonstrated above, Ms. Shanahan was subjected to numerous instances of antagonistic treatment after her complaint of discrimination and harassment and her requests for accommodation, culminating in her termination. Specifically, even prior to her return, Ms. Shanahan was threatened that she would be terminated unless she returned to work earlier than her physician's recommended return date. Moreover, upon her return (earlier than her prescribed return date), Ms. Shanahan was told that they would accommodate only those restrictions set forth in Dr. Kwaadu's note, but that they still expected

her to perform several other duties, including, with respect to home calls, driving, navigating

stairs, navigating driveways and hills, conducting surveys by moving furniture, and packing,

lifting and carrying items; and, with respect to the design center, navigating a two story, 18,000

square foot center, and lifting items as needed; and pushing, pulling and bending as required.

SOF ¶ 57. This seems highly illogical and designed to harass someone who had just returned

from a medical leave for foot surgery, particularly when such person had not healed entirely yet,

had come back to work earlier than doctor's orders, with restrictions, and who clearly would not

be able to perform such tasks. The antagonistic efforts did not stop there. The day of Ms.

Shanahan's return, she was forced to sign a Return to Work Agreement with unfair and

impossible terms, including an unjustified requirement for Ms. Shanahan to pay back certain

deficits and impossible quotas to make, an unwanted change in schedule, and a limitation on her

accommodations. SOF ¶ 127. Ms. Shanahan was also subjected to further harassment, including

lack of administrative support despite her numerous requests for help, removal of her computer

and files, and transfer of her clients to other designers. SOF ¶¶ 139, 141.

Moreover, after Ms. Shanahan complained, she was subjected to even further hostile

behavior. Ms. Shanahan was made to meet with Ms. Savino and Mr. Golinski, where, despite her

obvious distress, she received either empty promises or lack of response to her concerns and

shifting blame onto Ms. Shanahan herself, belittling and bullying her, making such comments as:

"you're making this too hard on yourself," "it's not that stressful," "if you have this kind of

attitude it won't help you," "that's not how we do things here," and, finally, indicating that if it

was too hard on her she should just go back out on leave. SOF ¶¶ 145, 146. This repeated hostile,

harassing and antagonistic treatment demonstrates the pattern of antagonism sufficient to

demonstrate a causal link between protected activity and an adverse employment action.

Ms. Shanahan has established both temporal proximity and a pattern of antagonism. Taken together, these more than amply demonstrate the causal link necessary to demonstrate retaliation. Based on the foregoing, Ms. Shanahan has established a claim for retaliation.

### E.  Ms. Shanahan Has Established FMLA Retaliation

"The FMLA's implementing regulations make clear that an employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave. For example ... employers cannot use the taking of FMLA leave as a negative factor in employment actions such as hiring, promotions or disciplinary actions...." *Scopelliti v. Traditional Home Health & Hospice*, No. 3:18-CV-00040, 2019 WL 8955168, at *4 (M.D. Pa. Dec. 4, 2019), *report and recommendation adopted as modified*, No. 3:18-CV-40, 2020 WL 2850905 (M.D. Pa. June 2, 2020) (citing 29 C.F.R. § 825.220(c)). "To prove a claim for FMLA retaliation, an employee must show that h[er] employer intentionally discriminated against him for exercising an FMLA right." *Id*. (citations omitted). "To establish a prima facie case of FMLA retaliation, the plaintiff must show that: (1) she took leave under the FMLA; (2) she suffered an adverse employment action; and (3) there was a causal connection between her protected activity and the employer's adverse employment action." *Id*. (citing *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012)).

"Courts generally analyze FMLA retaliation claims such as this one under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *VanStory-Frazier v. CHHS Hosp. Co., LLC*, 827 F. Supp. 2d 461, 473–74 (E.D. Pa. 2011). "Under this framework, a plaintiff must first establish a prima facie case of retaliation under the FMLA; to do so, she must show that (1) she took FMLA leave or engaged in other protected activity under the FMLA; (2) she suffered an adverse employment

27

action; and (3) the adverse action was causally related to her leave or other protected activity."
Id. at 474. "If the plaintiff establishes a prima facie case, the burden shifts to the defendant to
articulate a legitimate, nonretaliatory reason for the adverse action." *Id*. "[I]f the defendant
articulates such a reason, 'the plaintiff must be able to convince the factfinder both that the
[defendant's] proffered explanation was false, and that retaliation was the real reason for the
adverse ... action.'" *Id*.

Ms. Shanahan has established a prima facie case for retaliation under the FMLA. Ms.
Shanahan took FMLA leave and suffered an adverse employment action- termination –
approximately, two months later, although the evidence shows that Defendants actually
recommended her termination immediately upon the exhaustion of her leave.

Ms. Shanahan has further demonstrated that her termination was causally related to her
leave. "Because FMLA leave is a protected activity, the temporal proximity analysis may begin
at the point the plaintiff 'exhausted his twelve weeks of FMLA leave.'" *Mackenzie v. Caplan
Industries, Inc*., No. CV 19-371, 2019 WL 3284886, at *4 (E.D. Pa. July 19, 2019). Ms.
Shanahan's FMLA leave exhausted on September 27, 2019. P000248-49. She was ultimately
terminated on November 26, 2019, when Mr. Kalina sent her the letter stating that her position
was being filled, although the evidence demonstrates that Defendants sought to terminate Ms.
Shanahan earlier. Most significantly, by letter dated September 30, 2019, Ms. Savino wrote to
Ms. Ramey recommending that they no longer hold Ms. Shanahan's position open. SOF ¶ 184.

As this Court has noted, "[t]he Third Circuit has held that 'two days between the
protected activity engaged in and the alleged retaliation sufficed ... to support an inference of a
causal connection between the two…'" *Mackenzie v. Caplan Industries, Inc*., No. CV 19-371,

2019 WL 3284886, at *4 (E.D. Pa. July 19, 2019). Here, only three days elapsed between the exhaustion of Ms. Shanahan's FMLA leave and Defendants' clearly stated intent to fire her.

Nevertheless, even if the actual termination date of November 26, 2019 is used, Ms. Shanahan has still established a causal link. *See Mackenzie v. Caplan Industries, Inc*., No. CV 19-371, 2019 WL 3284886, at *4 (E.D. Pa. July 19, 2019) (noting that the Third Circuit has held that a 2-days to 2-months time frame sufficed to demonstrate unusually suggestive temporal promixity, and that several weeks was sufficient, particularly where plaintiff stayed in contact with defendant during leave and defendant told plaintiff to stay out of work until he was medically cleared to return). In addition, as discussed in detail above, there existed a severe and blatant pattern of antagonism against Ms. Shanahan upon her return from leave sufficient to demonstrate the causal link between her use of FMLA leave and her termination.

As also discussed above, Defendants failed to articulate a legitimate, nonretaliatory reason for Ms. Shanahan's termination; and, in any event, the explanation was false. Defendants argue that, upon Ms. Shanahan's expiration of FMLA leave, it took "all possible steps" to provide opportunities and additional accommodations. The facts demonstrate exactly the opposite: that it took aggressive steps to retaliate and recommended immediate termination.

In *Van-Story*, like the Defendants here, the defendant argued that it was entitled to summary judgment because plaintiff could not demonstrate a causal connection between FMLA leave and her termination, and even if she could, defendant terminated her due to insubordination and inappropriate behaviors at work. *See id*. The Court held that the factual dispute regarding the events leading to plaintiff's termination, in which both parties claimed that the other was unprofessional and aggressive, was sufficient to establish a factual issue regarding defendant's

29

reason for terminating plaintiff. Further, as Ms. Shanahan does here, the plaintiff had alleged

other retaliatory acts and a pattern of antagonism upon her return from FMLA leave.

As the *Van-Story* Court noted, just as "[a] play cannot be understood on the basis of some

of its scenes but only on its entire performance," a retaliation analysis "must concentrate not on

individual incidents, but on the overall scenario." *Id*. at 476 (citing *Shaner v. Synthes (USA)*, 204

F.3d 494, 503 n.9 (3d Cir. 2000)). The evidence here, taken as a whole and viewed in the light

most favorable to plaintiff, could suggest a retaliatory motive for Ms. Shanahan's termination. A

jury could conclude (as it should) that Defendants "tried to induce plaintiff's insubordination or

to manufacture other reasons" for terminating her. *See Van-Story*, 827 F.Supp.2d at 477. Based

on the foregoing, this Court should deny Defendants' Motion for Summary Judgment.

### F.  **Ethan Allen Has Not Demonstrated a Legitimate, Non-Retaliatory, or Non-Discriminatory Reason for Terminating Ms. Shanahan and Replacing her**

Once the plaintiff establishes her *prima facie* case, the burden shifts to the employer to

"proffer a legitimate, non-discriminatory reason for the adverse employment decision." *Wilkie v.

