## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TAMARA SHANAHAN** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **ETHAN ALLEN RETAIL, INC., KATE** | : | **NO. 21-595** |
| **SAVINO, and ROBERT KALINA** | : | |

### <u>MEMORANDUM OPINION</u>

**Savage, J.**                                                                                     **May 16, 2022**

After working as a design consultant for Ethan Allen for fifteen years,[1] Tamara Shanahan was terminated when she was temporarily unable to return to work after exhausting her FMLA leave.  Two weeks before she was expected to return to work, she was replaced by a younger person.  She was 61 years old when she was terminated.[2]

Shanahan then brought this action asserting claims of disability discrimination under the Americans with Disabilities Act (ADA), age discrimination under the Age Discrimination in Employment Act (ADEA), retaliation for exercising her rights under the Family and Medical Leave Act (FMLA) and for requesting an accommodation, and hostile work environment.  The defendants have moved for summary judgment.

---

[1] Statement of Undisputed Facts of Defs. Ethan Allen Retail, Inc., Kate Savino, & Robert Kalina ¶¶ 4, 105 ["DSUF"] (ECF No. 39-2); Pl. Tamara Shanahan's Resp. in Opp'n to DSUF ¶¶ 4, 105 ["PRDSUF"] (ECF No. 40-4); Pl.'s Statement of Material Facts in Opp'n to Defs.' Mot. for Summ. J. ¶¶ 2, 166–69 ["PSMF"] (ECF No. 40-5); Resp. of Defs. Ethan Allen Retail, Inc., Kate Savino, & Robert Kalina to PSMF ¶¶ 2, 166–69 ["DRPSMF"] (ECF No. 42-1); Dep. of Tamara Shanahan 81:23–82:2, 82:19–83:6 ["Shanahan Dep."] (ECF Nos. 39-3, 40-45).

[2] PRDSUF ¶ 11; PSMF ¶ 1; DRPSMF ¶ 1.

**Background**

In June 2019, Shanahan requested FMLA leave to have right foot surgery.[3]  On June 14, 2019, Ethan Allen approved twelve weeks of FMLA leave from July 5, 2019 through September 27, 2019.[4]  Four days before her scheduled leave, David Golinski, manager of Ethan Allen's Chadds Ford Design Center, sent Shanahan a memo criticizing her job performance.[5]  He advised she had a sales deficit[6] for June 2019 and would have

---

[3] DSUF ¶ 24; PRDSUF ¶ 24; PSMF ¶ 23; DRPSMF ¶ 23; Shanahan Dep. 118:4–7.

[4] DSUF ¶ 25; PRDSUF ¶ 25; PSMF ¶ 24; DRPSMF ¶ 24; Shanahan Dep. 129:14–130:22; Shanahan's Request for FMLA Leave, June 14, 2019 (ECF No. 40-47).

[5] Mem. from Golinski to Shanahan Re: Your Job Performance – Documented Discussions, July 1, 2019 ["Job Performance Memo July 2019"] (ECF No. 39-3 at 9).

[6] A deficit occurs when a design consultant does not write enough business to cover his or her monthly draw.  Design consultants must write sufficient business the following month to cover that month's draw and the earlier months' deficit.  *See* Ethan Allen's Plan B Design Consultant Incentive Compensation Plan, September 15, 2018 at 1, 3 ["Design Consultant Incentive Compensation Plan"] (ECF No. 39-3 at 2, 4); Shanahan's Design Consultant Performance Improvement Plan (PIP), Jan. 19, 2011 (ECF No. 39-4 at 39–41).

to write enough sales to cover the deficit and her July draw.[7]   Golinski outlined improvement strategies to implement upon her return from her FMLA leave.[8]

Shanahan underwent right foot surgery on July 5, 2019.[9]   Although Shanahan had hoped to return to work on September 26, 2019, her surgeon advised her to remain out through November 11, 2019.  She requested an extension of her medical leave through November 11.  Because her FMLA leave was exhausted, she went on short term disability leave.[10]

In late September 2019, Sheryl Ramey, Senior Benefits Specialist, consulted with Golinski and Kate Savino, managing director of the Philadelphia and New Jersey region,

---

[7] Job Performance Memo July 2019.  The terms of Shanahan's compensation plan provided:

> Design Consultant compensation will be incentive based with total compensation determined by incentives earned.  The Design Consultant will be advanced a draw, which is recoverable, each month against incentives earned.  Because draw is a pre-pay of incentives, the incentives earned for the current month will be reduced by the draw paid for that same month (which is your annual draw divided by twelve (12) months) or by any outstanding deficit carried forward from previous months.

> The Design Center Manager and/or the District Design Manager will determine a draw amount for each full-time and part-time Design Consultant.  Draw amounts are based on demonstrated performance and/or prior work experience.  Ethan Allen retains the right, at any time, to reduce or increase any draw amount with advance notification to the Design Consultant.  If a Design Consultant is in deficit, Ethan Allen may lower the draw to assist the Design Consultant in reducing their deficit.

> . . . .

> Covering your draw is a requirement of your position and a necessary condition of continued employment.  Design Consultants who do not cover their draw may be subject to corrective action up to and including termination.   Where possible, management may reduce a Design Consultant's draw to assist the Design Consultant in reducing their deficit.

Design Consultant Incentive Compensation Plan at 1, 3.

[8] Job Performance Memo July 2019.

[9] DSUF ¶ 26; PRDSUF ¶ 26; PSMF ¶ 26; DRPSMF ¶ 26; Shanahan Dep. 74:14–23.