Luzerne County*, 207 F.Supp.3d 433 (M.D. Pa. 2016).  "Once the plaintiff establishes the prima

facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason

for the adverse employment action." *Schneider v. Works*, 223 F. Supp. 3d 308 at 318 (E.D.Pa.

2016). "If a legitimate reason for the employment action is articulated, the burden shifts back to

plaintiff to demonstrate that the reason is merely pretextual." *Id*. (citing *Fuentes v. Perskie*, 32

F.3d 759, 764 (3d Cir. 1994)). "For a plaintiff to 'defeat summary judgment...[he] must point to

some evidence, direct or circumstantial, from which a factfinder could reasonably either (1)

disbelieve [Defendant's] articulated legitimate reason[ ]; or (2) believe that an invidious reason

was more likely than not a motivating or determinative cause of [Defendant's] action.'" *Id*.

Defendants claim that it filled Ms. Shanahan's position "because keeping the position

open was unreasonable as a matter of law, and caused undue hardship for Ethan Allen." *See* Defendants' Brief, at p. 34. This is not a legitimate reason to terminate Ms. Shanahan. Keeping a position open for someone for an additional two weeks is not unreasonable and it cannot be deemed an undue hardship for a store to have one less designer for a limited period of time in a historically slow month. Defendants have failed to provide a legitimate, non-discriminatory, non-retaliatory reason for Ms. Shanahan's termination.

### G.  Ms. Shanahan Has Demonstrated Pretext

Finally, even if Defendants did proffer a legitimate, nondiscriminatory reason for Ms. Shanahan's termination (although Defendants have not), Ms. Shanahan has shown that Defendants' proffered reasons are pretext for discrimination and retaliation. In order to create a genuine dispute of material fact as to whether Defendants' proffered reason is pretext, Plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably **either** (1) disbelieve the employer's articulated legitimate reasons; **or** (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Horton v. Amerway, Inc.*, No. CIV.A. 3:11-00112, 2013 WL 3802459, at *5 (W.D. Pa. July 19, 2013) (emphasis added). "Pretext for intentional discrimination may be established by showing inconsistencies in the employer's proffered reason." *Schneider*, 223 F. Supp. 3d 308 at 318 (citations omitted). As discussed below, Plaintiff has demonstrated pretext.

### a.  The evidence does not support Defendant's reasons for terminating Ms. Shanahan

As noted above, Defendants cite to alleged "undue hardship" as grounds for having replaced Ms. Shanahan while she was out on medical leave. Such grounds are not supported by the evidence and there is evidence from which a reasonable juror could disbelieve that Defendants had any alleged undue hardship from Ms. Shanahan's short absence while on leave.

There was no "undue hardship" upon Ethan Allen due to Ms. Shanahan's short absence during her medical leave. When Ms. Savino referred to the hardships warranting replacing Ms. Shanahan, she meant the decrease in home call performance, the decrease in written sales, and the decrease in be-back ratio. SOF ¶ 197.  Ms. Savino testified that there was not a set number of the correct designers, but claimed that she looked at certain "statistics" without identifying any of those numbers or statistics. SOF ¶ 185.

Ms. Savino stated that Ms. Shanahan's absence was a factor in the business being down 16%, but then testified that there were other factors that were "too numerous" to mention. SOF ¶ 186. With respect to home call performance, although Ms. Savino claimed that certain designers complained that they did not have time to do home calls, they did not give a reason as to why, and she could not identify even one designer that she felt was working 45 hours a week or more. SOF ¶ 191. With regard to the "be-back" business, which Ms. Savino claimed was down three percent without the proper number of designers, Ms. Savino admitted that there could be several reasons and factors other than Ms. Shanahan's absence why "be back" business was down, including price, preference for other furniture stores, and the inability for designers to relate to clients and encourage them to return. Savino Dep. SOF ¶¶ 194-196.[3]

Ms. Savino also could not answer when asked, if she could not say for certain how Ms. Shanahan's absence caused a shortage, how adding an additional designer would not have

---

[3] As an initial matter, Ms. Savino's credibility is questionable, as she claimed that she could not recall if she had been fired from any of the three management jobs that she had prior to Ethan Allen, and stated that she "possibly" was asked to resign from certain of these jobs, but could not recall the circumstances of being asked to resign. SOF ¶ 4. Similarly, Ms. Savino inconsistently testified that she believed she was overseeing six design consultants, and was sure it was more than five, but was not sure that it was less than ten. SOF ¶ 5. Ms. Savino also could not recall any training regarding discrimination and/or disabilities, claiming that she just referred to Human Resources for such issues. SOF ¶ 6.

effectively corrected the issues. SOF ¶ 206. Most importantly, other than Ms. Savino's self-serving testimony, Defendants have offered no evidence whatsoever that the alleged decreases in written sales,[4] home call performance and be-back ratios were due to Ms. Shanahan's short absence. Although Ms. Savino testified that she "did calculations" that they could not have added an additional designer to increase sales and improve home call performance while Ms. Shanahan was out on leave, she claimed that it could potentially be problematic by rendering a lack of opportunity for designers and did not provide any support, detail or analysis regarding her alleged calculations. SOF ¶ 198.

Moreover, upon being questioned at deposition, Ms. Savino could not point to any identifiable markers or calculations used to determine the "delicate balance" of "ideal" number of design consultants. SOF ¶ 202. Ms. Savino claimed there was nothing written down and it constantly changed, demonstrating that there was no formula used to determine how many design consultants were needed. In addition, Ms. Savino could not identify even one designer who was compelled to work overtime due to Ms. Shanahan's short absence. SOF ¶ 193.

Defendants further claim that the months of January and February were their "busiest times." The documents indicate that, although January and February have been slightly higher in sales in the last couple of years, the numbers are comparable or even less than the summer months. SOF ¶ 183. Even more notable, the month of December, during which Ms. Shanahan was replaced, was significantly lower for the previous two years and thus their least busy month. This was confirmed by Ethan Allen employee and Design Consultant Diane Rau, who told Ms. Shanahan that she should not have lost her job because the store was not busy and she did not

---

[4] Indeed, as noted below, for the past years, December had always been the lowest month for written sales, and Ms. Shanahan had not been on leave during those previous years. *See* SOF ¶ 183.

know why they had to hire another designer. SOF ¶ 177. Indeed, Ms. Rau sent Ms. Shanahan text messages because she felt bad that they were telling Ms. Shanahan that they were busy and had to hire somebody to take her place, when Ms. Rau knew that they were not really busy. SOF ¶ 179. According to Ms. Rau, she noted that the store had approximately one new person a day during that time, and it was "hardly busy." SOF ¶ 180.

Notably, the excuse of "hardship" is illogical based on Defendants' own testimony. Even if January and February were higher producing months requiring another consultant, it was undisputed that Ms. Shanahan was returning in early January, as she had confirmed as such with both Mr. Kalina and Ms. Savino weeks prior to that date. SOF ¶ 165. Ms. Savino testified that it would take approximately three to six months for a new designer to be profitable after hire. SOF ¶ 205. It therefore begs the question why Defendants would opt to replace Ms. Shanahan, who was indisputably going to return in January and begin earning money immediately, with a new hire that would not even begin to earn money until April at the earliest.

It is further notable that, while Ms. Savino cited six designers as the "ideal" number to have at the Chadds Ford store, particularly during the "busy" winter months, as of the date of this Brief, which is during the exact month in which Ms. Shanahan was replaced, there are five Design Consultants on the Ethan Allen Chadds Ford website. *See* SOF ¶ 204. Ms. Savino could not answer as to whether an additional design consultant hired would not have been the number to correct the alleged hardship. SOF ¶ 206.

Based on these facts, a reasonable juror could disbelieve Defendants' articulated reasons for Ms. Shanahan's termination.

### b.  The evidence demonstrates that Ms. Shanahan's disability was more likely than not the reason for her termination

Although not required to show both that a reasonable juror could disbelieve Defendants'

proffered reason and that there is evidence that the employer acted with discriminatory animus, Ms. Shanahan can do so here.[5]

Defendants violated their own policy in their quest to terminate Ms. Shanahan. The Ethan Allen Employee Handbook states that:

> Medical Leave of Absence.
>
> …
>
> Upon your return from a medical leave of absence, we will attempt to return you to your regular job if it is available. If it is not available, you will be placed in a similar job for which you are deemed by management to be qualified if such a job is available. If no jobs are available at the time, you will be given preferential consideration for any position for which you apply and for which you are deemed by management to be qualified following your notifying the Company in writing that you are ready and able to return to work.

SOF ¶ 209.

Mr. Kalina admitted that the Medical Leave of Absence policy had two parts: if a job was available, Ethan Allen would put the employee in that position, but if no job was available, the employee needed to apply. SOF ¶ 211. Defendants did not follow this procedure. Since Defendants replaced Ms. Shanahan (unnecessarily) during her leave, according to policy, they were obligated to place Ms. Shanahan in a similar position for which she was qualified. Defendants did not.