[10] DSUF ¶¶ 30–34; PRDSUF ¶¶ 30–34.

about Shanahan's absence.[11]  On September 30, 2019, at Ramey's request, Savino sent Shanahan a letter outlining the hardship on the Chadds Ford Design Center caused by her absence.  The hardships included a decrease in written business, home call performance, and "be-back business."[12]  Savino recommended that Ethan Allen no longer hold a design position open for Shanahan.[13]

On October 4, 2019, Ramey informed Shanahan that her FMLA protection had ended on September 27, 2019 and her job was no longer protected under the FMLA.[14] The exact details of this conversation are in dispute.  According to Shanahan, Ramey did not offer her any accommodations and warned her she would lose her job if she did not come back.[15]  Defendants describe a more favorable and less threatening version of the call.  According to them, Ramey called Shanahan to see if she could return to work with accommodations.  Ramey suggested Shanahan use her medical scooter, engage in sedentary work, and recommended Golinski or her husband drive her to home calls. Shanahan informed Ramey she could not return, with or without accommodations, because her physician recommended that she remain out until she completed physical therapy on November 11, 2019.[16]

By letter dated October 7, 2019, Robert Kalina, Ethan Allen's manager of compensation and benefits, informed Shanahan that her job protection under the FMLA

---

[11] Ramey Decl. ¶¶ 8–9.

[12] Be-back business is repeat customer sales.  Dep. of Kate Savino 45:11–12 ["Savino Dep."] (ECF Nos. 39-4 at 9–31, 40-46).

[13] Letter from Savino to Ramey, Sept. 30, 2019 (ECF No. 40-8).

[14] Ramey Decl. ¶ 17.

[15] Shanahan Dep. 134:23–136:8.

[16] Ramey Decl. ¶¶ 11–17.

had ended on September 27, 2019, and Ethan Allen would no longer hold her position open.  He invited her to apply for available positions once she was cleared to return to work.[17]  Shanahan contacted Ramey about the possibility of an early return to work. Ramey reiterated that Ethan Allen could not hold her position open until November 11, 2019, the date she had requested.  Shanahan responded that Ethan Allen was not considering her request for an accommodation that would enable her to return to work earlier and asked how to appeal.[18]

In an October 14, 2019 email, Kalina again informed Shanahan that although she was not being terminated, Ethan Allen could no longer hold her current position open.[19] He stated that when she was able to return to work, they would be more than happy to have her apply for any open position for which she was qualified.[20]  He also advised that assuming they could accommodate reasonable restrictions at that time, she could return to her former position if it was open.[21]

Shanahan informed her physician that Ethan Allen was threatening to fill her position if she did not return to work before November 11.  She sought her physician's permission to return sooner.  He released her to return on November 1, 2019, but with three accommodations: (1) she wear a medical walking boot on her right (operative) foot for a portion of the day and a sneaker on her left (nonoperative) foot; (2) she use her

---

[17] Letter from Kalina to Shanahan, Oct. 7, 2019 ["Kalina Oct. 7 Letter"] (ECF No. 40-9).

[18] Email Correspondence Between Shanahan & Ramey, Oct. 9–14, 2019 (ECF Nos. 39-4 at 53–55, 40-10).

[19] Email from Kalina to Shanahan, Oct. 14, 2019, 2:42 PM (ECF No. 40-11).

[20] *Id.*

[21] *Id.*

medical scooter as required when interacting with clients; and (3) she ice her foot periodically throughout the day as required.[22]

On October 23, 2019, Shanahan emailed her doctor's note to Ramey and Kalina. Ethan Allen agreed to her returning "with no need for accommodations other than what [was] included in [her] doctor's note."[23]   Shanahan was still expected "to perform all necessary functions of a design consultant."[24] These functions included scheduling and completing in-home consultations that involved driving; navigating stairs in multi-story homes, driveways, and hills; conducting full room surveys using a measuring tape, bending and stretching to measure; pushing and pulling furniture; and packing, lifting, and carrying fabric books, finish boards, carpet samples, and other tools to effectively conduct the home call.  Shanahan was also expected to complete the same tasks in the design center, which included navigating a two story, 18,000 square foot building.[25]

Upon her return on November 1, 2019, Golinski and Savino presented Shanahan with a Return to Work Program Agreement.  The agreement imposed a temporary modified work placement from November 1, 2019 to December 1, 2019 during which Shanahan would work from 9:30 a.m. to 6:00 p.m., Friday through Tuesday.  It accommodated her physician-imposed restrictions and listed the design consultant duties she was still expected to perform.[26]  Shanahan described the attitude of this meeting as

---

[22] Email from Shanahan to Dr. Kwaadu, Oct. 16, 2019, 7:54 AM (ECF No. 40-22); Doctor's Note, Oct. 21, 2019 (ECF No. 40-19).

[23] Email from Ramey to Shanahan, Oct. 23, 2019, 4:48 PM ["Ramey Oct. 23 Email"] (ECF No. 40-20); Email Correspondence Between Shanahan & Ramey, Oct. 23, 2019, 9:39 AM, 3:46 PM, 4:43 PM, 4:48 PM ["Shanahan & Ramey Oct. 23 Emails"] (ECF Nos. 39-4 at 61–63, 40-21).

[24] Ramey Oct. 23 Email; Shanahan & Ramey Oct. 23 Emails.

[25] Ramey Oct. 23 Email; Shanahan & Ramey Oct. 23 Emails.

[26] DSUF ¶¶ 55–56; PRDSUF ¶¶ 55–56; Return to Work Program Agreement (ECF No. 40-24).

"[v]ery mean."[27]   Because she felt like she would lose her job if she did not sign the agreement,[28] she signed it.

After the meeting, Savino emailed Shanahan thanking her for signing the work agreement and summarizing the accommodations.   Savino concluded by encouraging frequent communication and asked Shanahan to let them know if she had any questions or concerns.[29]

Two days later, Savino wrote Shanahan, identifying deficits and benchmarks. Savino explained that her June deficit, coupled with deficits from a cancelled aged order and an order sold with an error when she was on leave, resulted in a cumulative deficit of $3,988.83.  As a result, her next three months would be non-recoverable.[30]   Savino also requested Shanahan to reduce her deficit by 33% in November, noting that achieving all her benchmarks should help with the reduction.   Although Savino stated they would help Shanahan achieve these goals, she warned that failure to do so would result in a written warning.[31]

Upon her return, Shanahan asked Golinski for her computer.  He advised her that her "computer had to go back to corporate because they needed one ASAP because of a failure" and that her new computer should arrive the next day.[32]  It did not.

---

[27] Shanahan Dep. 104:3–7.