Tellingly, Defendants did not follow their own written policy. According to the handbook, under Medical Leave of Absence, if Ms. Shanahan tried to come back to work and her

---

[5] A plaintiff can demonstrate pretext at the summary judgment stage in two distinct ways: by either 1) pointing to evidence of record sufficient to convince a reasonable factfinder to disbelieve the employer's proffered reason; or 2) pointing to evidence that the employer acted with discriminatory animus. *See Burton v. Teleflex Inc.*, 707 F.3d 417, 430-31 (3d Cir. 2013). A plaintiff need not do both. *Id.*

position was filled, then Ethan Allen would have to place her in a similar position if one were open and only if one was not open, then she would have to apply for a job. SOF ¶ 209. Thus, an employee would only have to apply for a job if they could not find a similar job, because if a similar job was available, Ethan Allen was obligated to place the employee in that job. SOF ¶ 212.[6]

In this case, when Ms. Shanahan indicated that she had been cleared to return from leave, Defendants were obligated to determine if there were any available positions for which Ms. Shanahan was qualified and place her in that position. Not only did they not place Ms. Shanahan in a position for which she was qualified, the evidence demonstrates that no one even attempted to determine if any available positions existed. *See* SOF ¶ 223 (Mr. Kalina did not do anything to determine whether there were any similar jobs for which she was qualified that were open); SOF ¶ 213 (Ms. Savino did not believe she was required to do anything if an employee's job position had been filled in their absence); SOF ¶ 214 (Ms. Savino did not believe that it was her responsibility to help find an employee another position with Ethan Allen if their position was filled while they were out on medical leave).

Nor did Defendants even tell Ms. Shanahan about the part of the policy stating that if it was not available the employee would be placed in a similar job for which the employee was deemed qualified. SOF ¶ 227. Nor did they inform Ms. Shanahan that she would be placed without application into a similar job if one were available. SOF ¶ 220.

Contrary to Ethan Allen policy, Mr. Kalina did not believe he had any obligation or responsibility to ensure that there were no similar positions that Ms. Shanahan could be placed

---

[6] Even though Mr. Kalina claimed to know and understand the policy, at his deposition, Mr. Kalina appeared to have no idea what the actual provisions were or what they meant.

into. SOF ¶ 222. Instead, he instructed her to apply for any position that she felt she was qualified for. SOF ¶ 222. Mr. Kalina did not even know if there were any open or available positions at the time that they were having the conversations. SOF ¶ 225. Mr. Kalina only gave Ms. Shanahan a link to available positions in his January 8, 2020 email, but did not discuss with her the possibility of any similar jobs for which she was qualified, because it was not his responsibility; so he told her to go to the website and apply for listed positions "as they become available." SOF ¶ 226. Similarly, Ms. Savino stated that she may have been asked to consider whether there were any open job positions for which Ms. Shanahan was qualified when she was attempting to return to work, but did not recall looking for open positions. SOF ¶ 215.

In addition to the temporal proximity and pattern of antagonism experienced by Ms. Shanahan during her leave and immediately upon her return (discussed in detail below), the record is replete with numerous other instances demonstrating that Ms. Shanahan's disability was more likely than not the reason for her termination. As noted above, Ms. Savino had a history of discriminatory animus towards individuals with disabilities, such as when Ms. Shanahan was asked to finish the month out upon requesting time off to see her mother in the hospital, and the stories of other employees who had taken medical leaves and had been fired. SOF ¶ 8, 122. Defendants also unjustifiably refused to accommodate Ms. Shanahan, blatantly rejecting her request to remain on leave until November 11, per her physician's recommendation, and forcing her to return to work earlier upon threat of termination. SOF ¶¶ 35, 49.

In arguing that Plaintiff cannot demonstrate pretext, Defendants claim that Ethan Allen "went out of its way to accommodate the reasonable requests for accommodation was requesting." *See* Defendants' Brief, at p. 36. This is not supported by the record. As noted *supra*, Mr. Kalina admitted via email that Defendants would not accommodate Plaintiff's request for an

extended leave until November 11 or to return earlier on a part time or modified basis. SOF ¶ 49.

Nor was there, as Defendants claim, any "detailed analysis of the needs of the business to determine whether a continued leave of absence was a reasonable accommodation, or if it created an undue burden." Defendants' Brief, at p. 37. Ms. Savino testified generally that she "assessed the business" and "looked at certain statistics," but could not indicate how or why Ms. Shanahan's absence created an undue hardship or why the addition of another designer would not have resolved the issue. SOF ¶¶ 185, 201.

c.  **The temporal proximity and pattern of antagonism demonstrate pretext**

Ms. Shanahan has also established the causal connection and circumstances demonstrating pretext. With respect to the causal link between protected activity and the employer's adverse action, the case law has focused on two main factors: timing and evidence of ongoing antagonism. *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001). Ms. Shanahan has established both.

First, Ms. Shanahan has demonstrated temporal proximity sufficient to demonstrate pretext. Ms. Shanahan's medical leave relating to her disability was scheduled to take place from July 5, 2019 through July 27, 2019. Immediately thereafter, by letter dated September 30, 2019, Ms. Savino recommended that Ms. Shanahan be replaced. Defendants had not yet found her replacement as of November 1, 2019, so Ms. Shanahan returned on that date, but when Ms. Shanahan was compelled to take an additional short leave from November 21 through January 8, Defendants acted swiftly to replace her and found a replacement to begin less than two weeks prior to Ms. Shanahan's scheduled return date. "[T]emporal proximity ... is sufficient to establish the causal link…." *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001) (citing *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920–21 (3d Cir. 1997)).

Thus, even though Defendants actually terminated Ms. Shanahan during her second medical leave (which occurred less than two weeks after the first), the evidence indicates that Defendants did not hold Ms. Shanahan's position open and were actively seeking to replace her immediately upon the end of her first medical leave, after she requested a short extension of leave for her foot to properly heal.

Defendants ultimately terminated Ms. Shanahan during her medical leave, and the evidence indicates that Defendants had planned to terminate Ms. Shanahan earlier, once she requested an extension of the first leave. This was immediately after her requests and thus is unusually suggestive of a retaliatory motive. "Temporal proximity establishes causation on its own when the adverse action occurs so close to the protected conduct that the timing is 'unusually suggestive.'" *Zalinskie v. Rosner L. Offs., P.C.*, No. CIV.A. 12-289, 2014 WL 956022, at *7 (D.N.J. Mar. 12, 2014) (denying summary judgment where "the relatively short time between Plaintiff's initial written and multiple oral complaints and her termination is "unusually suggestive," and sufficient standing alone to create an inference of causality and defeat summary judgment.").

Notwithstanding the temporal proximity sufficient on its own to establish pretext, the Court need not rely on timing alone because Plaintiff has presented evidence of ongoing antagonism from her supervisor and others at Ethan Allen.

"[A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period." *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001) (citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920–21 (3d Cir.1997)). In *Incorvati v. Best*

*Buy Co.*, the District Court explained why the plaintiff had alleged facts sufficient to support a reasonable inference that the defendant retaliated against him for taking FMLA leave:

> This Court finds that Defendants' antagonistic conduct against Plaintiff during the period between Plaintiff's FMLA leave and discharge warrants an inference of causation. The allegations of antagonistic conduct … give rise to an inference that Defendants terminated Plaintiff's employment because he took FMLA leave.… Taken in the aggregate, these allegations give rise to a reasonable inference that Plaintiff's decision to take FMLA leave was causally connected to Defendants' decision to discharge him.

No. CIV 10-1939 RBK/KMW, 2010 WL 4807062 (D.N.J. Nov. 16, 2010). As discussed in detail below, Defendants subjected Plaintiff to a consistent pattern of antagonism after her leave.

The facts demonstrate that Defendants were clearly unhappy and resentful that Ms. Shanahan had a disability and took medical leave for that disability. The obvious harassment and antagonism demonstrated towards Ms. Shanahan during and after her leave indicates that it was her disability and use of leave that led to the decision to terminate Ms. Shanahan.