[28] *Id.* 103:22–104:1

[29] Email from Savino to Shanahan, Nov. 1, 2019, 2:34 PM (ECF No. 39-4 at 76).

[30] According to Savino, "non-recoverable" means that Shanahan "does not have to pay back her commission for three months.   So when she's on draw we advance her a draw every month.   And nonrecoverable means that typically when you are given draw you have to pay it back by selling against it. So we're allowing her for the next three months to work without paying it back."  Savino Dep. 31:14–23.   If Shanahan did not make up the deficit during those three months, it would then be taken against her draw. *Id.* 32:10–14.

[31] Letter from Savino to Shanahan, Nov. 3, 2019 (ECF No. 40-25).

[32] Text from Shanahan to Golinski, November 2019 (ECF No. 40-26).

Shanahan grew concerned with how she was being treated.  Although she tried raising her concerns several times with Golinski, she felt like "he would just kind of push it to the side."[33]  Shanahan raised concerns about the return to work agreement and Ethan Allen's treatment of her with Golinski, copying Savino, Kalina, and Ramey, in a November 7, 2019 email.  She expressed disappointment about how she had been treated, stating that "it feels like I am being treated differently because of my leave and the request I made for accommodation."[34]  This email prompted a November 11 meeting between Shanahan, Savino, and Golinski to discuss her concerns.

Shanahan did not recall what was discussed during that meeting.[35]  Savino, however, recalled that Shanahan brought up three concerns: (1) the 30-day timeline on her Return to Work Agreement; (2) the deficit; and (3) the loss of her computer.   With respect to the timeline, Savino explained that Ethan Allen's goal was for her to return to work, restriction free, within 90 days, and the 30-day timeline was not intended to limit the accommodation of her restrictions to 30 days.  Instead, Shanahan's condition would be reevaluated every 30 days, updating or amending her restrictions as needed.  Addressing the deficit concerns, Savino assured Shanahan that she and Golinksi would help her meet her goals and that no corrective action would be taken for 90 days.  As for her computer, Savino explained that Shanahan could access all saved files on her new computer. Golinksi offered to train her on accessing files and the floor planning tool, and told tech support to make sure she had complete access.  The meeting concluded with Savino and Golinski recommending an action plan to help Shanahan increase her sales.  The plan

---

[33] Shanahan Dep. 161:7–11.

[34] Email from Shanahan to Golinski, Nov. 7, 2019, 5:27 p.m. (ECF No. 40-27).

[35] Shanahan Dep. 164:3–9.

included completing three home calls per week and moving to next selling steps to close a transaction within five days of a home call.  Shanahan told them that all her concerns were addressed and agreed to the recommended action plan.[36]

After she returned to work, Shanahan experienced significant pain and swelling in her foot.[37]  Her physician recommended she go on medical leave until he re-evaluated her condition in January 2020.[38]  Shanahan informed Savino, via email dated November 21, 2019, that she was taking additional medical leave to complete her recovery.[39]  She explained, "My surgeon . . . expects I will be able to return to work at full strength on January 8."[40]

By letter dated November 26, 2019, Kalina explained to Shanahan that "having the right number of design consultants on the Chadds Ford, PA Design Center team is essential to building the business and due to the fact that you notified Ms. Savino that you will require at least 7 more weeks of leave, I'm sorry to advise you that, although you are not being terminated at this time, we can no longer hold your current position open for you."[41]  Shanahan responded to Kalina pointing out that he did not mention that she had advised Savino on November 21 that she "fully intended to return to work on January 8th . . . [a]nd that [her] doctor expected that [she] would be able to do so without any

---

[36] Decl. of Kate Savino in Supp. of Mot. for Summ. J. of Defs. ¶¶ 8–23 (ECF No. 39-4 at 55–68).

[37] Shanahan Dep. 172:22–173:3

[38] Doctor's Note, Nov. 19, 2019 ("Shanahan was seen by me today (11/19/19).  Based on my evaluation she should not return to work until 1/8/20.  She will be seen by me again for follow up on 1/7/2020, at which point her condition will be re-evaluated.") (ECF No. 40-29).

[39] Email from Shanahan to Savino, Nov. 21, 2019, 1:47 AM ["Shanahan Nov. 21 Email"] (ECF No. 40-30).

[40] Id.

[41] Letter from Kalina to Shanahan, Nov. 26, 2019 ["Kalina Nov. 26 Letter"] (ECF No. 40-17).

restrictions."[42]   Shanahan expressed that she felt like she was "being retaliated against because of [her] medical leave."[43] She received no response.[44]

In a December 20, 2019 email, Savino informed Ramey "that the design consultant position . . . has been filled and is no longer open.  An offer has been accepted and our new hire will begin on 12/27/2019."[45]

Ramey emailed Shanahan on January 2, 2020 after Kalina's November 26, 2019 letter was returned as not deliverable.  She explained that "[a]lthough your position was replaced, you may remain on leave of absence continuing your benefit elections until your short term disability claim . . . concludes."[46]   Shanahan responded the following day, expressing confusion about having been replaced and advising she could return to work on January 8.  She concluded by stating: "I do not understand why you now seem to be informing me that I have been replaced.  Why would I be replaced less than two weeks before I am scheduled to return?  It just makes no sense that after 15 years as a high performer with Ethan Allen that the company could not wait two more weeks for my return. I sincerely hope that there is some sort of misunderstanding, and that I am not being retaliated against for having to take time off due to my medical condition."[47]  Upon receipt, Ramey forwarded Shanahan's email to Kalina.[48]  Ramey did not respond to Shanahan.[49]

---

[42] Email from Shanahan to Kalina, Dec. 9, 2019, 12:04 PM (ECF No. 40-31 at 3).

[43] *Id.*

[44] Email from Shanahan to Kalina, Jan. 7, 2020, 5:23 PM (ECF No. 40-37).

[45] Email from Savino to Ramey, Dec. 20, 2019, 11:11 AM (ECF No. 40-34).

[46] Email from Ramey to Shanahan, Jan. 2, 2020, 10:35 AM (ECF No. 40-31 at 3).

[47] Email from Shanahan to Ramey, Jan. 3, 2020, 8:45 AM (ECF No. 40-31 at 2).