The below acts demonstrate that Ms. Shanahan was repeatedly and egregiously harassed both during and after her leave:

- Ms. Shanahan was told that her position would not be held open for her because she requested five additional weeks of leave for her foot to heal, per her physician's orders (SOF ¶ 30);

- Ms. Shanahan was told, while recovering from surgery, that they would not accommodate her request for additional leave and that if she did not return right away they would replace her (SOF ¶¶ 35, 37);

- Despite still recovering from a seven hour surgery to enable her to walk, Defendants informed Ms. Shanahan that they expected her to perform several duties that would be impossible for someone in a medical boot and scooter who was recovering from foot surgery, including, driving, navigating stairs, navigating driveways and hills, conducting surveys by moving furniture, and packing, lifting and carrying items, navigating a two story, 18,000 square foot center, and lifting items as needed, and pushing, pulling and bending (SOF ¶ 57);

- Ms. Shanahan was informed that they would only allow her to return to work with the few limited restrictions imposed by her physician and no other accommodations requested (SOF ¶ 58);

- Ms. Shanahan was repeatedly informed that they would not hold her position open for her (SOF ¶¶ 29, 30, 48, 219);

- Her first day back, Ms. Shanahan was forced to sign a Return to Work Agreement under threat of termination, which changed her schedule (despite her clearing her previous schedule with her physician and basing future appointments on that schedule), requiring Ms. Shanahan to pay for alleged "errors" that had taken place while she was out that she had no responsibility for, unilaterally limited Ms. Shanahan's accommodations to one month without consultation or doctor approval, and demanding that Ms. Shanahan perform a lengthy list of laborious duties that any person in a medical boot and using a scooter would be unable to perform, including, but not limited to, driving, navigating stairs. SOF ¶¶ 68, 69, 77;

- Ms. Shanahan was also forced to sign another letter, titled "Moving Forward," stating that Ms. Shanahan was obligated to reduce the (inaccurate) deficit by 33%, which would be accomplished by writing a minimum of $58,121 for the month of November (which included $16,454 as 33% of cumulative deficit and $41,667 to cover the November draw), and that she was required to make three (3) home calls per week, despite that it was a slow time for business and no other designers had such a high quota;  and that if she did not remove the deficit after 90 days, she would be obligated to repay all money after 90 days and placed on a warning. SOF ¶ 87. Essentially, Defendants were telling Ms. Shanahan that she had to sell an enormous amount in a short period of time during non-busy months, and if she didn't, they would take all her money back in 90 days and write her up.

In addition to the above harassing acts, Ms. Shanahan was not given any administrative support or any assistance or help regarding best practices or even an answer when Ms. Shanahan asked how other designers got business. SOF ¶ 105. Instead, Ms. Shanahan's files, computer and clients were taken, and her request for a new computer and assistance went unaddressed. SOF ¶¶ 107-109. To add insult to injury, when Ms. Shanahan complained about this incredibly unfair, hostile and discriminatory treatment, she was ignored, dismissed and belittled, with empty promises and harassing comments such as "just sell $100,000 this month," "you're making this too hard on yourself," and "you're not in Kansas anymore." SOF ¶¶ 142, 148.

All of this harassing and discriminatory behavior occurred both during and immediately after Ms. Shanahan's medical leave due to her disability. The grant of summary judgment is improper under these circumstances. *See Johnson v. Bally's Atl. City*, 147 F. App'x 284, 287 (3d Cir. 2005) (vacating summary judgment because, "[i]n addition to considering temporal proximity, the District Court should have considered Johnson's circumstantial evidence of pretext"); *Freeman v. Chertoff*, 604 F. Supp. 2d 726, 738 fn.21 (D.N.J. 2009) (denying summary judgment where "the evidence of pretext, along with the close temporal proximity of Freeman's removal and her requests to telework, are sufficient facts from which a reasonable factfinder could find causation"); *Moore v. Cty. of Camden*, No. CIV. 10-3044 RMB/JS, 2013 WL 1903300, at *5 (D.N.J. May 7, 2013) (denying summary judgment due to close temporal proximity and other evidence).

Based on the foregoing, due to the temporal proximity and pattern of antagonism here, Ms. Shanahan has demonstrated pretext and Defendants' motion should be denied.

## H.  Ms. Shanahan Has Demonstrated Harassment and Hostile Work Environment

To prevail on a hostile work environment/harassment claim, a Plaintiff must show that "1) the employee suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability." *Castleberry v. STI Grp*., 863 F.3d 259 (3d Cir. 2017).  Ms. Shanahan has established such a claim.

Despite Ethan Allen's claims that Ms. Shanahan was "welcomed" back to work on November 1, 2019, Ethan Allen was searching for Ms. Shanahan's replacement while simultaneously taking hostile and discriminatory acts to sabotage her and make it impossible for

Ms. Shanahan to perform her duties. Among other things, immediately upon her return to work, Defendant created a hostile environment and imposed impossible demands upon Ms. Shanahan.

Defendants demanded that Ms. Shanahan work five straight days, despite her prior schedule of three days in a row. Not only was such a schedule overwhelming and difficult for an individual recovering from surgery, but Ms. Shanahan had just returned from leave and had made her doctors' appointments based on the previous schedule. Defendants also mandated a lengthy list of duties required of Ms. Shanahan aggressively emphasizing physical labor, which was clearly meant to intimidate her with respect to coming back to work with her disability. SOF ¶ 75. This was clearly designed to harass and punish Ms. Shanahan, as the duties were impossible for an individual in a boot and using a scooter, particularly where Ms. Shanahan had previously patently stated she could not perform certain of the tasks, such as driving. SOF ¶¶ 75. Nevertheless, Defendants demanded that Plaintiff perform these tasks as if she was perfectly healthy and entirely recovered from surgery, even though they knew she was not and that she had defied her physician's orders in coming back to work earlier than her scheduled return date.

Defendants further refused to give Ms. Shanahan any support or assistance regarding best practices or even an answer on how other designers got business, removed Ms. Shanahan's computer, which held all her information, files, clients, etc. from her fifteen years at Ethan Allen, and re-distributed all of Ms. Shanahan's clients to other design consultants. SOF ¶¶ 105, 107, 113. With regard to her computer, Ms. Shanahan was informed that her computer, which stored all of her information, files and client information, had to be taken away and sent elsewhere, but that another computer would be sent to her immediately. SOF ¶ 107. Ms. Shanahan had texted Mr. Golinski requesting assistance for her computer to be up and running, but Mr. Golinski simply responded that her computer had to go back to corporate because they needed one and a

new computer was being sent to replace Ms. Shanahan's. SOF ¶¶ 108, 109. This was highly suspicious, as Defendants regularly purchased new computers, and it was unclear why Defendants needed Ms. Shanahan's used computer, particularly when she had all her data on that computer. SOF ¶ 110. Nevertheless, it took over a week for Ms. Shanahan to get a computer, which impeded Ms. Shanahan's ability to access emails, floor plans and other information necessary to do her work. SOF ¶ 111. To add insult to injury, when Ms. Shanahan finally did get a computer, it was broken, and Defendants refused to help Ms. Shanahan set up her computer as it had been prior to her leave. SOF ¶ 112.

Defendants also imposed certain "benchmarks" that were outrageously inflated and unattainable, requiring that she produce revenue more than 40% above quota, equating to an approximate average of selling $58,121 a month over the next three (3) months. SOF ¶ 97. This was an extremely difficult task in any normal situation, but particularly so upon an individual who had just returned from a lengthy medical leave, during a very slow time for business, as business had been very slow and November and December are historically slow months. Even worse, while Ethan Allen expected Ms. Shanahan to far exceed this outrageous quota immediately upon her return from medical leave, Ms. Shanahan had discovered that Ethan Allen had recently relieved other employees of their quota requirement. SOF ¶ 99. Ms. Shanahan was further informed that if she did not meet these outrageously inflated numbers, she would have to pay back the money, and, in addition to having to pay it back, she would also be written up.

Similarly, Defendants demanded that Ms. Shanahan repay a deficit in the amount of $3,998.83 caused by alleged issues with two clients, which had to be made up in three months and which would require Ms. Shanahan to write a minimum of $58,121 for three months, without informing Ms. Shanahan what the issues were, how they calculated the amount, or why

Ms. Shanahan was at fault. SOF ¶ 127. The two alleged "errors" were not the fault of Ms. Shanahan. SOF ¶ 92. With respect to the order for which the customer did not pay a part of the order, the client had an agreement to pay, and Ethan Allen easily could have contacted her regarding payment or instituted collection efforts – a practice followed in other locations. SOF ¶ 93. Regarding the alleged order error, Ms. Shanahan worked up until the day of her surgery to ensure that this order was settled and that the client had agreed to pay the required amount. SOF ¶ 94. To the extent there was a mistake or issue that occurred while Plaintiff was on leave, such mistake was not the fault of Ms. Shanahan and in no way should she have been required to make up payment for it. SOF ¶ 95.  Ms. Shanahan was also harassed in that she was told that if she did not sign what they put in front of her, then she would lose her job no matter what. SOF ¶ 77.

The November 2019 meeting to discuss Ms. Shanahan's concerns further demonstrates that Ms. Shanahan was being subjected to hostile and unfair treatment. While Ms. Shanahan expressed her concerns, it was even apparent to Ethan Allen that she was upset and stressed, as they repeatedly note that she began to cry and spoke in a high-pitched, loud voice. SOF ¶ 145. Ethan Allen further acknowledged Ms. Shanahan's repeated statement that she was stressed about the impossible demands placed upon her. SOF ¶ 145. Despite her acknowledged distress, however, Ethan Allen did and said nothing to alleviate her concerns or provide any assistance. SOF ¶ 145. In fact, while Ms. Shanahan was so obviously upset by the unreasonable demands placed upon her and the discriminatory treatment, Ethan Allen made hostile and negative comments, such as "you're making this too hard on yourself," "it's not that stressful," and "if you have this kind of attitude it won't help you." SOF ¶ 145. Moreover, during this meeting, Ethan Allen openly encouraged Ms. Shanahan to take further medical leave, despite having

previously informed her that they would not hold her job if she took the full amount of her medically-advised leave. SOF ¶ 146.