[48] Email from Ramey to Kalina, Jan. 3, 2020, 8:58 AM (ECF No. 40-31 at 2).

[49] Email from Shanahan to Kalina, Jan. 7, 2020, 5:23 PM.

Shanahan's physician cleared her to return to work on January 7, 2020.[50]  That same day she emailed Ramey: "As planned I will be returning to work on January 8.  As you know from previous emails, I had advised [Savino] on November 21st, and . . . Kalina on December 9th, that I would be able to return on this date."[51]

Almost immediately, Kalina responded that returning to work on January 8 was not an option.  He listed four reasons: (1) he had informed her on November 26, 2019 that Ethan Allen could no longer hold her position open; (2) she had been replaced; (3) she had not provided a release from her doctor to return to work on January 8, 2020; and (4) he had invited her to apply for any position for which she was qualified upon clearance to return to work.[52]  Shanahan replied to Kalina, again expressing confusion about being replaced and explaining she could return to work.   She requested that Ethan Allen reevaluate its decision.[53]

Kalina responded to Shanahan on January 8.  He stated: "As previously specified in my letter to you dated November 26, 2019 and . . .  Ramey's email to you dated January 2, 2020 (both attached), we could no longer hold your position for you.  Also as stated in my November 26, 2019 letter, you may apply for any position for which you are qualified."[54]  Although she continued to dispute Ethan Allen's actions, Shanahan asked

---

[50] Doctor's Note, Jan. 7, 2020 ("Shanahan was seen under my care today (1/7/2020) for follow-up care of flatfoot reconstruction.  Upon my evaluation, she is now able to return to work with no restrictions.") (ECF No. 39-4 at 92).

[51] Email from Shanahan to Ramey, Jan. 7, 2020, 4:06 PM (ECF No. 40-36)

[52] Email from Kalina to Shanahan, Jan. 7, 2020, 4:22 PM (ECF No. 40-37).

[53] Email from Shanahan to Kalina, Jan. 7, 2020, 5:23 PM.

[54] Email Correspondence Between Shanahan & Kalina, Jan. 8, 2019, 1:13 PM, 2:12 PM, & 5:11 PM (ECF No. 40-43).

Kalina how to apply for an open position.[55]  Kalina thanked her for acknowledging that Ethan Allen was not holding her job open and provided her the link to view job postings.[56]

Ethan Allen terminated Shanahan's employment on January 8, 2020.[57]  Shanahan later learned that her replacement was significantly younger and not disabled.  Her replacement had worked as a design consultant for Ethan Allen in 2012 and had taken off several years to have a family.

## Standard of Review

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In considering the motion, we must draw all reasonable inferences in the nonmovant's favor.  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).  Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment.  *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted).  Credibility determinations, the drawing of legitimate inferences from facts and the weighing of evidence are matters left to the jury.  *Anderson*, 477 U.S. at 255.

---

[55] *Id.*

[56] *Id.*

[57] DSUF ¶ 105.

**Analysis**[58]

Because Shanahan is proceeding under a pretext theory and does not present any "direct evidence" of discrimination, her claims are governed by the burden-shifting *McDonnell Douglas* analysis. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511 (2002); *Starceski v. Westinghouse Electric Corp.,* 54 F.3d 1089, 1095, n. 4 (3d Cir. 1995). She must first establish a *prima facie* case of discrimination. *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 266 (3d Cir. 2021) (citations omitted); *Capps v. Mondelez Global, LLC*, 847, F.3d 144, 151–52, 156 n.12 (3d Cir. 2017); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Establishing a *prima facie* case of discrimination "is not onerous and poses a burden easily met." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) (internal quotation marks omitted) (quoting *Tex. Dep't of Corr. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)). The determination of whether a *prima facie* case has been established is, under most circumstances, a question of law for the court. *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 347 n.1 (3d Cir. 1999).

If Shanahan succeeds in establishing a *prima facie* case, the burden shifts to the defendants to "'articulate a legitimate nondiscriminatory reason for the adverse employment action.'" *Willis v. UPMC Children's Hosp. of Pitts.*, 808 F.3d 638, 644 (3d Cir. 2015) (quoting *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 412 (3d Cir. 1999)) (further citations omitted). The defendants' burden is "relatively light." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). They can satisfy their burden by "introducing evidence which, taken as true, would permit the conclusion that there was a non discriminatory

---

[58] Relying on the same facts forming the basis for her ADEA and ADA, claims, Shanahan also alleges violations of the PHRA. The ADEA, ADA, and PHRA are coextensive. Therefore, our analysis of Shanahan's ADEA and ADA claims applies equally to her PHRA cause of action. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996); *Slagle v. County of Clarion*, 435 F.3d 262, 265 n.5 (3d Cir. 2006).

reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).   The defendants' burden is one of "production, . . . not persuasion." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123–24 (9th Cir. 2000).   It is not necessary to prove that the proffered reason actually motivated their decision. *Fuentes*, 32 F.3d at 763.   They need only show that the decision could have been motivated by the proffered legitimate, non-discriminatory reason.   *Id.*; *Iadimarco v. Runyon*, 190 F.3d 151, 157 (3d Cir. 1999).

If the defendants satisfy their burden, Shanahan must then produce evidence from which a reasonable factfinder could conclude that the proffered reason for taking the adverse action was merely a pretext for intentional discrimination. *Willis*, 808 F.3d at 644 (citing *Burton*, 707 F.3d at 426–27).   She may discredit the proffered reason by demonstrating "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons." *Willis*, 808 F.3d at 644–45 (citing *Fuentes*, 32 F.3d at 765).   Shanahan may discredit defendants' proffered justification by presenting evidence that she was replaced and terminated for a discriminatory reason.   *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 324 (3d Cir. 2014) (citing *Fuentes*, 32 F.3d at 764).   She can meet her burden by producing evidence from which a factfinder could conclude that the adverse employment action was more likely than not the result of discrimination. *Willis*, 808 F.3d at 645 (citing *Fuentes*, 32 F.3d at 763).