For these reasons, Ms. Shanahan has established a claim for harassment/hostile work environment, and Defendants' motion for summary judgment on this claim must be denied.

## I. Ms. Shanahan Has Established a Prima Facie Case of Disability and Age Discrimination and Retaliation Under the PHRA

PHRA claims are analyzed under the same standard as ADA claims. "Both the Americans with Disabilities Act and the Pennsylvania Human Relations Act prohibit certain entities from discriminating against disabled, otherwise qualified individuals in the hiring and firing of employees." *Sube v. City of Allentown*, 974 F. Supp. 2d 754, 764 (E.D. Pa. 2013) (citing 42 U.S.C. § 12112(a); Act of October 27, 1955, P.L. 744, § 5(a), as amended, 43 P.S. § 955(a)). "The same legal standard applies equally to the ADA and PHRA." *Id*. (citing *Kelly v. Drexel University*, 94 F.3d 102, 105 (3d Cir.1996)); *see also Colwell v. Rite Aid Corp*., 602 F.3d 495, 500 (3d Cir. 2010) ("the same legal standard that applies to the ADA applies equally to disability discrimination claims under the PHRA."); *Mascioli v. Arby's Rest. Grp., Inc*., 610 F. Supp. 2d 419, 447 (W.D. Pa. 2009) (noting that "the disposition of the ADA claims will be applicable to the PHRA claims"); *Bevan v. Cty. of Lackawanna*, No. 3:17-CV-0919, 2017 WL 6336595, at *3 n.2 (M.D. Pa. Dec. 12, 2017).

Similarly, Courts have held that it is "proper to address ADEA and PHRA age discrimination claims collectively." *Howell v. Raymours Furniture Co*., 26 F. Supp. 3d 366, 371 (M.D. Pa. 2014) (citing *Colwell v. Rite Aid Corp*., 602 F.3d 495, 499 n. 3 (3d Cir.2010); *Glanzman v. Metro. Mgmt. Corp*., 391 F.3d 506, 509 n. 2 (3d Cir., 2004) (noting "the same legal standards and analysis are applicable to claims under both the ADEA and the PHRA" (internal quotations omitted)); *see also Ferrigno v. Franklin Grp., Inc*., No. CIVA 08-1140, 2010 WL

1136293, at *5 n.2 (W.D. Pa. Mar. 1, 2010), *report and recommendation adopted*, No. CIVA08-1140, 2010 WL 1133431 (W.D. Pa. Mar. 23, 2010) (noting that "[t]he Third Circuit Court of Appeals has noted that '[t]he same legal standard applies to both the ADEA and the PHRA and therefore it is proper to address them collectively.'") (citing *The Milby v. Greater Philadelphia Health Action*, 339 Fed.Appx. 190, 191 n.3 (3d Cir. 2009).

As discussed in detail *supra*, Ms. Shanahan has sufficiently demonstrated discrimination based on her disability and age, failure to accommodate, and retaliation. In the alternative, even if Ms. Shanahan has not sufficiently demonstrated her right to relief on such claims, the conflicting testimony and inconsistencies in Defendants' proffered reasons for termination indicate that genuine issues of material fact exist, such that disposition of these issues is not appropriate on a motion for summary judgment. For these reasons, therefore, and as set forth above, Defendants' motion as to Ms. Shanahan's PHRA claims should also be denied.

### J.   Ms. Savino and Mr. Kalina are Individually Liable

Ms. Shanahan has successfully established a claim for aiding and abetting against Defendants Ms. Savino and Mr. Kalina.

"Section 955(e) of PHRA forbids 'any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice.'" *Todd v. New England Motor Freight*, No. CIV.A. 03-1684, 2003 WL 23199932, at *3–4 (E.D. Pa. Dec. 18, 2003) (citing 43 PA. CONS.STAT. § 955(e) (West 2003); *Dici v. Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996)).

As noted above, the record shows that Ethan Allen engaged in unlawful discriminatory practices by discriminating against and harassing Ms. Shanahan on the basis of her age and

disability or perceived disability, and retaliating against Ms. Shanahan for her complaints of the discrimination and harassment, for taking FMLA leave, and for requesting accommodations.

Ms. Savino and Mr. Kalina were very clearly the driving forces behind Ms. Shanahan's termination. The documentary evidence indicates that both Ms. Savino and Mr. Kalina acted aggressively to oust Ms. Shanahan continuously throughout her leave and after taking FMLA. Notably, and among other things, Mr. Kalina repeatedly informed Plaintiff that they could not hold her position open. SOF ¶¶ 30, 48, 157. By letter dated September 30, 2018, Ms. Savino recommended that they no longer hold the position open. SOF ¶ 184. By letter dated October 7, 2019, Mr. Kalina determined that Ethan Allen would no longer hold Ms. Shanahan's position open for her. SOF ¶ 30. Mr. Kalina wrote to Ms. Shanahan on November 26, 2019 stating that her position was being filled, and that she could apply for a position when she was cleared to return to work. SOF ¶ 157. Mr. Kalina also responded to Ms. Shanahan's January 7, 2020 email (in which she stated she was ready to return to work the following day) by insisting that her position had been filled and that she no longer had a position with Ethan Allen. SOF ¶ 166.

Defendants argue that Mr. Kalina should not be held liable because he did not believe that they were discriminating against Plaintiff. *See* Defendants' Brief, at p. 40. Contrary to Defendants' claim, regardless of what Mr. Kalina "believed" regarding the discriminatory acts against Ms. Shanahan, the evidence demonstrates that Ms. Shanahan was harassed, discriminated against, and retaliated against, that she complained, and that she firmly believed that she was being treated differently as a result of her age and disability, for having sought accommodations, and for having taken leave. SOF ¶ 123. Notably, both Mr. Kalina and Ms. Savino were copied on Ms. Shanahan's email complaining of the unlawful and disparate treatment. SOF ¶ 123.

Ms. Savino also engaged in numerous discriminatory, harassing and retaliatory acts clearly designed to remove Ms. Shanahan from her employment. Ms. Savino also sought to replace Ms. Shanahan early on during her medical leave. In fact, as early as September 30, 2019, Ms. Savino wrote to Ms. Ramey, stating that it was her recommendation that they no longer hold the position open for Ms. Shanahan. Ms. Savino was ultimately successful in her endeavor, as one week prior to Ms. Shanahan's return from medical leave, Ms. Savino actively filled Ms. Shanahan's position with a younger healthier individual. SOF ¶ 158.

Both Mr. Kalina and Ms. Savino were intricately involved in Ms. Shanahan's leave, were aware of her complaints and requests for accommodations, and were involved in the decision to terminate her. On this basis, Ms. Savino and Mr. Kalina aided and abetted Ethan Allen's discrimination, harassment and retaliation. *See Todd*, 2003 WL 23199932, at *4 (holding that, where individuals participated in the decision to terminate, were aware of complaints and participated in the handling of the medical note, "a reasonable jury could find" that such defendants aided and abetted the company's illegal conduct). Defendants' Motion for Summary Judgment on this claim should be denied.

### K.  Ms. Shanahan Has Established a Right to Punitive Damages, Front Pay, Back Pay and a Jury Trial

Defendants further argue that Ms. Shanahan's demand for jury trial should be stricken and that she has not established a right to certain damages: punitive damages, and front or back pay. As discussed below, Ms. Shanahan is entitled to a jury trial and can – and should – recover all her requested damages.

#### 1.  Ms. Shanahan is Permitted to Recover Punitive Damages

Punitive damages are available under the ADA when "the complaining party demonstrates that the respondent engaged in a discriminatory practice ... with malice or with

reckless indifference." *Gagliardo v. Connaught Labs., Inc*., 311 F.3d 565, 573 (3d Cir. 2002) (citing 42 U.S.C. § 1981a(b)(1) (2000)). These terms focus on the employer's state of mind and require that "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Id*. (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535–36, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)).