In other words, Shanahan must offer "'evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated

legitimate reasons . . . or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *In re Trib. Media Co.*, 902 F.3d at 402 (quoting *Fuentes*, 32 F.3d at 764); *see also Willis*, 808 F.3d at 644–45.  The final burden of production "merges with the ultimate burden of persuading [the jury] that she has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256.

*Age Discrimination*

To establish a *prima facie* case of age discrimination, a plaintiff must show she: (1) is at least 40 years old; (2) suffered an adverse employment decision; (3) was qualified for her position; and (4) was ultimately replaced by another employee who was sufficiently younger to support an inference of a discriminatory motive.  *Willis*, 808 F.3d at 644 (citations omitted).

Shanahan has made out a *prima facie* case of age discrimination.  She was over forty when she was fired; she was qualified as a design consultant, the position she held; she was terminated from that position; and she was replaced by a significantly younger person.

Defendants have articulated a legitimate nondiscriminatory reason.  They contend they were entitled to replace Shanahan because her FMLA protection had ended and Ethan Allen would continue to suffer an undue hardship by her absence.  They cite a decrease in home call performance, written sales, and repeat business attributable to her absence.

The burden shifts back to Shanahan to produce evidence suggesting Ethan Allen's legitimate, non-discriminatory reason is pretext for age discrimination.  She has not satisfied her burden.  She has not produced any evidence from which a factfinder could

conclude that Ethan Allen replaced her because of her age.  She claims that Ethan Allen's brochures exclusively feature designers under 40 and that Ethan Allen only solicited the youngest employees to represent the company at the Philadelphia Home Show.[59]  There is no evidence to support these accusations.

Shanahan also points to Ethan Allen's pandemic related layoffs.  She claims that Savino laid off the older employees and retained two younger ones with less seniority. Shanahan testified that a designer in his 50s felt he was discriminated when he was laid off during the pandemic despite having seniority and good sales.  Although he still works for Ethan Allen, she claims he transferred to the Connecticut office because he felt Savino favored younger designers.[60]  She did not present deposition testimony or an affidavit from him or anyone else.  She admitted at her deposition that she did not know whether the younger designers had higher sales numbers.[61]

Because Shanahan has not produced any evidence from which a jury could find that Ethan Allen's stated reason for terminating her was pretext, we shall grant summary judgment in favor of the defendants on her age discrimination claim.

*Age Retaliation*

An essential element of a *prima facie* case of retaliation is that Shanahan complained of age discrimination.  *See Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005) (citing *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567–68 (3d Cir. 2002)).  It is undisputed that Shanahan never complained of age discrimination.   Furthermore, she does not respond to the defendants' argument opposing the age retaliation claim.

---

[59] EEOC Charge at 10 (ECF No. 40-16).

[60] Shanahan Dep. 108:3–7, 156:23–159:4.

[61] *Id.* 108:18–22.

Because she has failed to make out a *prima facie* case of age-related retaliation, we shall grant defendants summary judgment on this claim.

*Disability Discrimination*

To make out a prima facie case of disability discrimination, Shanahan must show that she: (1) is "disabled" within the meaning of the ADA; (2) is otherwise qualified to perform the essential functions of the job; and (3) suffered an adverse employment decision because of disability based discrimination.  *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010).

Ethan Allen does not deny that Shanahan was a qualified individual and that she suffered an adverse employment decision.  It contends that she is not disabled and was not regarded as disabled.

Disability

Under the ADA, a person is disabled if she (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of an impairment; or, (3) is regarded as having such an impairment.  *Williams*, 380 F.3d at 762 (citing 42 U.S.C. § 12102(2)).

Shanahan claims that she was both actually disabled and regarded as disabled. She experienced severe foot pain for several years after a 2014 fall and had to take ibuprofen every day.   Her pain worsened to the point where she could barely walk, ultimately requiring her to undergo foot surgery.  According to Shanahan, this evidence is sufficient to establish that she had an actual disability and was regarded as disabled.

Ethan Allen counters that Shanahan's impairment was nothing more than a one-time occurrence with a limited recovery period.  It also argues that her impairment was objectively transitory and minor.

Actual Disability

The time period before Shanahan's surgery is irrelevant.  She worked without complaint.  There is no evidence that she was disabled and had informed Ethan Allen that she had any disability.  Indeed, there is no medical evidence documenting her "severe" foot pain or inability to walk before her request for FMLA leave for her 2019 surgery.  Nor is there any evidence that Ethan Allen was aware of her foot pain or walking difficulties before she applied for FMLA leave.

A plaintiff is actually disabled if she has "a physical or mental impairment that substantially limits [a] major life activit[y]." 42 U.S.C. § 12102(2)(A).  Not every impairment, however, constitutes a "disability" under the ADA.  29 C.F.R. § 1630.2(j)(1)(ii).  To qualify as an actual disability, an impairment must substantially limit a major life activity.  29 C.F.R. § 1630.2g(i).  Here, the major life activities are walking and working.  *See e.g., Sulima v. Tobyhanna Army Depot,* 602 F.3d 177, 185 (3d. Cir. 2010); *see also* 42 U.S.C. § 12102(2)(A).

The ADA does not apply to "transient, nonpermanent condition[s]," *McDonald v. Pa. Dep't of Public Welfare, Polk Ctr.*, 62 F.3d 92, 97 (3d Cir. 1995).  In *McDonald*, the Third Circuit held that because the plaintiff's inability to work due to surgery and subsequent recovery was of limited duration, she did not have a qualifying disability.  *Id.* A "temporary, non-chronic impairment of short duration" is not a disability under the ADA.

*Macfarlan v. Ivy Hill, SNF, LLC*, 675 F.3d 266, 274–75 (3d Cir. 2012) (quoting *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002)).

Shanahan had right foot surgery in July 2019 followed by a recovery period during which her ability to walk was limited.  By October 24, 2019, she had "improved to about 80% normal function."[62]  She was fully recovered by January 7, 2020, reporting that "[s]he traveled over the holidays, and feels like her right foot is brand new."[63]  Because her impairment was of limited duration and only temporary, it is not a disability under the ADA. *Macfarlan*, 675 F.3d at 274–75.