Defendants claim that Ms. Shanahan is not entitled to punitive damages because it made an effort to reasonably accommodate Plaintiff. *See* Defendants' Brief, at p. 41. The evidence demonstrates quite the opposite, and in fact, demonstrates that Defendants are liable for punitive damages. Defendants ignore record evidence that Ms. Shanahan sought assistance and made several requests for help, but was directly impeded from succeeding, particularly where Defendants imposed impossible quotas and demands upon her. In just one instance, although noting that Ms. Shanahan required to be in a boot and required periodic icing of her foot, Defendants demanded that Ms. Shanahan perform several duties, including driving, navigating stairs, navigating driveways and hills, conducting surveys by moving furniture, and packing, lifting and carrying items, navigating a two story, 18,000 square foot center, and lifting items as needed; and pushing, pulling and bending as required. SOF ¶ 57. This was more than obviously meant to punish Ms. Shanahan, and clearly someone with the accommodations requested – who had gone against physician orders to return early – would not be able to perform such tasks. In attempting to perform these duties too early, per the demands of Defendants, Ms. Shanahan negatively impacted her recovery and had to go back out on medical leave. SOF ¶¶ 151, 152.

Moreover, the evidence demonstrates that, as soon as Ms. Shanahan took her leave, Defendants wanted Ms. Shanahan out. Ms. Savino made efforts to replace her as early as September 2019, for no legitimate reason. When Defendants did replace her, it was with a

younger, less qualified and less experienced individual who was starting less than two weeks before Ms. Shanahan's confirmed return date, thus negating any claim of "burden" upon Defendants as a reason for Ms. Shanahan's termination.

The foregoing indicates that Defendants had the malice and willful intent to discriminate against Ms. Shanahan. At the very least, such conflicting testimony demonstrates that this determination cannot be resolved on a motion for summary judgment. *See Lowe v. Philadelphia Newspapers, Inc*., 594 F. Supp. 123, 129 (E.D. Pa. 1984) (because material facts regarding entitlement to punitive damages were in dispute, summary judgment must be denied).

Ms. Shanahan has thus alleged actions by the Defendants from which a jury could infer intentional discrimination, and that Defendants acted with malice or ill will when she was terminated. Defendants' motion for summary judgment should be denied.

### 2.  Ms. Shanahan's Request for Jury Trial Should Not be Stricken

Defendants argue that, with respect to Ms. Shanahan's retaliation claim, her sole remedy for the claim is equitable and she is not entitled to a jury trial. This, again, is incorrect. First, as Defendants point out, the Third Circuit has not spoken on this issue. Moreover, as discussed above, Ms. Shanahan has demonstrated a right to money damages relief on her other claims, and Defendants have not argued that Ms. Shanahan is not entitled to a jury trial on any other claim. Thus, it would be illogical and inappropriate to strike Ms. Shanahan's request for a jury trial here.

### 3.  Ms. Shanahan is Entitled to Back Pay and Front Pay

Defendants incorrectly argue that Ms. Shanahan is not entitled to front or back pay because she failed to mitigate her damages. The evidence demonstrates otherwise.

51

"An unemployed or underemployed claimant, like all other Title VII claimants, is subject to the statutory duty to minimize damages set out in [42 U.S.C. § 2000e–5(g) ]." *Caufield v. Ctr. Area Sch. Dist.*, 133 F. App'x 4, 10 (3d Cir. 2005). "This duty, rooted in an ancient principle of law, requires the claimant to use reasonable diligence in finding other suitable employment." *Id*.

"While it is the duty of a discrimination claimant to mitigate her losses, it is the employer who has the burden of proving a failure to mitigate." *Id*. To prove a failure to mitigate, the defendant must prove either that "other substantially equivalent positions were available" and she "failed to use reasonable diligence in attempting to secure those positions," or that Ms. Shanahan withdrew entirely from the employment market. *Id*. (citing *Tubari, Ltd., Inc. v. NLRB*, 959 F.2d 451, 454 (3d Cir. 1992)). "When an employer successfully proves a failure to mitigate, any back-pay award to an aggrieved employee will be cut off or reduced beginning at the time of the employee's failure to mitigate and any front-pay award will be foreclosed." *Id*. "The reasonableness of a Title VII claimant's diligence should be evaluated in light of the individual characteristics of the claimant and the job market ... [g]enerally, a plaintiff may satisfy the reasonable diligence requirement by demonstrating a continuing commitment to be a member of the work force and by remaining ready, willing, and available to accept employment." *Id*. (citing *Booker v. Taylor Milk Co., Inc*., 64 F.3d 860, 865 (3d Cir.1995)).

The evidence demonstrates that Ms. Shanahan sought to obtain new employment and mitigate her damages. Ms. Shanahan began looking for a job immediately upon being told that she had to reapply for her job and there was nothing available at Ethan Allen at the time. SOF ¶ 235. Ms. Shanahan went to the link in the email provided by Mr. Kalina and saw that there was nothing available in Chadds Ford. SOF ¶ 236. Ms. Shanahan also looked in other areas close to

her home. SOF ¶ 236. Ms. Shanahan continued to check back for any other open positions with Ethan Allen, once a month at least, but was looking for other jobs in the meantime. SOF ¶ 236.

Ms. Shanahan searched for jobs by talking to everyone she knew that were designers and walked and knocked on doors. SOF ¶ 237. She also subscribed to the Glassdoor online job search engine. SOF ¶ 237. Ms. Shanahan spoke with Calico Corners, Bassett, Pala Brothers and Johnny Janosik about employment. SOF ¶ 238. Although certain of these discussions progressed, Covid hit in March 2020 and Ms. Shanahan could not get a job at that time because everything was shut down due to Covid. SOF ¶ 242.

Ms. Shanahan applied for employment with Bassett Furniture for a position in or about March 2020. SOF ¶ 240. They were supposed to reach out and contact her but the next week Covid hit. SOF ¶ 240. Ms. Shanahan was also offered a position with Pala Brothers in March or April 2020, but could not take the position with Pala Brothers because she needed health insurance and the job did not offer it. SOF ¶ 239. Ms. Shanahan also was offered a job by Johnny Janosik in or about April 2020, and she was about to go online and submit her information when Covid hit. SOF ¶ 241. She never heard from them again and everything was closed. SOF ¶ 241.

While everything was shut down, on or around July 17, 2020, Ms. Shanahan had another surgery on her other foot. SOF ¶ 244. Ms. Shanahan had the second surgery because she could not get a job at that time, so she decided to have the surgery. SOF ¶ 244.

Ms. Shanahan started her job search up again after everyone started rehiring and going back to work and she had gotten her second vaccine. SOF ¶ 243. She then accepted an offer at Blinds to Go. SOF ¶ 246. She had discussions with them in January 2021 and began her employment on March 1, 2021. SOF ¶246. Although Ms. Shanahan left her job at Blinds to Go because she was working 14 hours a day and driving back and forth to New Jersey was too

much, as she was leaving at 8:30 a.m. and not getting home until 9 p.m. at night, she found and obtained other employment thereafter. SOF ¶¶ 248, 249.

Defendants claim that Ms. Shanahan improperly did not take the job offer from Pala Brothers in March or April 2020, and that she stopped efforts in March or April 2020 and did not start looking again until 2021. Defendants' Brief, at pp. 43-44. Defendants' arguments contradict the plain law stating that the "reasonableness of a Title VII claimant's diligence should be evaluated in light of the individual characteristics of the claimant and the job market." *Caufield*, 133 F. App'x 4 at 13. Ms. Shanahan's acts were more than reasonable. Ms. Shanahan clearly required health insurance, which Pala Brothers was unable to offer. Moreover, Covid-19, a national pandemic, negatively impacted employment everywhere in the world at the time, and thus, Ms. Shanahan's inability to obtain employment at that time and short abstention of looking were more than reasonable under the circumstances. Ms. Shanahan has thus properly mitigated her damages and is entitled to front and back pay.

## L.  This Court May Exercise Personal Jurisdiction over Mr. Kalina

### 1.  Standard for Personal Jurisdiction

Rule 4(e) of the Federal Rules of Civil Procedure permits a district court to assert personal jurisdiction over nonresidents to the extent allowed under the law of the state where the court sits. Fed. R. Civ. P. 4(e); *Time Share Vacation Club v. Atl. Resorts, Ltd*., 735 F.2d 61, 63 (3d Cir. 1984). Pennsylvania's long-arm statute authorizes this Court to entertain jurisdiction over non-resident defendants, acting directly or by an agent, upon "[c]ontracting to supply services or things in this Commonwealth." 42 Pa.C.S.A. § 5322(a)(2). Jurisdiction over such a person may be exercised "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa.C.S.A. § 5322(b). Consequently, the reach of this

Court's personal jurisdiction under the Pennsylvania statute is coextensive with the due process clause of the Fifth Amendment. *See Time Share Vacation Club*, 735 F.2d at 63.

As general personal jurisdiction confers the broadest scope, the first step in the inquiry is to determine whether a defendant's contacts with the forum state are sufficient to support that jurisdiction. *Mellon Bank (East) PSFS, Nat'l Assoc. v. Farino*, 960 F.2d 1217, 1221 (3d Cir. 1992). A party subject to general jurisdiction of a state can be called to answer any claim against him in that forum, regardless of whether the cause of action has any connection to the state. *Id*.