Regarded As

Even though she does not have an actual disability, an employee may be deemed disabled if her employer regarded her as having an impairment.  42 U.S.C. § 12102(1)(C). In other words, if the employer perceives the employee as having a physical or mental impairment though she does not, the employer may be liable for discrimination. *Eshleman v. Patrick Industries, Inc.*, 961 F.3d 242, 245 (3d Cir. 2020).  It is employer's "reactions and perceptions," not the employee's actual disabilities that is the focus of the regarded as inquiry.  *Kelly v. Drexel Univ.*, 94 F.3d 102, 108–09 (3d Cir. 1996).  Thus, to determine whether the employer regarded an employee as disabled, we consider how the employer responded to information it had regarding the plaintiff's condition.  *Buskirk v. Apollo Metals, Inc.*, 307 F.3d 160, 167 (3d Cir. 2002).

Ethan Allen knew that Shanahan took FMLA leave from July 5 to September 27, 2019.  It anticipated that she would be cleared to work at the end of her FMLA leave.

---

[62] ATI Progress Note (ECF No. 39-4 at 80).

[63] Temple Univ. Treatment Note (ECF No. 39-4 at 86).

However, on September 23, 2019, Shanahan requested an extension of her leave until November 11, 2019, at which time her surgeon would assess her ability to return to work.

Savino, concluding that Shanahan's absence caused a decrease in written business, home call performance, and repeat business, recommended Ethan Allen no longer hold Shanahan's position open. Ethan Allen informed Shanahan repeatedly that her FMLA protection had ended on September 27, 2019, and it could no longer hold her current position for her.

Shanahan briefly returned to work in November 2019. Ethan Allen was aware of her physician-imposed restrictions. Although it accommodated those restrictions, it still expected her to perform "all necessary functions of a design consultant."[64]

On November 19, 2019, Shanahan's surgeon recommended that she not return to work at least before January 8, 2020, and that he would reevaluate her condition on January 7, 2020. Two days later, Shanahan emailed Ethan Allen that she was "returning to medical leave effective immediately in order to complete [her] recovery."[65] Attaching her surgeon's note, she advised that he "expects [she] will be able to return to work at full strength on January 8."[66] Shanahan added: "I want to let you know how much I appreciate your understanding and telling me that I should return to medical leave if I needed to."[67]

---

[64] Ramey Oct. 23 Email.

[65] Shanahan Nov. 21 Email. Shanahan testified that she returned to medical leave because she "was having problems with [her] foot and where the stitches area were, where the excisions were, where the plates were, it was all inflamed and [she] couldn't get [her] foot to go back down and it was difficulty [sic] walking and using [her] scooter around the design center." Shanahan Dep. at 168:11–17.

[66] Shanahan Nov. 21 Email.

[67] *Id.*

Ethan Allen responded on November 26 by again informing Shanahan that her FMLA leave had ended and her current position was no longer open.  On December 9, she replied that she fully intended to return to work on January 8 without restriction.

Nonetheless, Ethan Allen replaced Shanahan on December 20, 2019.  Her replacement started on December 27, 2019, less than two weeks before she was to return to work.  Given these undisputed facts, a jury could find that the defendants perceived her as disabled and replaced her based on that perception.

Establishing that the employer perceived the impairment as disabling is not enough.  The perceived impairment must also be more than "transitory and minor."  42 U.S.C. § 12102(3)(B).  Transitory and minor are distinct, not synonymous, elements.  Both must be satisfied.

Whether an impairment is "transitory and minor" is an objective inquiry.  *Eshleman,* 961 F.3d at 249; *see also* 29 C.F.R. § 1630.15(f).  Although the term "transitory" is statutorily defined, "minor" is not.

Section 12102(3)(B) defines a transitory impairment as "an impairment with an actual or expected duration of 6 months or less."  42 U.S.C. § 12102(3)(B).  Put differently, a perceived impairment is not transitory if it is expected to last, or actually lasts, more than six months.  *See Interpretive Guidance on Title I of the Americans with Disabilities Act,* 29 C.F.R. Pt. 1630.15(f) App. (2016) ("For example, an individual who is denied a promotion because he has a minor back injury would be 'regarded as' an individual with a disability if the back impairment lasted or was expected to last more than six months").

Shanahan's impairment was more than transitory.  She had foot surgery on July 5, 2019.  Her physician did not clear her for full duty until January 7, 2020.  Her impairment lasted six months and two days.  Hence, it was not transitory.

To determine whether an impairment is minor, we analyze such factors as "the symptoms and severity of the impairment, the type of treatment required, the risk involved, and whether any kind of surgical intervention is anticipated or necessary—as well as the nature and scope of any post-operative care."  *Eshleman,* 961 F.3d at 249.

We must determine whether the foot injury, requiring surgery and several months of recovery, is objectively minor.  Shanahan underwent foot surgery on July 5, 2019.  Her recovery involved several months of physical therapy and use of a medical walking boot.  She was unable to do her job and was not cleared for full duty until January 7, 2020.  We conclude her impairment was not minor.

Ethan Allen's response to the information it had about Shanahan's condition and inability to do her job with or without accommodation and her medical leave of absence supports the reasonable inference that it regarded her as disabled.

<u>Failure to Accommodate</u>

To make out a claim for failure to accommodate a disability, Shanahan must produce evidence that: "(1) [s]he was disabled and h[er] employer knew it; (2) [s]he requested an accommodation or assistance; (3) h[er] employer did not make a good faith effort to assist; and (4) [s]he could have been reasonably accommodated."  *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (quoting *Armstrong v. Burdette Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)) (additional citations omitted).

As discussed previously, Shanahan has not established that she had an actual disability.  "[A]n individual who demonstrates that she is 'regarded as' disabled, but who fails to demonstrate that she is actually disabled, is not entitled to a reasonable accommodation."  *Robinson v. First State Community Action Agency*, 920 F.3d 182, 186 (3d Cir. 2019) (citations omitted).  Therefore, we shall grant summary judgment on the failure to accommodate claim.