Absent general authority, a court may exercise jurisdiction if specific personal jurisdiction exists. *Mellon Bank*, 960 F.2d at 1221. This inquiry focuses on the relationship among the defendant, the forum, and the present litigation. *Pinker v. Roche Holdings, Ltd*., 292 F.3d 361, 368 (3d Cir. 2002). The plaintiff's claim(s) must relate to or arise out of the defendant's contacts with the forum. *Mellon Bank*, 960 F.2d at 1221. Such contacts must be constitutionally sufficient so as to comport with the due process clause of the Fifth Amendment and with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citing *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1941)); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Pinker*, 292 F.3d at 368–69.

Contacts that are "random, isolated or fortuitous" are not sufficient to confer jurisdiction. *Keeton v. Hustler Magazine, Inc*., 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). "Jurisdiction is proper, however, where contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State." *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174 (citing *McGee v. Int'l Life Ins. Co*., 355 U.S. 220, 223, 78 S.Ct. 199,

2 L.Ed.2d 223 (1957)). Further, "a corporate officer's contacts in his corporate capacity may be factored into the personal jurisdiction analysis when the officer is sued in his individual capacity." *Beistle Co. v. Party U.S.A., Inc*., 914 F.Supp. 92, 95 (M.D. Pa. 1996) (Caldwell, J.) (citing *Donner v. Tams–Witmark Music Library, Inc*., 480 F. Supp. 1229 (E.D. Pa. 1979)).

The Third Circuit applies a three-part test to determine whether specific personal jurisdiction exists. *O'Connor v. Sandy Lane Hotel Co., Ltd*., 496 F.3d 312, 317 (3d Cir. 2007). First, the defendant must have "purposefully directed its activities" at the forum state. *Id*. (quoting *Burger King*, 471 U.S. at 472, 105 S.Ct. 2174). Second, the litigation must "arise out of or relate to" at least one of those activities. *Id*. (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–15 n.9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (internal quotations omitted)). Third, if the first two requirements are met, a court may consider whether the exercise of jurisdiction otherwise "comports with 'fair play and substantial justice.'" *Id*. (quoting *Burger King*, 471 U.S. at 476, 105 S.Ct. 2174).

## 2. <u>This Court Has Personal Jurisdiction Over Defendant Robert Kalina</u>

### a. <u>This Court has General Jurisdiction over Mr. Kalina.</u>

Mr. Kalina argues that there is no general jurisdiction because he allegedly is not domiciled here and physically conducts no business in Pennsylvania. While Mr. Kalina may not be domiciled in Pennsylvania, he is subject to this Court's jurisdiction.

Mr. Kalina was employed by Ethan Allen as its Manager of Compensation and Benefits. SOF ¶ 207. Pursuant to his employment with Ethan Allen, Mr. Kalina worked with its employees, including its employees at the Pennsylvania Ethan Allen location where Ms. Shanahan was employed. While he may not physically be in Pennsylvania, Mr. Kalina conducts business in Pennsylvania and directs communications into Pennsylvania routinely to

communicate with Ethan Allen's Pennsylvania employees. At the very least, per his role, he is called upon to engage in business dealings and communications with Pennsylvania employees.

As noted above in detail, the evidence makes clear that Mr. Kalina was intricately involved with Ms. Shanahan's employment – which was indisputably in Pennsylvania. Ms. Shanahan may have been domiciled in Delaware, but she was employed in Pennsylvania. Moreover, Mr. Kalina sought and obtained employment with an entity that he knew had a location in Pennsylvania, and his employment required him to engage in systematic and continuous activities involving the Pennsylvania store and its Pennsylvania employees. These facts are sufficient to demonstrate systematic and continuous activities in the Commonwealth and thus confer general jurisdiction over Mr. Kalina.

### b. This Court has Specific Jurisdiction over Mr. Kalina.

In the alternative, should this Court determined that it does not have general jurisdiction over Mr. Kalina, it certainly maintains specific personal jurisdiction over him. In the absence of general jurisdiction, *in personam* jurisdiction is dependent upon the concept of specific personal jurisdiction. *Mellon Bank (E.) PSFS, Nat. Ass'n v. Farino*, 960 F.2d 1217(3d Cir. 1992). Specific jurisdiction arises when the plaintiff's "claim is related to or arises out of the defendant's contacts with the forum." *Dollar Sav. Bank v. First Sec. Bank*, 746 F.2d 208, 211 (3d Cir. 1984). In such a case, the court may go forward if it is satisfied that the relationship among the defendant, the cause of action, and the forum falls within the "minimum contacts" framework first announced in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and later refined by the abundant progeny of that landmark case.

Courts have determined that, in each case, there should be some act by which the defendant purposely avails itself of the privilege of conducting business within the forum state, thus invoking the benefits and protections of its laws. *See Hanson v. Denckla*, 357 U.S. 235, 253,

78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Courts also consider "the relationship among the forum, the defendant and the litigation," *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977), to determine if "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

Ms. Shanahan's claims are related to and/or arise out of the Defendants' contacts with the forum. Mr. Kalina focuses only on his correspondence directed to Ms. Shanahan's residence in Delaware. This is too narrow of a reading of the requirement for specific personal jurisdiction. Mr. Kalina admits that he is employed by Ethan Allen as a Manager of Compensation & Benefits in connection with Ethan Allen's Human Resources Department.

Ms. Shanahan was employed in Pennsylvania. Even if she was living in Delaware at the time, and thus, Mr. Kalina sent certain communications to her at her residence in Delaware, all of the acts complained of in this litigation involve Ms. Shanahan's employment in Pennsylvania and all of the correspondence and communications related to her Pennsylvania employment. Simply because Mr. Kalina allegedly sent some correspondence to her residence, rather than her business address, cannot permit him to evade this litigation on grounds of personal jurisdiction.

Defendant further attempts to evade the imposition of jurisdiction by claiming that Plaintiff resides in Delaware and resided in Delaware at the time of events giving rise to this litigation. Defendant purposefully omits the fact that Plaintiff was employed at Ethan Allen's Pennsylvania location. Similarly, Defendant focuses on Mr. Kalina's residence in Connecticut, omitting the fact that his employment required him to handle tasks for the Pennsylvania Ethan Allen store and routinely deal with issues of and communicate with Pennsylvania employees.

In his capacity as a corporate human resources employee of Ethan Allen, Mr. Kalina clearly engaged in contacts with employees of the Pennsylvania Ethan Allen store for the specific purpose of assisting Pennsylvania employees of their Pennsylvania location. As noted above, Mr. Kalina took the role for Ethan Allen knowing that he would be engaging and extensively involved with the Pennsylvania location and its Pennsylvania employees. As a corporate employee, it was Mr. Kalina's responsibility to handle issues relating to employees – including employees of the Pennsylvania Ethan Allen location. As noted above, Mr. Kalina engaged in numerous communications with Ms. Shanahan regarding her employment and was extensively involved in the decision to terminate her from her Pennsylvania employment. He thus purposefully directed numerous specific activities to this Commonwealth.

Mr. Kalina further argues that, because his only contacts were due his employment, he is not subject to personal jurisdiction. In *Hickman v. TL Transportation, LLC*, 317 F. Supp. 3d 890 (E.D. Pa. 2018), the Court noted that a top-ranking manager need only engage in management and supervisory activities in a forum to be subject to personal jurisdiction for wage and hour claims. The defendant at issue had two contacts with Pennsylvania: one in which he traveled to Pennsylvania to interview a prospective safety consultant, and another time to interview drivers to work at a TLT location in Swedesboro, New Jersey. The Court held that these contacts were related to Plaintiffs' claims, as the defendant entered Pennsylvania for company business and to better the business of the company. His involvement in hiring a safety consultant furthered the company's expansion into Pennsylvania. As the Court explained, "[j]ust one contact with a forum can give rise to personal jurisdiction if it "creates a 'substantial connection' with the forum." *Id.* at 897 (citing *Burger King*, 471 U.S. at 476 n.18, 105 S.Ct. 2174). Thus, these two meetings related to the claims of the case and were sufficient to confer personal jurisdiction. *See id.* at 898.

Ms. Shanahan's claims arise out of Mr. Kalina's contacts with this Commonwealth. As noted above, Mr. Kalina was significantly involved in the wrongful conduct alleged, which was all based upon Ms. Shanahan's employment with and wrongful termination from employment in Pennsylvania. Mr. Kalina repeatedly attempted to prevent Ms. Shanahan from returning to work after her medical leave. Despite a medical note stating that she was to be out until November 11, 2019, on October 7, 2019, Mr. Kalina informed Plaintiff that her job protection had "ended", that her position at the Pennsylvania store would not be held open for her and she could apply for an open position. SOF ¶ 30. This caused Ms. Shanahan to defy doctor's orders and return to work earlier than advised, which ultimately caused further damage and delayed her recovery. In fact, Mr. Kalina repeatedly informed Ms. Shanahan that her job was not being held open for her, including on October 14, 2019, November 26, 2019 and January 7, 2020. SOF ¶¶ 48, 157, 166. Mr. Kalina also provided a link to view job postings rather than seeking available jobs for which Ms. Shanahan was qualified, in contradiction of the terms and guarantees of the Ethan Allen Employee Handbook. SOF ¶¶ 209, 226. This further demonstrates Mr. Kalina's discriminatory animus toward Ms. Shanahan and significant involvement in her Pennsylvania employment.