*Disability Retaliation*

To establish a *prima facie* case of ADA retaliation, Shanahan must prove: (1) she engaged in a protected activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action.  *E.E.O.C. v. Allstate Ins. Co*., 778 F.3d 444, 449 (3d Cir. 2015) (quoting *Fogleman v. Mercy Hosp. Inc*., 283 F.3d 561, 567–68 (3d Cir. 2002)).  Retaliation claims, unlike disability discrimination claims, do not require a finding of disability.  *Krouse v. Am. Sterilizer Co*., 126 F.3d 494, 502 (3d Cir. 1997).  To support a retaliation claim, the plaintiff need only have a good faith belief that she was disabled. *Shellenberger v. Summit Bancorp, Inc*., 318 F.3d 183, 191 (3d Cir. 2003).

A good faith request for a reasonable accommodation is protected activity for purposes of ADA retaliation.  *Id*.; *see also Sulima*, 602 F.3d at 188.  Leave for a medical condition may be considered a request for a reasonable accommodation.  *See e.g., Doe v. Triangle Doughnuts, LLC,* 472 F. Supp. 3d. 115, 140–41 (E.D. Pa., July 16, 2020) (denying motion to dismiss retaliation claim against HIV-positive employee when medical leave request was "denied and she ended up going into work while sick").

Shanahan requested three accommodations to return to work on November 1, 2019.  Those accommodations were: (1) she wear a medical walking boot on her right (operative) foot for a portion of the day and a sneaker on her left (nonoperative) foot; (2) she use a medical scooter as required when interacting with clients; and (3) she ice her foot periodically throughout the day as required.  She informed Ramey that she "believe[d] that these accommodations are reasonable and . . . [were] the only accommodations [she] need[ed] to perform [her] job."[68]   Shanahan's request was granted.

She also requested short term disability leave on November 21, 2019.  She informed Savino that "[i]n light of the events since [her] return and [her] doctor's advice, [she] w[ould] be returning to medical leave effective immediately in order to complete [her] recovery."[69]   Five days later, Ethan Allen told her it could no longer hold her position open.[70]   In response, she emailed Kalina that she felt she was "being retaliated against because of [her] medical leave."[71]  Her good faith requests for accommodations and leave were protected conduct.

There is no dispute that Ethan Allen took an adverse employment action after Shanahan's request for accommodation and medical leave.  Indeed, it replaced her on December 20, 2019, and terminated her employment on January 8, 2020.

A plaintiff may establish a causal connection through the "unusually suggestive temporal proximity" of the adverse action to the protected activity, "a pattern of antagonism coupled with timing," or other facts supporting an inference of causation.

---

[68] Shanahan & Ramey Oct. 23 Emails.

[69] Shanahan Nov. 21 Email.

[70] Kalina Nov. 26 Letter.

[71] Email from Shanahan to Kalina, Dec. 9, 2019.

*Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).  Two days and ten days have been found sufficient to establish causation.  *See, e.g., Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989); *Shellenberger*, 318 F.3d at 189.  Two or three months is not unduly suggestive.  *LeBoon v. Lancaster Jewish Community Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007); *Williams v. Phila. Housing Auth. Police Dept.* 380 F.3d 751, 760 (3d Cir. 2004).

Shanahan was replaced approximately two months after her accommodation request and one month after her medical leave request.  She was terminated approximately two and a half months after her accommodation request and a month and a half after her medical leave request.

Where "the temporal proximity is not so close as to be unduly suggestive," the more appropriate test is "timing plus other evidence. . . ."  *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 513 (3d Cir. 2003)).  Other evidence includes "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus."  *LeBoon*, 503 F.3d at 232–33 (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279–81 (3d Cir. 2000)).

Despite granting Shanahan's accommodation request, Ethan Allen still expected her to perform "all necessary functions of a design consultant"[72] notwithstanding her physician-imposed restrictions.  Ramey justified this expectation by telling Shanahan that her "doctor's note doesn't address the physical requirements involved with home

---

[72] Ramey Oct. 23 Email.

consultations and tasks within the design center.  Some of those include driving, navigating stairs, driveways or hills in addition to measuring lifting fabric boards, carpet samples etc."[73]  Ethan Allen also imposed inflated and unattainable benchmarks and insisted on a more strenuous work schedule.  A reasonable jury could find that these actions, taken after she complained, were calculated to force Shanahan out by requiring her to perform tasks it knew she could not do.

Shanahan had to take medical leave again.  Five days later, Ethan Allen notified her that it would no longer hold her position open.  It hired her replacement less than a month later and less than two weeks before she was to return.  A reasonable jury could find a causal connection between Shanahan's requests and her termination.  Thus, she has established a *prima facie* case of retaliation.

Shanahan has carried her burden to discredit defendants' proffered justification and presented evidence that she was replaced and terminated because of her request for accommodation.  There is evidence that the defendants engaged in conduct calculated to doom her to failure.  Although defendants appeared to accommodate her, they still expected Shanahan to perform tasks that required more than her physician allowed.  They imposed inflated and unattainable benchmarks and a strenuous new work schedule.  They replaced her two weeks before her return date.  This evidence is sufficient for a jury to find that the defendants unlawfully retaliated against Shanahan for requesting an accommodation and complaining about her treatment.

---

[73] Shanahan & Ramey Oct. 23 Emails.

*FMLA Retaliation*

To make out a *prima facie* case of FMLA retaliation, Shanahan must show that: (1) she took FMLA leave; (2) she suffered an adverse employment decision; and (3) there is a causal link between the two. *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 256 (3d Cir. 2014) (citations omitted).

Shanahan was granted FMLA leave. Her FMLA leave ended on September 27, 2019. Heeding her physician's advice, she requested to extend her leave of absence to November 11, 2019. While on leave on October 7, 2019, she was informed that her current position would no longer be held open for her. To avoid losing her job, she returned to work on November 1, 2019, with medical restrictions. Her physician recommended a third medical leave beginning on November 19, 2019. A week after beginning that leave, Shanahan was again informed that her position would not be held open for her. Less than a month later and three months after her FMLA leave ended, she was replaced. Two and a half weeks later, she was terminated.