As in the case of *Mellon Bank (East) PSFS, Nat'l Assoc. v. Farino*, 960 F.2d 1217, 1221 (3d Cir. 1992), Mr. Kalina relies heavily on the fact that he had little to no actual physical contact with or presence in the Commonwealth. *See id*. at 1225. While it may be true that Mr. Kalina does not reside in the forum, that is not dispositive. *Id*. When a defendant has received the benefits and protections of the forum's laws by engaging in business activities with a forum resident, the courts have "consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id*. (citing *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184). It is true that physical presence in the forum state is a contact which figures into the

analysis. Nevertheless, at least since the time of *International Shoe*, the physical presence of the

defendant in the forum has not been regarded as a jurisdictional litmus test. *Id*.

Notwithstanding the foregoing, as Mr. Kalina has been significantly involved with Ms.

Shanahan, a Pennsylvania employee, as well as other Pennsylvania employees, and certainly has

had significant involvement with the Pennsylvania Ethan Allen location, Mr. Kalina has more

than demonstrated a "physical presence" in the forum.

In *Burger King*, the Court stated that:

> [W]ith respect to interstate contractual obligations, we have emphasized that
> parties who "reach out beyond one state and create continuing relationships
> and obligations with citizens of another state" are subject to regulation and
> sanctions in the other State for the consequences of their activities....
> [W]here individuals "purposely derive benefit" from their interstate
> activities, it may well be unfair to allow them to escape having to account in
> other States for consequences that arise proximately from such activities;
> the Due Process Clause may not readily be wielded as a territorial shield to
> avoid interstate obligations that have been voluntarily assumed.

*Id*. at 473–74, 105 S.Ct. at 2182–83 (citations omitted). The Court went on to conclude that:

> [W]here the defendant "deliberately" has engaged in significant activity
> within a State, or has created "continuing obligations" between himself and
> residents of the forum, he manifestly has availed himself of the privilege of
> conducting business there, and because his activities are shielded by "the
> benefits and protections" of the forum's law it is presumptively not
> unreasonable to require him to submit to the burdens of litigation in that
> forum as well.

*Id*. at 475–76, 105 S.Ct. at 2184 (citations omitted). This is precisely what Defendant has done

here. In obtaining employment with an entity with a Pennsylvania office, and due to his

significant involvement with the Pennsylvania store and its employees, Mr. Kalina

deliberately engaged in significant activity within the Commonwealth, has created "continuing

obligations" between himself and the forum, and has availed himself of the privilege of

conducting business here. It is, therefore, not unreasonable to require Defendant to submit to the burdens of litigation in this forum.

Notwithstanding the foregoing, to the extent this Court determines that it lacks general or specific jurisdiction, jurisdiction over Mr. Kalina is also proper under the *Calder* test. "In addition to this three-part test of specific jurisdiction, the Supreme Court has established a second analysis which is applicable to personal jurisdiction with respect to intentional tort claims." *Vizant Techs., LLC v. Whitchurch*, 97 F. Supp. 3d 618, 628 (E.D. Pa. 2015).

In *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 148, 279 L.Ed.2d 804 (1984), the Supreme Court "endorsed a test of specific jurisdiction which places emphasis upon the effects of a defendant's actions in the forum state." *Id*. The Third Circuit subsequently held that *Calder* permits personal jurisdiction where the following three elements are satisfied:

> (1) The defendant committed an intentional tort;
> (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; [and]
> (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.
> Id. at 629 (citations omitted).

"A defendant's conduct is 'expressly aimed' at the forum when 'the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and [when the plaintiff can] point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum.'" *Id*. (citations omitted). Mr. Kalina engaged in the discrimination, harassment, and retaliation against Ms. Shanahan, and Ms. Shanahan suffered the brunt of that harm in Pennsylvania, where she was employed. Moreover, it is apparent that Mr. Kalina expressly aimed his tortious conduct at that forum, as he knew that Ms. Shanahan worked in the Pennsylvania location and sought to return to her employment at the Pennsylvania store.

Mr. Kalina cites to several cases for the proposition that an employee of a corporation amenable to jurisdiction does not equate to jurisdiction over an employee. These cases are distinguishable. Notably, Mr. Kalina heavily relies on *Merical v. Valor Healthcare, Inc.*, No. CIV.A. 12-1681, 2013 WL 5408986 (W.D. Pa. Sept. 25, 2013). In *Merical*, the individual defendant made trips to Pennsylvania, but such trips were unrelated to the plaintiff's claims. Moreover, the plaintiff had only made vague allegations of "harassment" and "animosity"; the only communications with the plaintiff had granted a leave of absence and requested clarification about a return date. This is in stark contrast to the facts here, where the facts indicate that Mr. Kalina was actively engaged in the discriminatory, harassing and retaliatory conduct towards Ms. Shanahan, particularly where he repeatedly ignored her physician's notes, threatened termination, and confirmed her termination by defying the terms of Company policy.

Mr. Kalina's other cases in support of its arguments are similarly unavailing. *See Nicholas v. Saul Stone & Co. LLC*, 224 F.3d 179, 180–90 (3d Cir. 2000) (noting that individual defendants had never communicated with plaintiffs in New Jersey and never corresponded with anyone purporting to represent entities); *Keuch v. Teva Pharms. USA, Inc.*, No. CV 19-5488, 2020 WL 6870602 (E.D. Pa. Nov. 23, 2020) (noting that plaintiff made only conclusory allegations that individual aided and abetted discriminatory actions, without any factual support).

Mr. Kalina purposefully availed himself of the privilege of conducting business in the Commonwealth. Mr. Kalina sought and accepted this role with Ethan Allen and assumed significant responsibility for Pennsylvania employees, which involved extensive work and communications with such employees. Moreover, Mr. Kalina actively participated in the harassment, discrimination and retaliation against Ms. Shanahan, an employee in the Pennsylvania store, in their communications. Based on the foregoing, and even more so in light

of the unlawful acts perpetrated by him upon Ms. Shanahan, it would not be unreasonable to require Mr. Kalina to now submit to the burdens of litigation in this forum as well. There is more than ample evidence for this Court to exert personal jurisdiction over Mr. Kalina.  Accordingly, Defendant's motion to dismiss based on lack of personal jurisdiction should be denied.

### 3.  The Assertion of Personal Jurisdiction in this Case Comports with Fair Play and Substantial Justice.

The Court must consider whether the exercise of jurisdiction otherwise comports with "traditional notions of fair play and substantial justice." *Gentex Corp. v. Abbott*, 978 F. Supp. 2d 391, 401 (M.D. Pa. 2013) (citing *Sandy Lane Hotel*, 496 F.3d at 324 (quoting *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154 (internal quotations omitted))). Once minimum contacts are established, jurisdiction is "presumptively constitutional." *Id*. To defeat this presumption, "the defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id*.

To determine whether the assertion of personal jurisdiction comports with fair play and substantial justice, the Court may examine the "fairness factors" of *World–Wide Volkswagen*. These factors include: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477, 105 S.Ct. at 2184 (quoting *World–Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. at 564) (internal quotations omitted). As the Court indicated in *Burger King*, this second tier of analysis is discretionary with the court.

Several of these factors weigh in favor of jurisdiction. Pennsylvania is undoubtedly interested in protecting its employees, particularly so where Ethan Allen owns and operates a

business with an office here and hired many Pennsylvania residents as employees. Ms. Shanahan

is interested in obtaining convenient and effective relief. *Id*. And, the most efficient resolution of

controversies would be litigation in Pennsylvania, where all of the wrongful acts occurred.

On balance, the exercise of jurisdiction over Mr. Kalina based on minimum contacts with

Pennsylvania is sufficient to comport with "traditional notions of fair play and substantial

justice." *See Gentex*, 978 F. Supp. 2d at 401. Mr. Kalina is subject to the jurisdiction of this

Commonwealth and Court and should be held liable for his wrongful acts against Ms. Shanahan.

## IV.   <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiff respectfully requests that Defendants' Motion for

Summary Judgment be denied.

<div style="margin-left: 40%;">

Respectfully submitted,

BELL & BELL LLP

By:   <u>*/s/ Christopher A. Macey, Jr.*</u>
Christopher A. Macey, Jr., Esquire
Bell & Bell LLP
1617 JFK Blvd. – Suite 1254
Philadelphia, PA 19103
(215) 569-2500

*Attorneys for Plaintiff Tamara Shanahan*

</div>

DATED:  December 10, 2021