Shanahan has introduced evidence to suggest Ethan Allen's reasons for replacing her were pretext for FMLA retaliation. Although Savino attributed undue hardship in the Chadds Ford store to Shanahan's absence, she admitted at her deposition that there could have been other contributing factors not related to Shanahan's absence, such as the inability of other designers to relate to clients on their first visit, designer-customer conflicts during a project, price concerns, and preference for another furniture company. That testimony, coupled with Savino's admission that it takes three to six months of training and Ethan Allen's decision to replace Shanahan two weeks before her termination, may give rise to an inference of a causal connection between Shanahan's

FMLA leave and her termination.  Therefore, because a jury could find that the defendants retaliated against Shanahan for taking FMLA leave, we shall deny summary judgment on this claim.

*Hostile Work Environment*

A "hostile workplace" exists when a workplace is permeated with discriminatory intimidation, ridicule and insult so severe or pervasive as to alter the terms and conditions of the plaintiff's employment and create an abusive work environment.  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  A hostile work environment claim does not exist by itself.  It must be related to discrimination under the ADEA or ADA.  *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), *overruled on other grounds by Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006); *Sampson v. Methacton Sch. Dist.*, 88 F. Supp. 3d 422, 445 (E.D. Pa. 2015).

To succeed on a hostile work environment claim, Shanahan must establish that (1) she suffered intentional discrimination because of her protected status; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of respondeat superior liability. *Mandel v. M & Q Packaging Corp.,* 706 F.3d 157, 167 (3d Cir. 2013) (citing *Jensen*, 435 F.3d at 449).  The first four elements establish a hostile work environment, and the fifth determines employer liability.  *Id.* (citing *Huston v. Procter & Gamble Paper Prods. Corp.,* 568 F.3d 100, 104 (3d Cir. 2009)).

The work environment must have been objectively hostile or abusive and Shanahan must have perceived it as hostile or abusive.  *Harris*, 510 U.S. at 22.

Determining whether a work environment is hostile or abusive requires us to look at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

Shanahan cites eight instances of harassment by defendants that she contends created a hostile work environment: (1) demanding she work five days in a row instead of her previous three days; (2) expecting she perform heavy physical labor despite her restrictions; (3) refusing to support or assist her with developing business practices to generate business; (4) delaying her computer access; (5) redistributing her work and clients to other design consultants; (6) imposing inflated and unattainable benchmarks; (7) demanding she repay a deficit that was not her fault; and (8) failing to alleviate her concerns or aid with the issues she raised during the November 2019 meeting with Savino and Golinski.

Defendants' conduct could be seen as having interfered with Shanahan's work performance and having altered the conditions of her employment.  Whether the conduct was so "severe or pervasive" as to amount to a hostile work environment is another matter.  Was it retaliatory?  There is evidence to suggest that it was.  But, was it objectively hostile or abusive?  That remains to be seen.  Such inquiries are reserved for the jury. Therefore, we shall deny summary judgment on the hostile work environment claim.

### *Individual Liability*

The PHRA makes it unlawful for "any person ... to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory

29

practice." 43 P.S. § 955(e).  Coworkers cannot be held liable under section 955(e), but supervisors can be.  *Dici v. Pennsylvania*, 91 F.3d 542, 552–53 (3d Cir. 1996).

A jury could find Savino individually liable.  Shanahan reported to Golinski who reported to Savino.  Savino recommended that the company no longer hold her position open.  Savino was involved in the decision-making regarding Shanahan's return to work, subsequent leave, and ultimate replacement.

The same cannot be said for Kalina, the Manager of Compensation and Benefits.  He was not Shanahan's supervisor.  His involvement in Shanahan's replacement and ultimate termination was administrative.  Kalina did no more than follow Ethan Allen's short-term leave policies and inform Shanahan of Ethan Allen's decisions.  There is no evidence of his involvement in the actual decision to replace and terminate Shanahan.  He was a messenger.  Thus, we shall grant summary judgment in favor of Kalina.

*Punitive Damages*

Punitive damages are not recoverable under the ADEA, FMLA, and PHRA.  Nor are they available for ADA retaliation claims.  They are, however, recoverable under the ADA where an employer has engaged in intentional discrimination "with malice or with reckless indifference to [the employee's] federally protected rights. . . ."  42 U.S.C. § 1981 a(b)(1).  Shanahan may present evidence showing that the defendants acted with reckless indifference to her rights.  At this point, we decline to dismiss the request for punitive damages.

*Demand for Jury Trial*

Because her surviving claims involve legal and equitable claims, Shanahan is entitled to a jury trial. *Ross v. Bernhard*, 396 U.S. 531, 537–38 (1970). Therefore, defendants' motion to strike the jury demand will be denied.

*Mitigation of Damages*

Defendants argue that Shanahan's failure to accept an offer of employment and her acknowledgement that her employment with Ethan Allen would have been laid off during the pandemic precludes her from seeking back pay or front pay.

Shanahan counters that the evidence demonstrates that she sought new employment and mitigated her damages. She claims that she immediately checked Ethan Allen's job postings after Kalina told her she could return to an open position. There were no openings in Chadds Ford or other locations near her home. Shanahan continued to check with Ethan Allen at least once a month. She also looked for other jobs in the interim. Her job search involved talking to fellow designers, subscribing to Glassdoor, and speaking with Calico Corners, Bassett Furniture, Pala Brothers, and Johnny Janosik. Pala Brothers offered Shanahan a job, which she did not accept because the offer did not include health insurance. She was also offered a job with Johnny Janoski but that offer did not pan out due to the pandemic. Shanahan was unable to get a job during the pandemic. When companies started rehiring and after she was vaccinated, Shanahan resumed her job search. She eventually accepted a job at Blinds to Go.

Determining whether Shanahan mitigated her damages involves credibility determinations that are reserved for the jury. Therefore, summary judgment is inappropriate.

**Conclusion**

We shall grant the defendants' motion for summary judgment in part and deny it in part.  We shall grant the motion to the extent it requests judgment on Tamara Shanahan's claims for age discrimination, age retaliation, disability discrimination based on an actual disability, failure to accommodate, and Robert Kalina's individual liability.  We shall deny it with respect to the remaining claims.